No. 25-1426

IN THE

# United States Court of Appeals for the Federal Circuit

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD.;
WUHAN CHINA STAR OPTOELECTRONICS
SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD.;
TIANMA MICROELECTRONICS CO. LTD.; VISIONOX TECHNOLOGY, INC.,
*Appellants*,

*v.*

SAMSUNG DISPLAY CO., LTD.,
*Appellee.*

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board No. IPR2023-00941

**OPENING BRIEF OF APPELLANTS MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD.; WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD.; TIANMA MICROELECTRONICS CO. LTD. AND VISIONOX TECHNOLOGY, INC.**


Travis Jensen
Bas de Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Xiang Wang
ORRICK, HERRINGTON & SUTCLIFFE LLP
Number 1 Jianguomenwai Avenue
5701 China World Tower A
Beijing, Beijing 100004
People's Republic of China

Melanie L. Bostwick
Jonas Q. Wang
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

Richard Martinelli
Joseph R. Kolker
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

*Counsel for Appellants*

## CLAIM LANGUAGE AT ISSUE

### U.S. Patent No. 7,414,599, Representative claims 7 and 14

**7.** A pixel circuit in an organic light emitting device, comprising:

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for programming the data signal voltage and for generating a driving current in response to a programmed data signal when light is emitted;

a third transistor for providing the data signal voltage for the second transistor in response to the current scan signal;

a capacitor for maintaining the data signal voltage programmed onto the second transistor;

a fourth transistor for delivering a power supply voltage to the second transistor when the light is emitted;

a fifth transistor for delivering the driving current, provided from the second transistor, in response to the data signal voltage when the light is emitted; and

an electroluminescent element for emitting light corresponding to the driving current delivered through the fifth transistor,

wherein the third transistor connects the second transistor in the form of a diode in response to the current scan signal so that the second transistor detects and compensates its threshold voltage deviation in itself.

**14.** A pixel circuit in an organic light emitting device, comprising:

an electroluminescent element for emitting light in response to an applied driving current;

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for generating a driving current to drive the electroluminescent element in response to the data signal voltage;

a third transistor for connecting the second transistor in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor;

a capacitor for storing the data signal voltage delivered to the second transistor;

a fourth transistor for delivering a power supply voltage to the second transistor in response to a current light-emitting signal; and

a fifth transistor for providing the driving current, provided from the second transistor, for the electroluminescent element in response to the current light-emitting signal.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1426

**Short Case Caption** Mianyang BOE Optoelectronics Technology Co., Ltd. v. Samsung Display Co., Ltd.

**Filing Party/Entity** Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co., Ltd.; Visionox Technology, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/19/2025

Signature: /s/ Melanie L. Bostwick

Name: Melanie L. Bostwick

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Mianyang BOE Optoelectronics Technology Co., Ltd. | | |
| Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd. | | |
| Tianma Microelectronics Co., Ltd. | | |
| Visionox Technology, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Johannes Hsu | K. Patrick Herman | Donald Daybell |
| Tyler Miller | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

**Page**

CLAIM LANGUAGE AT ISSUE .......... i
CERTIFICATE OF INTEREST .......... iii
TABLE OF AUTHORITIES .......... viii
STATEMENT OF RELATED CASES .......... xi
INTRODUCTION .......... 1
JURISDICTIONAL STATEMENT .......... 3
STATEMENT OF THE ISSUES .......... 3
STATEMENT OF THE CASE .......... 4
By The Early 2000s, Inventors Had Developed Pixel Circuit Technology Addressing Brightness Irregularities In OLED Displays .......... 4
Samsung Obtains The ’599 Patent, Which Also Addresses Display Nonuniformity For OLEDs .......... 11
Samsung Asserts The ’599 Patent, And BOE Pursues Inter Partes Review .......... 16
The Board Institutes Review, Finds BOE Has Persuasively Demonstrated Grounds For Unpatentability, And Invites BOE To Develop The Record On Certain Issues .......... 24
The Board Holds None Of The Challenged Claims Unpatentable .......... 28
SUMMARY OF ARGUMENT .......... 33
STANDARD OF REVIEW .......... 36
ARGUMENT .......... 37
I. The Board Erred In Finding That An All-pMOS Modification Was Not Obvious. .......... 37
A. The Board erred in its rejection of interchangeability as to Transistor 3. .......... 38

1. The Board erred in failing to find that Transistor 3 is a switching transistor. ............... 38

2. The Board erred in finding that leakage concerns would discourage a skilled artisan from modifying Transistor 3 from nMOS to pMOS................................................................. 43

B. The Board further erred in rejecting evidence of manufacturing benefits............................................... 55

II. The Board Erred In Finding That Kimura Does Not Render Obvious The "Shared Control Of Two Transistors." ..................................................................... 60

A. The Board erred in finding that BOE's petition failed to disclose a complete theory under Kimura's Figure 36. .................................................................. 62

1. BOE's petition relied on Kimura's Figure 36 to meet the shared control limitation. .................... 62

2. The Board erred in finding that BOE's reply relying on Kimura's Figure 36 represented a new direction. ..................................................... 69

B. The Board erred in denying BOE's motion to submit supplemental information regarding shared control........................................................... 73

III. The Board Abused Its Discretion In Denying BOE's Motion To Submit Supplemental Information. .................... 76

CONCLUSION ......................................................................... 79

ADDENDUM

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Altaire Pharms., Inc. v. Paragon Bioteck, Inc.*,
889 F.3d 1274 (Fed. Cir. 2018) .............................................. 45, 48, 60

*AMC Multi-Cinema, Inc. v. Fall Line Pats., LLC*,
No. 21-1051, 2021 WL 4470062 (Fed. Cir. Sept. 30, 2021) .......... 60, 78

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020) ..........................37, 60, 71, 72, 75, 77, 78

*Apple Inc. v. Gesture Tech. Partners, LLC*,
129 F.4th 1367 (Fed. Cir. 2025) ......................................................... 42

*Applications in Internet Time, LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018) .................................................... 38, 40

*Bayer Pharma AG v. Watson Lab'ys, Inc.*,
874 F.3d 1316 (Fed. Cir. 2017) ....................................... 44, 51, 53, 55

*Beckson Marine, Inc. v. NFM, Inc.*,
292 F.3d 718 (Fed. Cir. 2002) ........................................................... 42

*Campbell Soup Co. v. Gamon Plus, Inc.*,
10 F.4th 1268 (Fed. Cir. 2021) ........................................................... 36

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1938) ........................................................................... 36

*Ericsson Inc. v. Intell. Ventures I LLC*,
890 F.3d 1336 (Fed. Cir. 2018) ....................................... 43, 48, 51, 57

*Everstar Merch. Co. v. Willis Elec. Co.*,
No. 21-1882, 2022 WL 1089909 (Fed. Cir. Apr. 12, 2022) ........... 60, 77

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .................................................... 36, 43

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) .......... 52

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023) .......... 55, 57

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 784 (Fed. Cir. 2021) .......... 51

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......... 42, 51, 55, 68

*Netflix, Inc. v. DivX, LLC*,
80 F.4th 1352 (Fed. Cir. 2023) .......... 67, 68

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) .......... 73

*PAR Pharm., Inc. v. TWI Pharm., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) .......... 51, 52, 53, 55

*In re Paulsen*,
30 F.3d 1475 (Fed. Cir. 1994) .......... 54

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) .......... 38, 40

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022) .......... 65, 67, 73

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
856 F.3d 1019 (Fed. Cir. 2017) .......... 36

*In re Thrift*,
298 F.3d 1357 (Fed. Cir. 2002) .......... 41

*Application of Tomlinson*,
363 F.2d 928 (C.C.P.A. 1966) .......... 42

*Ultratec, Inc. v. CaptionCall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017) .......... 36, 45, 48

## Statutes

5 U.S.C. § 706 .......... 36

28 U.S.C. § 1295(a)(4)(A) .......... 3

35 U.S.C. § 141(c) .......... 3

35 U.S.C. § 142 .......... 3

35 U.S.C. § 311(a) .......... 3

35 U.S.C. § 319 .......... 3

## Rules and Regulations

37 C.F.R. § 90.3(a)(1) .......... 3

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding was previously before this or any other appellate court.

This Court's decision may directly affect or be directly affected by the following cases that involve the same patent that is at issue in this appeal: *In the Matter of Certain Active Matrix Organic Light-Emitting Diode Display Panels and Modules for Mobile Devices and Components Thereof*, Inv. No. 337-TA-1351 (U.S.I.T.C.), *petition for review pending*, *Samsung Display Co., Ltd. v. International Trade Commission*, No. 25-___ (Fed. Cir.); *Samsung Display Co., Ltd. v. BOE Technology Co., Ltd. et al.*, No. 2:23-cv-00309-JRG-RSP (E.D. Tex.).

## INTRODUCTION

In this inter partes review proceeding, BOE[1] presented a well-grounded case of single-reference obviousness. Samsung's U.S. Patent No. 7,414,599 and the prior-art Kimura reference are both addressed to the same problem: brightness irregularities that result in light-emitting devices, such as organic light-emitting diode (OLED) display screens, due to manufacturing variations that occur in the transistors that drive each pixel in the display. And both the '599 patent and Kimura solve this problem in the same way: using a circuit design that allows for self-compensation of the threshold voltage of the driving transistor, so that variations in those threshold voltages across pixel circuits do not result in undesirable nonuniformity from pixel to pixel.

There is no dispute that Kimura disclosed the self-compensation technique at the heart of the '599 patent. Yet the Board upheld all of the challenged claims, based on an analysis beset by procedural and substantive errors. The Board primarily rejected BOE's obviousness

[1] Petitioners included Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co. Ltd. and Visionox Technology, Inc. For simplicity, we refer to petitioners as "BOE."

showing because it found a lack of motivation to modify the polarity of one transistor in the circuit—even though many challenged claims do not even specify the polarity of that transistor, and despite an overwhelming evidentiary showing that such a modification was a routine substitution, as both the '599 patent and Kimura confirm. The Board reached its contrary conclusion only by ignoring record evidence, misapplying the law, and preventing BOE from further developing an already extensive record on this key issue after the Board itself had invited development.

The Board further erred with respect to a subset of the challenged claims, which require shared control of two specific transistors in a circuit. Here the Board plainly misread BOE's petition and demanded that BOE prove a theory that it unquestionably was not advancing. The Board might have been better able to understand BOE's theory had it not again erred in rejecting BOE's attempts to provide clarification (and respond to Samsung's mischaracterizations)—again after specifically inviting development on this issue.

Because the Board's findings are infected with legal and procedural error and are not supported by substantial evidence, this

Court should vacate and remand for a proper consideration of BOE's obviousness challenge.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction of the inter partes review proceeding under 35 U.S.C. § 311(a). The Board issued its final written decision on December 6, 2024. Appx1-57. BOE timely filed a notice of appeal from that decision on February 6, 2025. *See* Appx932-936; 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

## STATEMENT OF THE ISSUES

**I.** Whether the Board erred in rejecting BOE's obviousness showing because BOE relied on a modified version of the prior-art circuit to consist of all pMOS transistors (rather than some pMOS and some nMOS), as is required by some (but not all) challenged claims, when the Board (1) ignored BOE's evidence for why this was a simple and obvious substitution; (2) misapprehended BOE's showing of why this substitution was beneficial; and (3) abused its discretion in denying BOE's motion to supplement the record after the Board invited further factual development.

**II.** Whether the Board erred in concluding that Kimura does not render obvious the "shared control of two transistors," as several challenged claims require, when it (1) faulted BOE for not addressing a theory that BOE expressly was not advancing and (2) ignored BOE's reply argument and rejected its supplemental evidence that would have directly addressed the Board's confusion on this issue, again after inviting BOE to provide clarification.

**III.** Whether the Board abused its discretion in denying BOE's motion to supplement with respect to a third factual dispute that the Board did not reach on the merits but that will be relevant should this Court remand.

## STATEMENT OF THE CASE

### *By The Early 2000s, Inventors Had Developed Pixel Circuit Technology Addressing Brightness Irregularities In OLED Displays.*

This case involves technology that enables pixel circuits in an organic light-emitting diode (OLED) display to emit light uniformly from pixel to pixel. OLED displays are made up of a matrix of individual pixels. Each pixel includes a light-emitting diode—an element that emits light in response to electrical current—as well as

driving circuitry that supplies current to the diode. Appx82-83; Appx1065-1068. The brightness of an LED's output is a function of the current flowing through it. Appx1065-1067. This means that variations in the driving circuitry from pixel to pixel can cause undesirable differences in brightness across the OLED display. Appx1066-1067; Appx1083-1084; *see* Appx94; Appx65 1:38-50; Appx990 [0359].

A key component of the pixel circuitry that causes LED brightness variability is the transistor. Appx1051-1052. A transistor is a semiconductor device that can perform an analog function (akin to controlling how much water flows through a faucet) or a digital function (acting as on/off switch) for electrical signals. Appx1047. Within a pixel circuit, for instance, transistors send the signals to turn on and off an LED and to power its brightness. When functioning as a switch to control the operation of a pixel, a transistor is referred to as a "switching transistor." Appx84; Appx1067-1068. When functioning to supply current for an LED, a transistor is referred to as a "driving transistor." Appx1068. In either case, the transistor itself will have a particular voltage value, known as the "threshold value," that

determines when the transistor turns "on." Appx1055. Even with a well-controlled manufacturing process, statistical variations will occur in the threshold values of individual driving transistors—and, in turn, the brightness of the pixels driven by those transistors will vary. Appx1062; *see* Appx1056-1061; Appx1084.

Innovators understood this problem in the 1990s and 2000s, when OLEDs were hitting the commercial market. *See* Appx1879 (citing Appx1882); Appx3265. In 2002, for example, inventors Hajime Kimura and Yoshifumi Tanada submitted a patent application addressing the "[b]rightness irregularities that develop in a light emitting device due to [d]ispersion among pixels in the threshold values of TFTs [thin-film transistors] used for supplying electric current to light emitting devices." Appx937; *see* Appx990 [0359]. This application, known as the "Kimura" reference, was published in July 2003. Appx937-1021.

Kimura discloses a way to "offset" uneven "threshold values of the TFTs among pixels." Appx937. It describes a "semiconductor device and driving method thereof," directed at "provid[ing] a light emitting device using as a pixel a semiconductor device that is capable of correcting dispersion in TFT threshold values." Appx937; Appx992

[0378]. That correction is accomplished through a pixel circuit design that allows for self-compensation of the driving transistor's threshold voltage.

Transistors have three terminals: a source, a drain, and a gate. Current generally flows through a transistor either from source to drain or vice versa (depending on the transistor's polarity), with voltage at the gate controlling the flow of current. Appx1047-1048; Appx1050. In a "diode-connected" configuration, the gate of a transistor is directly connected to either the source or the drain of that same transistor. Appx1063-1064. This simple configuration allows the voltages of two transistor terminals to always be the same. Appx1064.

Kimura's ninth embodiment, depicted in Figures 33A-33E ("Figure 33," for shorthand) makes use of that diode-connected configuration. Appx970; Appx1011 [0654]-[0660]. Figure 33 depicts a pixel circuit with an LED, referred to as the "electroluminescent device" (element 3313), and five transistors (elements 3306-3310, annotated with labels from 1 through 5):




Appx96.

As shown in Figure 33A above, Transistor 3 connects the gate and drain of driving Transistor 2. Appx19; Appx1011 [0654]. Transistor 2 therefore exhibits the behavior of a diode-connected TFT when Transistor 3 is on. Appx1011 [0654]. Making use of the diode-connectedness, Kimura discloses three operational modes to achieve the self-compensating technology that solves for the problem of threshold voltage variation. Those modes are: (1) initialization; (2) programming; and (3) light emission. Appx953 (Fig. 16B) (showing "erasure" and "initialization"; "input image signal," that is, programming; and

“sustain,” that is light emission); *see* Appx96; Appx995 [0427]-[0428]; Appx1089-1098.

During initialization, Kimura’s circuit is reset to a baseline mode of operation. Transistor 5 “eras[es]” the voltage of the capacitor (element 3311), which stores a charge, to a default value. Appx1011 [0658]; Appx95; Appx98-99; *see* Appx1041.

During programming, a current flows through Transistors 1, 2, and 3 to program the capacitor to a desired voltage. When Transistor 3 is on, it connects the gate and drain of Transistor 2 in the form of a diode. Appx1139. That diode connection allows the pixel’s capacitor to store a voltage calibrated to Transistor 2’s threshold voltage. Appx1092-1094; *see* Appx1086-1087; Appx1041; Appx1135. This allows for the self-compensation of any variances in Transistor 2’s threshold voltage. Appx96-97; Appx1011 [0655], [0657]; Appx1094-1095; *see* Appx1087-1088.

During light emission, the self-compensated voltage stored on the capacitor activates Transistor 2 to produce a driving current. Appx97; Appx1011 [0655]-[0656]. Transistors 2, 4, and 5, now on, provide a current path through the electroluminescent light-emitting element,

causing light emission. Appx97; Appx1011 [0656]. The programmed voltage applied to Transistor 2 ensures that a given pixel emits the desired level of brightness intensity. Through this choreography, Kimura provides for light emission to occur at Transistor 2's self-compensated voltage, ensuring brightness uniformity. Appx1088-1098.

Kimura also discloses a different version of the Figure 33 circuit, in an embodiment depicted in Figure 36. Appx973 (Figs. 36A-36E); Appx1011 (describing embodiment eleven). Whereas Figure 33B shows the fourth and fifth transistors controlled by different signals, so that one of those transistors is off while the other is on, Figure 36 shows that the fourth and fifth transistors are always off or on together, across all operation states of initialization (Fig. 36B), programming (Figs. 36C-D), and light emission (Fig. 36E). Appx1161-1162; Appx970; Appx973. Kimura explains that reducing the number of control lines, as Figure 36 does, improves aperture ratio (that is, the area of a pixel that emits light relative to the area occupied by wiring and other components). Appx995; Appx1162. Apart from those changes, Figure 36 otherwise operates in all relevant respects in the same manner as the three-step choreography described above. Appx616-619; Appx95 n.3.

***Samsung Obtains The '599 Patent, Which Also Addresses Display Nonuniformity For OLEDs.***

Around the time of Kimura, Samsung was also working to address the problem of display nonuniformity. From a Korean patent application filed in July 2003, Samsung ultimately obtained U.S. Patent No. 7,414,599, titled "Organic Light Emitting Device Pixel Circuit and Driving Method Therefor." Appx58.[2]

Like Kimura, the '599 patent is directed to a pixel circuit in an OLED display that self-compensates the threshold voltage of a pixel's driving transistor. Appx128-129. The '599 patent likewise addresses the problem of "display nonuniformity" caused by "threshold voltage deviations between pixels." Appx65 1:40-50. It recognizes that "the threshold voltage" of a driving transistor "changes depending on manufacturing," which results in a "voltage de[vi]ation problem," "lead[ing] to a change in the current flowing through the EL [electroluminescent] element." Appx65 1:38-51.

[2] Samsung's predecessor company was the original assignee. Appx540. For convenience, BOE refers to the relevant entity throughout as "Samsung."

The ’599 patent, like Kimura, proposes to address this problem using a “pixel circuit in an organic light emitting device capable of realizing high gradation representation by self-compensating a threshold voltage, and a method for driving the same.” Appx58. The ’599 patent uses a diode-connected, self-compensating transistor configuration to solve for threshold voltage deviation in the driving transistor before emitting light. Appx66 3:46-47; *see* Appx88-91; Appx94-102; Appx1071-1082. This self-compensation “allow[s] a driving current flowing through” a light-emitting element “to be uniform regardless of threshold voltage deviation between respective pixels.” Appx66 3:51-58.

The ’599 patent discloses a pixel driver circuit for OLED displays that includes five or more transistors. *See* Appx58. Figure 3 illustrates the central architecture in a six-transistor embodiment:




Appx85-87.

Figure 3 discloses six transistors (elements T31 through T36, labeled 1 through 6 above), an electroluminescent element (EL31), and a capacitor (C31). Appx67 6:20-23; Appx86. The first transistor delivers a data signal voltage; the second transistor supplies the driving current to the electroluminescent device; the third transistor provides threshold voltage compensation; the fourth transistor provides power supply voltage; the fifth transistor provides a path for the driving current from the second transistor to the LED; and the sixth transistor

initializes the data signal stored in the capacitor. Appx67-68 6:25-7:6; *see* Appx87-88.[3]

Like Kimura, the '599 patent discloses the three operating modes of initialization, programming, and light emission. Appx68 7:12-65; *see* Appx88-91. During initialization, the circuit is reset to a baseline mode of operation, with all transistors turned off except for the sixth transistor, which replaces the residual voltage stored on the capacitor with an initialization voltage. Appx68 7:15-26; Appx88. During programming, the capacitor stores a data voltage. Appx68 7:28-48; Appx89. Due to the diode-connected arrangement of the second and third transistors, the capacitor's voltage is set to a level compensating for the threshold voltage of the second transistor (the driving transistor). Appx68 7:28-48; Appx89. During light emission, the self-compensated voltage stored on the capacitor activates the second transistor to produce the driving current, with the second, fourth, and

[3] Dependent claim 2 refers to this initialization transistor as the "fourth" transistor, following the numbering convention of independent claim 1, which recites a first, second, third, fifth, and sixth transistor (skipping the "fourth"). Appx68-69 8:53-9:10.

fifth transistors providing a current path running through the light-emitting element, causing light emission. Appx68 7:50-65; Appx90.

Despite these strong similarities, Kimura was not substantively considered during prosecution of the ’599 patent. In its information disclosure statements, Samsung cited U.S. Patent No. 6,229,506 (the “Dawson” reference) and U.S. Patent No. 6,362,798—(the “Kimura ’798” reference), and other references not at issue, but did not initially cite Kimura. *See* Appx1580-1583; Appx1630; Appx1717; *see* Appx91-92.[4]

The examiner substantively relied only on Dawson. Appx1574-1576. Because Dawson discloses a pixel circuit with four transistors, the first office action allowed any claims with five or more transistors and rejected the others as anticipated. Appx1576-1578; *see* Appx1355-1356. Samsung then amended its rejected claims to add transistors and secure allowance. *See* Appx1348-1349; Appx1315; Appx91-92. Only after all claims were deemed allowable did Samsung identify a Japanese version of Kimura in an information disclosure statement.

---

[4] The inventors of the Kimura and Kimura ’798 references are different individuals with a common surname. *See* Appx937; Appx1262.

Appx91-92; Appx1366. No English-language translation of Kimura, however, was included in the prosecution history. Appx92.

***Samsung Asserts The '599 Patent, And BOE Pursues Inter Partes Review.***

In February 2023, based on a complaint filed by Samsung, the U.S. International Trade Commission instituted a Section 337 investigation into alleged infringement of the '599 patent and other patents. Samsung's complaint sought a general exclusion order barring importation of replacement screens for mobile devices, including those made by BOE, that allegedly infringed Samsung's patents. But Samsung named as respondents only various retailers who sell those devices. BOE therefore intervened and responded in the ITC action. *See* Appx175. BOE also filed a petition with the Patent Trial and Appeal Board seeking inter partes review of all claims of the '599 patent. Appx75-179. Shortly thereafter, Samsung sued BOE Technology Co., Ltd., and petitioner-appellant Mianyang BOE Optoelectronics Technology Co., Ltd., in the Eastern District of Texas, alleging infringement of the same patents involved in the ITC action.

BOE's inter partes review petition demonstrated that all claims of the '599 patent are obvious over Kimura. Appx94-174. BOE supported

its petition with a detailed declaration from Dr. Daniel Foty, who has over thirty years of experience in integrated circuit design. Appx1030; *see* Appx1223-1261. BOE showed that Kimura and the '599 patent addressed the same problem. Appx85; Appx94. BOE then showed that Kimura's Figure 33 discloses the same functionality and circuitry recited in most claims of the '599 patent. *See, e.g.*, Appx94-126; *see infra* 21-24.

BOE's petition addressed one difference between Kimura's Figure 33 and some of the challenged '599 patent claims, relating to the polarity of the transistors involved. In general, a transistor can have one of two polarities—positive or negative. Appx1040-1046. An n-type transistor is called an "nMOS transistor," and a p-type transistor a "pMOS transistor." *See* Appx83; Appx1040-1046; Appx1830-1842. In the art, nMOS and pMOS transistors are depicted through the following symbols:



Appx1047-1048 (nMOS left, pMOS right).

Some of the challenged claims of the ’599 patent do not specify the polarity of any of the recited transistors. Appx22; *see* Appx68-69 8:53-9:12 (claims 1-2); Appx69 9:31-64 (claims 6-8); Appx69 10:16-19 (claim 12); Appx69 10:29-50 (claim 14). Some dependent claims specify that one or two particular transistors are pMOS. *See* Appx69 9:13-30 (claims 3-5); Appx69 9:65-10:15 (claims 9-11); Appx69 10:20-28 (claim 13). And independent claims 15 and 17 (and therefore dependent claims 16 and 18) recite connections that require all of the transistors therein to be pMOS. Appx22; Appx151-152; Appx160. Kimura’s Figure 33, meanwhile, shows Transistor 2 as a pMOS transistor and the remaining transistors—1, 3, 4, and 5—as nMOS transistors. Appx99-100; Appx985 [0156]; Appx970; *see also* Appx973 (Fig. 36).

To simplify matters, BOE’s petition generally relied on a modified version of Kimura’s figures, including Figure 33, in which all transistors were pMOS. *See* Appx99-102; Appx152; Appx95 n.3. This modification is shown below:







**ORIGINAL** **MODIFIED**

Appx102 (reproduced at Appx21); Appx1102.

Even though not required by most of the challenged claims, BOE took this approach because it believed it would be non-controversial and would streamline the proceedings. As BOE's petition and Dr. Foty's testimony demonstrated, the all-pMOS modification "would have been a simple and obvious design choice" for a person of ordinary skill. Appx101. Kimura expressly discloses the possibility of using a pMOS transistor for the first and fourth transistors in Figure 33. Appx1011 [0659] (disclosing use of the "opposite … polarity" for these transistors); Appx101. And, with respect to the remaining nMOS transistors of Figure 33—the third and sixth transistors—it would have been "a simple design choice" to substitute polarity. Appx100-101.

It was well-known in the art that pMOS and nMOS switching transistors are interchangeable. Appx99-103. As BOE's expert explained, nMOS and pMOS transistors are "essentially mirror-images of each other," with nMOS transistors turning on with a high gate voltage ("active-high" signaling), and pMOS transistors turning on with a low gate voltage ("active-low" signaling). Appx1052-1054. Both nMOS and pMOS switching transistors, however, "achieve the same functionality" by serving as "simple on/off switch[es]," and "swapping" one for the other would have been "easy and well-known to a POSITA." Appx1053-1054; *see* Appx1099-1103. Kimura itself repeatedly teaches that nMOS transistors that "function as simple switching devices" could be of "any polarity." Appx993 [0396] (first embodiment); *see* Appx996 [0438] (sixth embodiment); Appx997 [0445] (seventh embodiment); Appx1010 [0649] (eighth embodiment). The '599 patent likewise indicates that pMOS and nMOS transistors can be used interchangeably, stating that, "other than the PMOS transistor" expressly disclosed (that is, the driving transistor, which is the second transistor), "the pixel circuit can be configured [with] a NMOS transistor, a CMOS transistor or the like." Appx605 (quoting Appx68

8:36-38). The Kimura ’798 reference, which Samsung cited during the ’599 patent’s prosecution, similarly demonstrates this interchangeability. Appx84; Appx1262. Kimura ’798 teaches that “every TFT can be N-channel type TFTs or all TFTs can be P-channel type TFTs.” Appx1280 12:30-34.

BOE also showed that the all-pMOS modification of Kimura’s Figure 33 would lead to manufacturing benefits, thus providing an additional reason for a skilled artisan to take this approach. Appx84; Appx133. Dr. Foty explained that a skilled artisan may “want[] to use a single-species pixel circuit” to take advantage of “a single-species manufacturing process” or “more consistent inter-transistor behavior achieved by single-species circuits.” Appx2189. Citing the disclosures of Kimura ’798, Dr. Foty demonstrated that the prior art teaches that “it is often advantageous in manufacturing when all TFTs are of the same type.” Appx2187 (quoting Appx1280 12:30-49).

As BOE showed, by applying this trivial modification, Kimura’s Figure 33 would become an all-pMOS circuit and would therefore satisfy all of the ’599 patent claims—those that specify polarity and those that do not. Appx99-102; Appx152. Transistor 1 (3306) in

Kimura discloses the first transistor (T32) in the ’599 patent, Appx1108-1112; Transistor 2 (3308) in Kimura discloses the second transistor (T31), Appx1112-1121; Transistor 3 (3309) in Kimura discloses the third transistor (T33), Appx1121-1126; a configuration between Transistors 2 and 3 provides for the “diode connected” configuration, Appx108-111; Appx126; Appx1137-1140; Transistor 4 (3307) in Kimura discloses the fourth transistor (T35), Appx1129-1132; Transistor 5 (3310) discloses the fifth transistor (T36), Appx1132-1135; and Kimura’s initialization transistor (1607) can be used to perform the function of the sixth transistor (T34), Appx1140-1150; *see* Appx104-136. Additionally, Kimura discloses a capacitor in the same place and serving the same function as the capacitor in the ’599 patent. Appx117-118; Appx1126-1128. Kimura’s “electroluminescent element for emitting light” (3313) also discloses the light-emitting element (EL31) in the ’599 patent, Appx1135-1137; *see* Appx124-126. And Kimura discloses the three initialization, programming, and light-emission steps for self-compensating for threshold-voltage variability of driving transistors in powering the lighting element. Appx94-99.

BOE also showed that Kimura rendered obvious the shared control of two transistors limitation recited by claims 1-6 and 13-18—the requirement that the gates of both the fourth and fifth transistors be controlled by "the current light emitting signal," Appx69 10:20-28. This shared control is depicted in Kimura Figure 36, which makes small (but important) changes to Figure 33. BOE's petition therefore "relie[d] on an 'all-PMOS version of Kimura Fig. 36'" to show obviousness of claim 13, which is representative of the "shared control" limitation. Appx37-38 (quoting Appx142-143). BOE then adopted the same analysis for the remainder of claims 1-6 and 14-18. *See* Appx49; Appx1219-1221; Appx1172-1174; Appx1179-1181; Appx1185; Appx1195-1198; Appx1200.

BOE similarly showed that Kimura rendered obvious the "sixth initialization transistor" required by claims 2, 8, 16, and 18. Claim 8 requires, for example, "a sixth initialization transistor for discharging the data signal voltage stored in the capacitor in response to a scan signal just before the current scan signal upon initialization." Appx129. BOE explained that incorporating the initialization transistor from Kimura Figures 16-17 into Figure 33 would result in adding a dedicated

initialization transistor, a combination for which Kimura itself provides express motivation. Appx130-136.

### ***The Board Institutes Review, Finds BOE Has Persuasively Demonstrated Grounds For Unpatentability, And Invites BOE To Develop The Record On Certain Issues.***

At institution, the Board found BOE's showing "sufficiently persuasive" that a skilled artisan would have known to "make a modification" of Kimura's Figure 33 embodiment with all pMOS transistors, due to the "general interchangeability of nMOS and pMOS transistors used as switching transistors." Appx290. The interchangeability of parts, the Board explained, "itself provides the motivation to change." Appx296. The Board thus found a reasonable likelihood of BOE prevailing with respect to the all-pMOS general interchangeability theory, which affects all claims of the '599 patent.

The Board, however, "question[ed] the completeness" of the manufacturing benefits rationale for the all-pMOS configuration. Appx298. The Board noted that a pixel circuit is manufactured on a semiconductor substrate that also contains a driver circuit. Appx298.[5]

---

[5] The "driver" circuit here refers to control circuitry outside the pixel and is distinct from the "driving transistor" inside the pixel.

It then concluded that, because BOE had not argued that a skilled artisan would modify the transistors in the separate *driver* circuit into an all-pMOS configuration, that BOE had not shown manufacturing benefits to modifying the *pixel* circuit in this way. Appx298. The Board invited the parties to "further develop this issue subsequent to institution of trial." Appx299.

The Board also questioned BOE's showing on the "shared control" limitation and the "sixth initialization transistor" limitation. With respect to "shared control," the Board acknowledged that BOE "relie[d] on an 'all-PMOS version of Kimura Fig. 36'" and "agree[d] that if the fourth and fifth transistors are always turned on and off together, as Petitioner asserts is the case for the embodiment of Figures 36A-36E, there is reason for one of ordinary skill in the art to drive the fourth and fifth transistors by the same control signal." Appx317-318. But the Board questioned this theory because its "reasoning only has application to the embodiment of Figures 36A-36E, … and does not apply to the embodiment of Figures 33A-33E in which the fourth and fifth transistors do not always turn on and off together." Appx318. Identifying "architecture differences between the embodiments in

Kimura's Figures 33 and 36," the Board questioned BOE's "claim 13" analysis. Appx318-319. The Board invited the parties to "further develop the issue subsequent to institution of trial." Appx319.

Finally, with respect to the initialization transistor claims, the Board accepted Samsung's argument that BOE conflated "erasure" to mean "initialization," Appx314, and reasoned that BOE had not shown, "[b]ased on the preliminary record," Appx315, "that initialization and erasure are the same," Appx316. The Board therefore "question[ed] Petitioner's accounting for the alleged obviousness of claim 8." Appx316.

After institution, BOE sought to supplement the record with a supplemental declaration addressing the three issues on which the Board had invited "further develop[ment]." Appx319; Appx356-367; *see* Appx1895-1930; Appx1931-1969; Appx1970-1998.

With respect to the shared control of two transistors, BOE sought to address the Board's stated concern and explain "how and why the operation of Fig. 36 is congruent in all material respects with Fig. 33, including vis-à-vis the claimed shared light-emitting signal." Appx362. In response to the Board's concern that "Fig. 36 has 'architecture

differences' [] of significance," BOE submitted a new reference (Sakamoto) not to satisfy any missing claim limitations but "to show suitability and use of a shared light emitting signal in a variety of pixel configurations, demonstrating a high likelihood of success" and relevant background knowledge. Appx363.

With regard to the sixth initialization transistor, BOE responded to Samsung's arguments that the Board preliminarily adopted at institution. While Samsung argued, Appx205-209, and the Board accepted, Appx312-316, that BOE was conflating "initialization" with "erasure" and that the two processes do not overlap, BOE sought to correct those mischaracterizations of its theory. BOE explained that, because the initialization phase repeats itself every time the first gate line signal pulses, the initialization period *does* overlap with, and occurs within, the erasure period. Appx363-364; Appx1910-1916. BOE offered declaration testimony supporting its argument and responding to Samsung's reliance on embodiments raised for the first time in its responsive briefing. Appx1916-1921.

As to the manufacturing benefits issue, BOE's supplement explained that a skilled artisan would understand Kimura's teachings

as applying "where the pixel array and the peripheral control circuitry are made separately from each other," using "two different manufacturing processes and on two separate substrates," and then connected after fabrication. Appx1923; *see* Appx365. This explained why the Board's concern that there could be other circuits on the same substrate was no impediment to obtaining manufacturing gains in an all-pMOS pixel circuit configuration.

The Board denied BOE's request to supplement the record. Appx397-414. It acknowledged that the supplemental information "does not introduce new grounds of unpatentability and does not introduce new combinations of prior art references." Appx401. The Board nevertheless held that the supplemental expert declaration addressed different positions from the petition. Appx402; Appx406-407; Appx410; Appx412.

***The Board Holds None Of The Challenged Claims Unpatentable.***

In its final written decision, the Board found none of the claims unpatentable. Appx55. The decision addressed four main issues.

***All-pMOS—general interchangeability.*** First, the Board changed tack from the institution decision with respect to the general

interchangeability of pMOS and nMOS transistors. The Board did not disagree with BOE's showing that, as a general matter, pMOS and nMOS switching transistors are interchangeable. The Board also did not disagree with BOE's showing that three of the four nMOS transistors in Kimura Figure 33 could be modified into pMOS. *See* Appx26-32. Instead, the Board zeroed in on a passing dispute between the parties with respect to a *single* transistor in Kimura's Figure 33: Transistor 3.

In a single paragraph that cited no evidence or argument, the Board rejected BOE's showing that Transistor 3 in Kimura's Figure 33 was a switching transistor. The Board simply stated that "the Petition fails to explain what makes Transistor 3 in Kimura's Figure 33 embodiment … a 'switching transistor.'" Appx26. The Board did not cite any of the parties' evidence on this issue.

The Board then found in the alternative that, even if BOE had demonstrated that Transistor 3 is a switching transistor, BOE nevertheless had not shown that a skilled artisan would be motivated to modify that transistor into a pMOS transistor. Appx31-32. The Board concluded that a skilled artisan "would have understood there were

material differences between NMOS transistors and PMOS transistors relevant to, and that would affect the design and operation of, a pixel circuit for an AMOLED display." Appx27. Specifically, the Board reasoned that "a pMOS transistor would have additional leakage current compared to an nMOS transistor," and that "this excess leakage current may affect pixel brightness and thus the operation of a pixel circuit for an AMOLED display." Appx29. The Board concluded that a "proposed modification of Transistor 3 … would result in consequential leakage current effects," which, the Board said, "have not been addressed by Petitioner." Appx26-27.

The Board did not address BOE's showing that the leakage concern was unfounded, including BOE's evidence (1) disproving that any purported leakage risk would have any effect on pixel brightness, and (2) showing that a skilled artisan would have known how to make a simple voltage adjustment to fix leakage problems. Appx28-29; Appx608; Appx2197-2201. The Board did, however, criticize one additional aspect of BOE's showing. BOE had explained that, if using pMOS transistors in place of nMOS transistors risked a leakage problem, then the '599 patent—which discloses an all-pMOS pixel

circuit design—would suffer the same problems. Appx607-608. BOE therefore argued that if leakage were a problem, then the claims of the ’599 patent themselves would “lack enablement and/or written description.” Appx605-606. The Board responded to this point by faulting BOE for supposedly placing the burden of proof on Samsung to disprove obviousness. Appx28-29.

Having found leakage as a concern for modifying Transistor 3, the Board declined to address Samsung’s additional arguments. Appx31-32.

***All-pMOS—manufacturing benefits.*** The Board also rejected BOE’s showing of manufacturing benefits that would flow from an all-pMOS pixel circuit configuration. Appx32-37. The Board’s analysis largely rested on block-quoting Samsung while failing to address BOE’s evidence. The Board’s primary finding was that “the substrate containing Kimura’s pixel circuit also includes a driving circuit portion that includes both nMOS and pMOS transistors in a CMOS configuration.” Appx36. From this, the Board concluded that there were no manufacturing benefits to modifying the pixel circuit to all-

pMOS, because a *different* circuit on the same substrate consists of nMOS and pMOS pairs.

BOE had also reiterated in its reply brief that its manufacturing benefits rationale was "sound." Appx605 n.2. The Board, however, faulted BOE for "cho[osing] not to provide any further briefing" after institution, Appx33, even though the Board had rejected BOE's request to supplement to address this very issue, *see* Appx412.

***Shared control signal.*** The Board found that BOE had not shown that Kimura rendered obvious the "shared control of two transistors" limitation required by certain claims. Appx37-50. The Board acknowledged that BOE's petition "relie[d] on an 'all-PMOS version of Kimura Fig. 36'" for that requirement of representative claim 13, Appx37-38, and the Board did not dispute that Kimura Figure 36 renders obvious the shared control limitation. But the Board found that BOE had relied on Kimura Figure 33 for *other* limitations of the relevant claims, including the portions of dependent claim 13 that are found in independent claim 7. It then faulted BOE for not explaining how Figure *33* could be modified to render obvious the shared control limitation. To reach this result, the Board discounted the petition's

express statement that BOE was relying on "the all-PMOS version of Kimura Fig. 36"—not Figure 33—to "render[] claim 13 obvious." Appx142-143; Appx43. The Board also declined to consider the explanation BOE had provided on reply, in response to the Board's confusion on this same issue. The Board labeled this responsive briefing a "new" argument that was not disclosed in the petition. Appx45.

***Sixth initialization transistor.*** The Board noted that this issue related only to dependent claims 2, 8, 16, and 18, and declined to reach the issue based on its other grounds for upholding those claims. Appx51.

The Board therefore found claims 1-18 not unpatentable. Appx56. It declined to reach additional issues, including Samsung's arguments about secondary considerations of nonobviousness. Appx51.

## SUMMARY OF ARGUMENT

The Board's conclusion that Kimura does not render obvious claims 1-18 of the '599 patent was infected by procedural errors at every turn and is not supported by substantial evidence.

**I.** The Board first retreated from its institution decision determining that BOE had demonstrated the general interchangeability of pMOS and nMOS switching transistors by zeroing in on a single transistor—Transistor 3—of Kimura's Figure 33. It rejected out of hand that Transistor 3 was a switching transistor, without addressing any of BOE's evidence on this point, and it relied on an unsubstantiated concern about current leakage to reject modifying Transistor 3 from nMOS to pMOS. The Board's findings were infected by legal error, because the Board failed to address the parties' actual evidence and applied an inappropriate legal standard to evaluate a skilled artisan's motivation to modify. The findings also lacked substantial evidence, as BOE demonstrated that the Board's criticisms were not well-founded. The Board further erred by failing to recognize the manufacturing benefits to an all-pMOS pixel circuit modification, both on the existing record and in rejecting BOE's request to supplement made in response to the Board's express invitation to do so.

**II.** The Board also erred in finding that Kimura does not render obvious the "shared control of two transistors" limitation recited by claims 1-6 and 13-18. The Board's finding was premised not on any

technical flaw in BOE's theory that Kimura's Figure 36 renders obvious that limitation, but instead on a mischaracterization of BOE's petition. BOE made clear that, for the "shared control" claims, it was relying not on Kimura's Figure 33 (which is incompatible with shared control) but on Figure 36, which is an extension of Figure 33 that discloses (and is compatible with) shared control. The two figures are otherwise very similar, but different in this critical respect. The Board nonetheless faulted BOE for failing to address how Kimura's Figure 33 would render obvious the shared control limitation. That was indisputably not BOE's theory. Compounding the error, the Board refused to consider BOE's reply arguments and submission of a supplemental declaration, both of which properly attempted to correct the Board's and Samsung's mischaracterization and misunderstanding of BOE's theory.

**III.** The Board similarly erred in denying BOE's motion to submit supplemental evidence with respect to the sixth initialization transistor issue. BOE's supplemental evidence was directly responsive to the Board's and Samsung's arguments, and the Board's refusal to consider this evidence was an abuse of discretion. Should the Court remand for further proceedings, it should correct that error.

## STANDARD OF REVIEW

"Obviousness is a question of law based on underlying facts." *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1275 (Fed. Cir. 2021). This Court "review[s] the Board's legal determinations de novo and its factual findings for substantial evidence." *Id.* Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The Court also "review[s] the Board's decisions under the Administrative Procedure Act (APA)." *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017). The Court must "hold unlawful and set aside" any findings or conclusions that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "without observance of procedure required by law"; or "unsupported by substantial evidence." *Id.* (quoting 5 U.S.C. § 706).

This Court reviews the Board's evidentiary rulings under an abuse of discretion standard. *Ultratec, Inc. v. CaptionCall, LLC*, 872

F.3d 1267, 1271, 1275 (Fed. Cir. 2017). The same standard applies to this Court's review of the Board's determination of the proper scope of a reply brief. *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020).

## ARGUMENT

### I. The Board Erred In Finding That An All-pMOS Modification Was Not Obvious.

BOE extensively documented that the prior art was replete with disclosures of the general interchangeability of pMOS and nMOS switching transistors. The Board, for its part, did not disagree with the premise that switching transistors are generally interchangeable. Instead, it seized on a narrow dispute—whether Transistor 3 in Kimura's Figure 33 is a switching transistor, and whether BOE had demonstrated that *this* particular switching transistor was, like the other switching transistors in Figure 33, interchangeable with a pMOS transistor. BOE clearly demonstrated both.

The Board erroneously determined that Transistor 3 is not a switching transistor and, even if it were, that a skilled artisan would not be motivated to modify Transistor 3 from nMOS to pMOS because of purported concerns with current leakage. § I.A. The Board also erred

in rejecting BOE's showing that manufacturing benefits provide yet another reason for a skilled artisan to make an all-pMOS modification to Figure 33. § I.B. The Court should vacate the Board's findings.

### A. The Board erred in its rejection of interchangeability as to Transistor 3.

#### 1. The Board erred in failing to find that Transistor 3 is a switching transistor.

The Board's finding that Transistor 3 is not a switching transistor (a) violates the APA because the Board impermissibly ignored BOE's evidence and (b) is not supported by substantial evidence.

**a.** The Board's failure to address BOE's specific arguments and evidence, before summarily concluding that Transistor 3 is not a switching transistor, violated the APA. "Though the Board is not required to discuss every piece of evidence," it cannot entirely "disregard" a party's presentation of "evidence without explanation." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015) ("Just as it may not short-cut its legal analysis, the Board may not short-cut its consideration of the factual record before it."); *see Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1352 (Fed. Cir. 2018) ("*AIT*") ("[A]n agency's refusal to consider

evidence bearing on the issue before it is, by definition, arbitrary and capricious[.]" (citation omitted)).

Here, the Board summarily concluded that BOE did not "explain what makes Transistor 3 in Kimura's Figure 33 embodiment" a "switching transistor." Appx26; *see* Appx30-31. It did so without citing any of the parties' evidence or explaining why it was rejecting BOE's showing.

BOE's evidence on this issue was extensive. BOE pointed to the disclosures of Kimura itself, along with analysis by BOE's expert, showing that Transistor 3 is a switching transistor. BOE explained that the function of this transistor matches that of a switching transistor: "[S]witching transistors" are simply those that "act as on/off switches to control the operation of the pixel." Appx1068. And Kimura discloses that Transistor 3 (TFT 3309) "turn[s] on" and "off" during different stages of circuitry operation—just like Transistors 1, 4, and 5, which are undeniably switching transistors—thus performing "on and off control" of the pixel circuitry. Appx1011 [0654]-[0655]; *see* Appx100; Appx115; Appx126-127; Appx611-614; Appx867; Appx1091-1095; Appx1116; Appx1099-1100.

BOE also demonstrated how the circuit architecture further shows that Transistor 3 is a switching transistor. The petition explained that "OLED driver circuits are formed from transistors," that "[e]ach pixel has a 'driving transistor' that supplies current for the light emitting element," Appx84 (citing Appx1000 [0502]), and that "[t]he remaining transistors function as 'switching transistors' and serve various supporting roles," Appx84 (citing Appx1067-1068). Kimura labels only Transistor 2 as a driving transistor. Appx97; Appx99-100; Appx1011 [0657]; *see* Appx23. That makes the remaining transistors, including Transistor 3, switching transistors. Appx100.

The Board did not address any of this evidence, which "bear[s] directly on the issue of whether" Transistor 3 is a switching transistor. *AIT*, 897 F.3d at 1353. The Board's wholesale "disregard" of BOE's "evidence without explanation" thus contravenes the APA. *Princeton Vanguard*, 786 F.3d at 970. Indeed, the Board's finding on Transistor 3 was a critical aspect of the final written decision—making the failure to address BOE's evidence particularly prejudicial. Because the Board "fail[ed] to address" BOE's arguments and its finding is "simply

inadequate on its face," the Court should vacate. *In re Thrift*, 298 F.3d 1357, 1366 (Fed. Cir. 2002).

**b.** Even apart from its procedural error in ignoring BOE's affirmative evidence, the Board's finding on its own terms lacks substantial evidence. The Board did not actually cite Samsung's evidence in making its determination, *see* Appx26, but that evidence could not even implicitly supply a foundation for the Board's finding.

First, Samsung argued in its surreply that Kimura does not expressly refer to Transistor 3 as a switching transistor, and indeed does not expressly mention any switching transistors when discussing Figure 33, creating uncertainty. Appx673. There is no uncertainty. Kimura discloses its invention "in the context of a general light emitting device," which it describes as having a "typical" composition of both "driv[ing]" and "switching" transistors (and other elements). Appx990 [0352]. Kimura discloses Figure 33 as having a "driving transistor." Appx84 (citing Appx1000 [0502]). As discussed throughout Kimura's embodiments, "[t]he remaining transistors function as 'switching transistors.'" Appx84 (citing Appx1067-1068); *e.g.*, Appx1010 [0649]. Because Transistor 2 of Figure 33 is the driving transistor, *see*

Appx1011 [0657], a person of ordinary skill would know that the remaining transistors are switching transistors. Appx868-869. That Kimura does not expressly state, in every instance, that a particular transistor in a particular pixel circuit is a switching transistor is therefore "immaterial." *Application of Tomlinson*, 363 F.2d 928, 933-34 (C.C.P.A. 1966); *see Apple Inc. v. Gesture Tech. Partners, LLC*, 129 F.4th 1367, 1378 (Fed. Cir. 2025) ("[E]xpress disclosures are not required when a petitioner is arguing obviousness." (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)); *Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 727 (Fed. Cir. 2002) (similar).

Second, Samsung contended that Transistor 3 is not a "*simple* switching device." Appx673. By this, Samsung referred to the fact that Transistor 3 also "controls the flow of charge to the capacitor during programming and holds charge on the capacitor during emission." Appx673. But Samsung did not explain why Transistor 3 has to be a "simple" switching device to qualify as a switching transistor. Indeed, Samsung did not dispute that Transistor 3 has an on/off function, and its expert agreed that switching transistors are those that perform an on/off function. Appx606 n.3; *see* Appx2085 160:8-18; *see also*

Appx1116-1118 (noting that Figure 34 shows Kimura's Transistors 1 and 3 turning on and off at the same time based on the same gate signal line).

The Board's conclusion that BOE "does not persuasively show that Transistor 3 is a 'switching transistor,'" Appx26, lacks the "evidence as a reasonable mind might accept as adequate to support [such] a conclusion." *Gartside*, 203 F.3d at 1312; *see Ericsson Inc. v. Intell. Ventures I LLC*, 890 F.3d 1336, 1348 (Fed. Cir. 2018) (vacating finding of patentability as unsupported by substantial evidence).

#### 2. The Board erred in finding that leakage concerns would discourage a skilled artisan from modifying Transistor 3 from nMOS to pMOS.

In addition to establishing that Transistor 3 is a switching transistor, BOE also provided an extensive showing of the general interchangeability of nMOS and pMOS switching transistors. BOE's expert explained that it was well-understood in the art that "either an nMOS transistor or a pMOS transistor can be chosen" for switching transistors. Appx1053-1054 (citing 2003 textbook); *see* Appx1099-1103.

Kimura expressly contemplates substituting nMOS transistors for pMOS transistors for the first and fourth transistors in Figure 33.

Appx1011 [0659] (disclosing changing the polarity of the first or fourth transistors in Figure 33 with the "opposite … polarity"). It was therefore a natural inference that the third transistor, a switching transistor, could likewise be made pMOS. *See* Appx100-101 (relying on Kimura's first and fourth transistor disclosures to propose an all-pMOS implementation); Appx1099-1102. BOE also explained that the '599 patent itself indicates that pMOS and nMOS switching transistors can be used interchangeably. As the '599 patent states, "other than the PMOS transistor" expressly disclosed, "the pixel circuit can be configured [with] a NMOS transistor, a CMOS transistor or the like." Appx68 8:36-38; *see* Appx605. Indeed, in describing the state of the prior art, Samsung's own expert cited prior art using all-pMOS transistors, further supporting BOE's showing of obviousness of an all-pMOS modification of Kimura. Appx606 (citing Appx3172; Appx3174-3176); *see also* Appx2184-2190. This and other evidence demonstrated that Transistor 3 could be either pMOS or nMOS, and that BOE's proposed modification to an all-pMOS pixel circuit was a "suitable" option to a skilled artisan. *Bayer Pharma AG v. Watson Lab'ys, Inc.*, 874 F.3d 1316, 1328 (Fed. Cir. 2017) (citation omitted); *see supra* 19-21.

The Board, however, found that even if Transistor 3 were a switching transistor, the possibility of current leakage would undermine a motivation to modify it into a pMOS transistor. Appx31-32. The Board did so based on two findings: (1) "Petitioner does not dispute that a pMOS transistor would have additional leakage current compared to an nMOS transistor"; and (2) "Nor does Petitioner dispute that this excess leakage current may affect pixel brightness and thus the operation of a pixel circuit for an AMOLED display." Appx29. Neither finding is correct.

The Board erred in four ways. First, the Board impermissibly ignored material evidence showing that leakage was not a concern. Second, the Board's determination that leakage was a concern lacked substantial evidence. Third, the Board committed legal error by rejecting BOE's showing of a suitable modification. Fourth, the Board's requirement of showing complete technical equivalency of nMOS and pMOS transistors imposed an improper burden.

**a.** Although the Board may assign weight to the parties' evidence according to their persuasive value, it may not simply ignore and "fail[] to consider material evidence." *Ultratec*, 872 F.3d at 1269; *see Altaire*

*Pharms., Inc. v. Paragon Bioteck, Inc.*, 889 F.3d 1274, 1285 (Fed. Cir. 2018) (instructing that the Board cannot "assign no weight" to probative expert testimony under the APA), *remand order modified by stipulation*, 738 F. App'x 1017 (Fed. Cir. 2018).

In concluding that "Petitioner does not dispute that a pMOS transistor would have additional leakage current compared to an nMOS transistor," Appx29, the Board impermissibly ignored critical aspects of BOE's evidence. BOE did dispute that Samsung's evidence of leakage was even applicable to Kimura. Appx607-608; Appx2200-2202. The Board simply failed to acknowledge BOE's showing. Appx28-29.

The Board block-quoted Samsung's arguments, which contended that Transistor 3 "controls charge flow to the capacitor and holds the programmed data for the pixel to maintain the intended brightness level." Appx28 (quoting Appx502-503). From there, Samsung asserted that a pMOS transistor had a "potential for greater leakage current" compared to an nMOS transistor. Appx28 (quoting Appx502-503). Samsung's support for the predicate showing that leakage was even a concern, however, rested on an inapposite 1997 study. *See* Appx501-503 (citing Appx3143-3145); Appx3143 (relying solely on 1997 Angelis study

to establish that "NMOS transistors were known to be less susceptible to leakage current").

BOE explained, with evidence the Board failed to cite or address, that Samsung's reliance on the 1997 Angelis study was misplaced. That study addressed a different kind of leakage inapplicable to Kimura. As BOE's expert explained, there are different kinds of "leakage" known in the art, with some "nuisance" level leakage "inherent" to "field-effect transistors," such as TFTs, Appx2200-2201; *see* Appx1127; Appx1040; Appx608, and other kinds of leakage "essentially [reflecting] failure mechanisms that render particular transistors unsuitable for use in real product circuitry," Appx2197. Pointing to articles from 1992 and 1999 showing de minimis polysilicon TFT leakage, BOE explained that the 1997 paper was elaborating on a different kind of leakage problem than what the polysilicon TFT pixel circuits in Kimura would experience. Appx2200-2201 (citing Appx2249-2255). BOE demonstrated that the 1997 study was instead focused on "essentially non-functional" field-effect transistors that were "unsuitable for product-grade usage, *regardless of* whether they were pMOS or nMOS transistors." Appx2201-2202 (emphasis added). In

short, BOE showed that the "leakage" problem Samsung invoked was "indicative of failed transistors" of a nonconventional type. Appx2198-2199. By contrast, there was no indication that Kimura's transistors were of a nonconventional failed transistor type susceptible to this problem.

Samsung had no response to BOE's showing. *Compare* Appx2200-2201 *with* Appx670-674; Appx4166-4168. And the final written decision failed to address this evidence, which directly rebutted that a pMOS Transistor 3 in Kimura "would have additional leakage current" at all, let alone enough to be problematic. *Contra* Appx29. The Board's failure to engage with BOE's showing disproving Samsung's asserted leakage concern, while concluding that BOE had left this issue undisputed, Appx29, warrants vacatur because it impermissibly ignored BOE's probative evidence. *Ultratec*, 872 F.3d at 1275; *Altaire Pharms*, 889 F.3d at 1285.

**b.** The Board's findings on the leakage issue also lacked substantial evidence. Appx26-30; *see Ericsson*, 890 F.3d at 1348.

The Board found that "a pMOS transistor would have additional leakage current." Appx29. But BOE explained that Samsung's

asserted leakage problem was nowhere to be found in the ’599 patent or Kimura. Appx607-608 (explaining that neither “say[s] anything about leakage,” and that this “reflect[ed]” that pMOS transistor leakage was not “a meaningful concern”) (quoted at Appx28). Indeed, as Samsung conceded, Kimura expressly discloses converting Transistors 1 and 4 into pMOS—even though, under the Board’s logic, this would have been an undesirable change because it would risk leakage. Appx100-101; Appx1011 [0659] (disclosing changing the polarity of the first or fourth transistors in Figure 33 with the “opposite … polarity”); Appx607-608; Appx503-504. BOE’s expert further explained that a skilled artisan would know how to address any pMOS leakage in a transistor like Kimura’s by making a simple threshold-voltage adjustment. Appx2198.

The Board’s finding that “excess leakage current may affect pixel brightness,” Appx29, also lacked substantial evidence. First, the Board relied on a selective quoting of Dr. Wolfe’s testimony about “design[ing]” the circuit “so that the impact of the leakage is imperceptible.” Appx29. But it ignored BOE’s showing that Dr. Wolfe also admitted that “leakage does ‘not necessarily’ affect pixel brightness ‘in a perceptible manner,’” Appx608, undercutting Samsung’s assertion that any current

leakage for Transistor 3 would have any perceptible impact. *See* Appx1127; Appx2200-2201.

Second, the Board quoted Samsung's argument that Transistor 3's "control[] [of] charge flow to the capacitor" somehow suggested that leakage would affect pixel brightness. Appx28. But BOE explained that Kimura's circuitry requires resetting the capacitor every cycle. The capacitor is discharged and recharged every cycle during initialization and programming, meaning that "the capacitor need not hold charge for an extended time, making modest leakage unimportant." Appx607-608; *see* Appx28-29 (quoting Appx607-608). Samsung had no answer to BOE's showing that the reset that occurs every cycle diminishes the impact of any leakage on stored brightness level. Appx607-608. Samsung merely contended that this feature of Transistor 3 underscores that it "is not serving as a 'simple switching device,'" Appx674—a nonresponsive argument that fails for the reason explained above (at 42-43).

Because the record does not support the conclusion that leakage was a meaningful concern for Kimura at all, much less for Transistor 3

specifically, the Board's finding lacked substantial evidence. *See Ericsson*, 890 F.3d at 1348.

**c.** The Board also legally erred by finding a lack of motivation to modify. Motivation "may be found in many different places and forms." *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1197 (Fed. Cir. 2014) Such motivation "does not have to be explicitly stated in the prior art, and can be supported by testimony of an expert witness regarding knowledge of a person of skill in the art at the time of invention." *Id.* Particularly relevant here, "obviousness 'does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away.'" *Bayer Pharma*, 874 F.3d at 1328 (quoting *PAR Pharm.*, 773 F.3d at 1197-98).

As explained above (at 19-21, 43-44), BOE demonstrated that pMOS and nMOS transistors were generally interchangeable. There can be no question that BOE's proposed modification was "suitable" given this context. *Par Pharm.*, 773 F.3d at 1197-98; *see Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 799-800 (Fed. Cir. 2021) (applying "the predictable use of prior art elements according to their established

functions" provides an "obvious solution" (quoting *KSR*, 550 U.S. at 417)).

BOE also showed that making Transistor 3 pMOS was a modification "from which the prior art did not teach away." *Par Pharm.*, 773 F.3d at 1197-98. Kimura, for instance, "does not make a single negative statement" about an all-pMOS configuration, or say anything specifically disparaging such a modification of Transistor 3. *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1349-50 (Fed. Cir. 2020). Therefore, Kimura "does not criticize, [dis]credit, or discourage" that modification. *Id.* And the Board did not find otherwise. Indeed, the Board found the very opposite at institution, rejecting Samsung's argument that "Kimura's disclosure of changing just one of the first or fourth transistor to pMOS type" is somehow tantamount to "teaching away from using [all] pMOS transistors." Appx292. Samsung did not reprise this rejected position after institution. It instead limited its argument to suggesting that a skilled artisan would be "discourage[d]," without arguing "teaching away." Appx505; Appx534.

Even if Samsung had demonstrated any purported disadvantages to a pMOS modification of Transistor 3, that at most could suggest that "a skilled artisan may have *preferred*" an nMOS polarity for Transistor 3. *Bayer Pharma*, 874 F.3d at 1328. But this Court has instructed that "obviousness 'does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away.'" *Id.* (quoting *Par Pharm.*, 773 F.3d at 1197-98). As in *Bayer Pharma*, the Board here may not have "clearly err[ed] in its fact finding that a skilled artisan would have had concerns over" the proposed modification, but rejecting BOE's demonstration of a "suitable option" was legal error. *Id.* at 1328.

**d.** The Board also erred in its treatment of BOE's reliance on the '599 patent's own disclosures. Appx29-30. As described above (at 30-31), one of BOE's arguments for interchangeability was the fact that the '599 patent would be subject to the same "leakage concerns" identified by Samsung if those concerns were actually valid. After all, the '599 patent discloses an all-pMOS pixel circuit and states that a "pixel circuit can be configured of a NMOS transistor, a CMOS transistor or the like other than the PMOS transistor." Appx605 (quoting Appx68

8:36-38). The fact that the '599 patent uses all pMOS transistors and expresses general interchangeability without expressing any concern about current leakage demonstrates that these concerns are at least overblown (if not irrelevant). *See* Appx605-606.

The Board's response consisted of two non-sequiturs. The Board first reasoned that "[i]t is not [Samsung]'s burden to show nonobviousness." Appx29. That is true, but it is also irrelevant. BOE was not trying to shift the burden of proof to Samsung. It was pointing out an additional affirmative reason why BOE's own obviousness rationale was supported. *Cf. In re Paulsen*, 30 F.3d 1475, 1481 n.9 (Fed. Cir. 1994) (rejecting the application of an enablement standard to a prior art reference that would render patent itself non-enabling). The Board continued by stating that Samsung had not "presented a nonobviousness argument" but was "noting technical and material differences between nMOS and pMOS transistors [that] undermine [BOE's] rationale for applying the general principle of interchangeability." Appx29. Again, true enough. But BOE was showing why Samsung's assertions did not actually "undermine" that rationale. The Board did not actually address BOE's showing.

Second, the Board reasoned that the fact "that the '599 patent itself does not discuss leakage current issues with respect to pMOS transistors … does not render nMOS and pMOS transistors technical equivalents for all roles within a pixel circuit." Appx30. But BOE did not need to show such across-the-board technical equivalency in order to show general interchangeability within the context of Kimura and the '599 patent.

Again, obviousness does not require complete technical equivalency—only that a modification be "suitable." *Bayer Pharma*, 847 F.3d at 1328 & n.6; *cf. Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1379-81 (Fed. Cir. 2023); *Par Pharm.*, 773 F.3d at 1196-98 (same); *see also KSR*, 550 U.S. at 415, 421 (instructing a more "expansive and flexible approach" in determining whether a patented invention was obvious at the time it was made). To the extent the Board imposed a higher burden on BOE, that was legally erroneous.

### B. The Board further erred in rejecting evidence of manufacturing benefits.

The Court can vacate on the basis of BOE's general interchangeability ground alone, but the Board's rejection of BOE's manufacturing evidence provides an additional basis for doing so. BOE

demonstrated that an all-pMOS modification of Kimura's Figure 33 would have been particularly obvious to a skilled artisan given the known manufacturing benefits of circuits of a single transistor species. Appx84; Appx101; Appx133; Appx605 n.2. Indeed, the '599 patent itself cited Kimura '798, which discloses that it would have been "advantageous in manufacturing when all TFTs are of the same type." Appx58; Appx1280 12:48-49; *see* Appx84. The Board analyzed BOE's manufacturing-benefits argument as both further support for BOE's theory of general interchangeability for switching transistors (discussed above), Appx297-298, and as a potential stand-alone ground for the all-pMOS modification. Appx298-299; Appx32-37. The Board erred in two ways.

First, the Board's findings lacked substantial evidence. The Board faulted BOE for purportedly not "balanc[ing] … the proposed modification of Figure 33 transistors to all be of a single type with Kimura's focus on and preference for having a CMOS design which includes both nMOS and pMOS transistors." Appx36. The Board essentially reasoned that, because BOE was only proposing to modify the pixel circuit to all-pMOS, and *another* circuit on the same substrate

consists of nMOS and pMOS pairs, there would be no manufacturing benefits.

Yet BOE *did* show manufacturing benefits for single transistor-type circuits even where those circuits share a substrate with other, mixed transistor-type circuits. BOE's expert explained, for instance, that "a POSITA wanting to use a single-species pixel circuit" would benefit from the "single-species manufacturing process" and the "advantage of more-consistent inter-transistor behavior achieved by single-species circuits." Appx2189; *see also* Appx2187 (discussing manufacturing advantages disclosed in Kimura '798); Appx2184-2187 (discussing Kimura's disclosures permitting a single-species pixel circuit alongside a CMOS driving circuit). Even if manufacturing benefits are greater where both circuits on the substrate are exclusively of one polarity, that does not negate the manufacturing benefits where "only one species (nMOS or pMOS) is used exclusively in a [given] circuit." Appx1054; Appx2184-2187. In assuming zero manufacturing benefits to BOE's proposed all-pMOS modification of the pixel circuit, the Board's finding lacked substantial evidence. *Ericsson*, 890 F.3d at

1348; *cf. Intel Corp.*, 61 F.4th at 1380 (a modification need not be "the best option").

Second, although BOE's existing evidence sufficed to demonstrate such manufacturing benefits, *see* Appx605 n.2, BOE further supported its showing through a motion to submit supplemental evidence, which the Board erroneously denied. The Board at institution appeared to assume that BOE proposed an all-pMOS change to the driver circuit as well, rather than just the pixel circuit, and it questioned how the driver circuit "would stay operative" under that configuration. Appx298. The Board invited BOE to "further develop this issue subsequent to institution of trial." Appx299.

BOE's supplemental declaration did just that. BOE squarely addressed the Board's concerns, showing that a skilled artisan would understand Kimura's teachings to apply "where the pixel array and the peripheral control circuitry are made separately from each other." Appx1923. This evidence demonstrated that there were manufacturing gains to an all-pMOS modification of Kimura's pixel circuit, because the driver circuitry was not necessarily made on the same substrate.

Appx1922-1925. This directly addressed the Board's misapprehension that circuits on the same substrate had to be manufactured together.

BOE further explained why changing only the pixel circuit to all-pMOS would yield manufacturing benefits, even when manufactured alongside a driver circuit with both nMOS and pMOS transistors. Appx1926-1929. BOE explained the manufacturing advantage of a "reduced production cost," citing to an additional reference. Appx365 (citing Akimoto); *see* Appx361. BOE's submission therefore built on the petition's showing that an all-pMOS modification of the *pixel circuit* had manufacturing benefits and also explained why the Board's assumption that one would also have to modify the *driver circuit* was mistaken. Because BOE offered "further develop[ment]" of the issue, BOE did not "go[] in a new direction" as the Board said. Appx412; *contra* Appx375. The Board appeared to find a new direction only by doubling down on its prior misconception that such benefits required changing the driver circuitry in addition to the pixel circuitry, Appx412, when the petition did not so argue, *see* Appx84; Appx101; Appx133.

Because BOE's supplement was directly responsive to the Board's questions at institution, the Board's refusal to permit such evidence was

an abuse of discretion. "[A] petitioner is entitled in its reply to 'respond to arguments raised in the corresponding opposition, patent owner preliminary response, patent owner response, or decision on institution.'" *Everstar Merch. Co. v. Willis Elec. Co.*, No. 21-1882, 2022 WL 1089909, at *4 (Fed. Cir. Apr. 12, 2022) (citation omitted); *cf. Apple*, 949 F.3d at 704-07 (finding abuse of discretion in Board's setting aside of a petitioner's "responsive" reply declaration and brief); *AMC Multi-Cinema, Inc. v. Fall Line Pats., LLC*, No. 21-1051, 2021 WL 4470062, at *6, *8 (Fed. Cir. Sept. 30, 2021) (finding abuse of discretion in the Board's ignoring of a supplemental expert declaration "that fairly adds confirmation [to] … initially presented material"); *Altaire*, 889 F.3d at 1284-85 (finding abuse of discretion where the Board declined to consider reply declaration).

## II. The Board Erred In Finding That Kimura Does Not Render Obvious The "Shared Control Of Two Transistors."

Claims 1-6 and 13-18 of the '599 patent also require the "shared control of two transistors." Appx37 (capitalization omitted). The Board erred in finding that Kimura does not render obvious this common limitation.

The parties and the Board treated claim 13 as representative for purposes of this limitation. Appx37; Appx526-532. And, as the Board acknowledged, BOE's petition expressly "relie[d] on an 'all-PMOS version of Kimura Fig. 36,'" rather than Figure 33, to show how Kimura discloses the shared control limitation. Appx37-38 (quoting Appx142-143). BOE did so because Figure 33 is not compatible with shared control. Appx38 (quoting Appx144-145); Appx1161-1166. But, in every other material respect, Figure 36 is identical to (and indeed an extension of) Figure 33. Appx43 (quoting Appx95 n.3). So BOE's petition explained that the Figure 33 analysis mostly applied to Figure 36 as well, Appx95 n.3, then showed how Figure 36 also disclosed the "shared control" required by the relevant claims, Appx142-147.

Contrary to BOE's petition, the Board held that BOE must necessarily have relied *also* on Figure 33 to disclose the "shared control" limitation, and it faulted BOE for failing to show how Figure 33 did so. Appx40-44.

This Court should vacate and remand for two reasons. First, the Board erred in finding that BOE's petition failed to disclose a complete shared control theory based on Figure 36, and in requiring BOE to also

address Figure 33 in connection with the "shared control" limitation. § II.A. Second, the Board erred in denying BOE's motion to submit supplemental information in further support of BOE's shared control theory under Figure 36, after the Board invited BOE to do so. § II.B.

### A. The Board erred in finding that BOE's petition failed to disclose a complete theory under Kimura's Figure 36.

#### 1. BOE's petition relied on Kimura's Figure 36 to meet the shared control limitation.

BOE's petition focused generally on the all-pMOS modification of Kimura's Figure 33, Appx41-42, except with respect to representative claim 13's "shared control" requirement—that is, the limitation that the gates of both the fourth and fifth transistors be controlled by "the current light emitting signal." Appx37-38 (quoting Appx69 10:20-28; Appx142-143); Appx1161-1166. Figure 33 does not include this shared control. On the contrary, as BOE explained, Figure 33 shows the fourth and fifth transistors controlled by different signals—such that the fourth transistor can be off while the fifth transistor is on. Appx144-145.

Figure 36 is different on its face. While Figure 36 is largely the same as Figure 33, it has one key difference relevant to shared control.

In Figure 36, the fourth and fifth transistors are always on or off together. Appx144-145. A skilled artisan would therefore understand that Kimura discloses (or renders obvious) using a shared light-emitting signal to control the fourth and fifth transistors. Appx145; *see also* Appx610-619. Kimura itself provides one reason for using a shared light-emitting signal in this context—reducing the number of control lines improves aperture ratio. Appx144-145; Appx317-318.

Thus, as the Board and Samsung acknowledged, BOE expressly relied on an "all-PMOS version of Kimura Fig. 36" to show how Kimura satisfied the "shared control" limitation of representative claim 13. Appx37-38; *see also* Appx239 (Samsung recognizing that BOE relied not on Figure 33 but on "Kimura's Figure 36"); *see* Appx237-246. BOE then relied on that analysis to demonstrate obviousness of the "shared control" limitation in the other relevant claims. With respect to claim 1, BOE "relie[d] on the same reasoning it presents for essentially the same limitation in claim 13," Appx49, incorporating that analysis for each of dependent claims 2-6, Appx1219-1222. And BOE similarly analyzed the shared control requirement for claims 14-18 by referring back to its claim 13 analysis. *See* Appx1172-1174 (limitations 14f-g); Appx1179-

1181 (limitations 15d-e); Appx1185 (referring back to claim 15 analysis for dependent claim 16); Appx1195-1198 (analyzing limitations 17d-e by referring back to 15d-e); Appx1200 (referring back to claim 17 analysis for dependent claim 18).

But BOE made clear that, apart from the shared control limitation, the obviousness analysis was the same for Figures 33 and 36. As BOE's petition explained, "Kimura Fig. 36 is merely an extension of Fig. 33[,] and discussion of one applies equally to the other unless noted." Appx95 n.3. In other words, for the remaining limitations of the shared control claims, the analysis BOE had provided elsewhere in connection with Figure 33 applied equally to Figure 36.

In rejecting BOE's showing, the Board did not disagree that Figure 36 would render the "shared control" limitation obvious. Nor did it substantively reject BOE's showing that the remaining limitations of the relevant claims were found equally in Figures 33 and 36. Instead, the Board observed that Figure *33* would not be compatible with shared control, Appx40, and found that BOE's claim 13 "obviousness contentions necessarily rely on Kimura's Figure 33 embodiment." Appx41. That finding was doubly flawed.

First, the Board erred in its "mischaracterization of" BOE's claim 13 analysis as relying on Kimura's Figure 33, a procedural error that requires vacatur. *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 124 (Fed. Cir. 2022). The Board reasoned that, "because claim 13 depends from independent claim 7 and thus incorporates all of the limitations from claim 7," BOE's claim 7 analysis must apply equally to its claim 13 analysis. And, because BOE relied on Figure 33 in connection with claim 7, the Board reasoned that BOE *necessarily* relied on Figure 33 in support of its claim 13 theory as well. Appx42-44. But that inference is wrong. Again, the petition was clear that "the all-PMOS version of Kimura Fig. 36 … renders claim 13 obvious." Appx142-143.

That express statement alone should have ended the matter. But the Board discounted it, contending that "Petitioner seems to rely on Figure 36 only for teaching the added limitations of claim 13." Appx43. In other words, the Board seems to have taken BOE to be suggesting a combination of the Figure 33 and Figure 36 embodiments, with most of the showing premised on Figure 33. But that is simply not what BOE said. The Board was therefore wrong to fault BOE for not stating "how such teachings would be reconciled with the Figure 33 teachings on

which Petitioner relies for base claim 7." Appx43. There was nothing to "reconcile[]." With respect to the limitations of independent claim 7 that are part of dependent claim 13, BOE's analysis under Figure 33 and Figure 36 was *identical*. Appx615-616; Appx95 n.3. That explains why, as the Board recognized, "in Petitioner's discussion of Kimura's Figure 36 embodiment with respect to claim 13, Petitioner does not revisit any of previously addressed limitations of claim 7 based on Kimura's Figure 33 embodiment." Appx43. This is similar to Kimura's own approach of explaining Figure 33 in detail and then simply noting the changes made in subsequent figures, including Figure 36. Appx1011 [0665]-[0666].

The Board refused to accept BOE's straightforward explanation for this approach—namely, that "Kimura Fig. 36 is merely an extension of Fig. 33[,] and discussion of one applies equally to the other unless noted." Appx43 (quoting Appx95 n.3). The Board discounted that statement too, holding that "[i]t does not reasonably convey that Petitioner's substantive analysis for claim 13 … is completely based on Kimura's Figure 36 embodiment and not at all on Kimura's Figure 33 embodiment." Appx43. It is difficult to see what more BOE could have

done to convey its substantive analysis. The Board's "mischaracterization of [BOE's] argument," and its resulting refusal to address the substance of BOE's showing, "precludes [this Court] from engaging in meaningful appellate review and, therefore, violates the APA." *Provisur*, 50 F.4th at 124.

This Court has also held that the Board abuses its discretion when it requires a party to use "magic words" or "formulaically articulate" a proposition even though the substance of that proposition is apparent from the party's argument. *Netflix, Inc. v. DivX, LLC*, 80 F.4th 1352, 1359-60 (Fed. Cir. 2023). That is what the Board seems to have done here, asking BOE to state not just that "the all-PMOS version of Kimura Fig. 36 … renders claim 13 obvious" but that "the all-PMOS version of Kimura Fig. 36 … renders claim 13 obvious, *with respect to each of claim 13's limitations, including those in common with claim 7*." Here, as in *Netflix*, the Board "erred by imposing a higher burden than that required by [this Court's] precedent." *Id.* at 1360.

Second, the Board erred in demanding that BOE prove that Figure 33 was compatible with the shared control limitation, Appx39-40. Again, BOE was clear that it was relying on Figure 36 for the

common "shared control" limitation in claims 1-6 and 13-18 precisely *because* Figure 33 did not accommodate shared control. Appx144-145; *see also* Appx239 (Samsung noting same at institution stage). Yet the Board insisted that, because BOE did not rely *exclusively* on Figure 36 to establish some *other* limitations of those claims—instead incorporating its discussion of Figure 33 with respect to those limitations—BOE could not establish obviousness as to any of these claims. *See* Appx49 (finding that "[t]he deficiency discussed above for claim 13 equally applies to" claims 1-6 and 14-18).

The Board's demand that BOE prove Figure 33's compatibility with shared control erroneously assumed that BOE was somehow relying on Figure 33 to establish shared control. For the reasons explained above, BOE was not. By nonetheless requiring BOE to make this showing, the Board further "erred by imposing a higher burden than that required by [this Court's] precedent." *Netflix*, 80 F.4th at 1360.

The Board's imposition of that higher burden also violated the well-established legal principle that obviousness requires "an expansive and flexible approach" informed by "common sense" rather than a "rigid

approach." *KSR*, 550 U.S. at 415, 421. As explained above, BOE's theory in the petition was that while Figures 33 and 36 had everything else relevant in common, the two figures differed in the critical respect that Figure 36 disclosed shared control, while Figure 33 did not and could not. The Board's rigid insistence that Figure 33 itself must be compatible with the "shared control" limitation, simply because BOE had relied on the otherwise substantial overlap between the two figures in the course of its obviousness analysis, is inconsistent with the common-sense and flexible approach demanded by *KSR*.

Because the Board erred in finding that BOE failed to disclose a complete shared control theory relying on Figure 36, the Court should vacate this aspect of the Board's decision.

#### 2. The Board erred in finding that BOE's reply relying on Kimura's Figure 36 represented a new direction.

The Board might have avoided the errors discussed above had it not committed another, related error in analyzing BOE's reply arguments.

As explained above (at 62-66), BOE's petition demonstrated why Figure 36 rendered obvious the shared control limitation. In response,

Samsung proceeded from the mischaracterization that "[t]he Petition's theory is that a POSITA would modify Kimura's Figure *33* embodiment to control the fourth and fifth transistors with a shared light emitting signal." Appx529 (emphasis added). Samsung then argued that adopting a shared control modification would render a circuit based on Figure 33 inoperable. Appx526-532; *contra* Appx239 (Samsung, pre-institution, acknowledging that BOE's shared control theory rested on Figure 36). BOE replied that Samsung mischaracterized BOE's petition, which had relied on Figure 36, not Figure 33, for the shared control limitation and its representative claim 13 analysis. Appx611-619; Appx2202-2213. BOE similarly explained that the Board's focus on Figure 33 in its institution decision was misplaced; BOE had not relied directly on Figure 33 to show obviousness of claim 13, but had relied on the fact that, for all the limitations of independent claim 7, the analysis was identical under Figures 33 and 36. Appx615-619.

The Board found that this reply material "represents a new direction with a new approach as compared to the positions Petitioner took in the Petition." Appx45. The Board declined to address BOE's explanation (Appx615-619) of its reliance on Figure 36 versus Figure

33. The Board's finding that the reply "represents a new direction" is both (1) unsupported by the record and (2) unsupported by any reasoned explanation.

**1.** The Board abused its discretion in finding that BOE's "claim 13" analysis under Figure 36 "represent[ed] a new direction." BOE's reply relied on exactly the same prior art, evidence, and argument as its petition. *Compare, e.g.*, Appx142-147, Appx103-129, *with* Appx610-619. Indeed, the whole point of the reply material was to respond to (and correct) the Board's and Samsung's misunderstanding of BOE's argument. *See supra* 62-67. Far from taking a "new direction," Appx45, BOE was attempting to provide a map of the trail it had already blazed.

This Court's decision in *Apple*, 949 F.3d at 705-07, illustrates the Board's error. In that case, the Board had similarly "declined to consider certain arguments … on the ground that Apple was raising new arguments in its reply brief." *Id.* at 699. This Court disagreed. Apple's reply relied on the same material from the same prior art reference as its petition had; its "legal ground did not change." *Id.* at 705-06. And Apple's elaboration on this evidence was responsive to arguments raised in the patent owner's response. *Id.* at 706-07. In

those circumstances, "the conclusion that the reply brief constitutes an impermissible new matter is an abuse of discretion." *Id.* at 707.

The same is true here. BOE's reply relied on the same portion of a prior-art reference—that is, Kimura's Figure 36—that it had previously identified as rendering obvious the same "shared control" limitation in the same representative claim 13. Just as the petition identified the "all-PMOS version of Kimura Fig. 36" as "render[ing] claim 13 obvious," Appx142-143, the reply did the same, Appx612-619. BOE explained in detail why Samsung's contrary argument was wrong. Appx611-619. To require BOE to have anticipated Samsung's and the Board's misunderstanding of the original argument would "hold petitioners to" an "unreasonabl[y] … high standard." 949 F.3d at 706. The Board's abuse of discretion warrants vacatur and remand for consideration on the full record.

**2.** This Court should also vacate the Board's rejection of BOE's reply argument because the Board failed to provide a reasoned basis for its decision. Here, the very portions of BOE's reply that the Board declined to consider or address explained *why* BOE's obviousness theory was not "new." Rather than grapple with those issues and correct its

own misunderstanding, the Board summarily labeled BOE's explanation *itself* a new theory in order to avoid addressing BOE's arguments. That was improper.

Failing to address and "mischaracteriz[ing]" a party's "arguments[] precludes [this Court] from engaging in meaningful appellate review and, therefore, violates the APA." *Provisur*, 50 F.4th at 123-24. And similarly, where the Board "fail[s] to articulate a *reason why*" it credits one party's arguments over another, vacatur is required. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382-85 (Fed. Cir. 2016). In determining obviousness, "it is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument." *Id.* at 1383. Because the Board mischaracterized BOE's theory in the petition and reply and failed to provide a reasoned basis for rejecting BOE's arguments on reply, vacatur is required.

### B. The Board erred in denying BOE's motion to submit supplemental information regarding shared control.

The Board also erred in denying BOE's motion to submit supplemental information regarding the shared control of two transistors.

At institution, the Board agreed with BOE that, "if the fourth and fifth transistors are always turned on and off together, as Petitioner asserts is the case for the embodiment of Figures 36A-36E, there is reason for one of ordinary skill in the art to drive the fourth and fifth transistors by the same control signal, i.e., reducing the number of control lines and improving aperture ratio." Appx318. But the Board questioned whether the fourth and fifth transistors are always turned on and off together, because BOE's reasoning applied only to Figure 36 and not to Figure 33. The Board noted that it "question[ed] [BOE's] reasoning presented to account for claim 13" and stated that "[t]he parties may further develop the issue subsequent to institution of trial." Appx319.

BOE sought to answer the Board's questions by moving to submit supplemental information, including a supplemental expert declaration addressing Figure 36. Appx361-363; Appx1898-1910. But the Board denied that motion. Appx403-407. To justify that ruling, the Board block-quoted a portion of Samsung's opposition that took issue with two aspects of the supplemental information: Dr. Foty's discussion of the

operation of Figure 36, and Dr. Foty's citation to another reference to show that shared control was well known in the art. Appx405-406.

The Board stated that, when it invited the parties to "further develop the issue," it was authorizing the parties only to address whether "operations that used to be governed by a particular output from the fourth or fifth transistor *in Figure 33* would continue to operate the same as when [sic] they used to operate, when the output provided from the fourth or fifth transistor is different." Appx44 n.11 (quoting Appx319) (emphasis added). But that characterization is flatly inconsistent with the actual text of the institution decision. After raising multiple questions about the petition's showing on the "shared control" issue, Appx316-319, the Board concluded: "For the foregoing reasons, we question Petitioner's reasoning presented to account for claim 13," and "[t]he parties may further develop the issue subsequent to institution of trial." Appx319. Those "foregoing reasons"—plural—were not limited to the one sentence the Board seized on in denying BOE's motion to supplement.

Moreover, even without an express invitation from the Board, BOE was entitled to provide a "responsive … argument[,]" *Apple*, 949

F.3d at 706, to the skepticism expressed in the institution decision (Appx316-319)—skepticism that Samsung would later adopt into a full-fledged mischaracterization in its patent owner response (Appx526-532). BOE's proposed supplemental materials were directly responsive to both. *See supra* 62-67; 71-72.

In sum, the Board invited BOE to develop this issue further, BOE did so, and the Board then rejected and ignored BOE's development. That was an abuse of discretion.

## III. The Board Abused Its Discretion In Denying BOE's Motion To Submit Supplemental Information.

As explained, the Board abused its discretion in excluding additional evidence on manufacturing benefits, *supra* § I.B, and on the shared control of two transistors, *supra* § II.B. The Board similarly abused its discretion in excluding additional evidence on the sixth initialization transistor issue.

Dependent claims 2, 8, 16, and 18 add a sixth transistor to the five-transistor design of the other claims. *See* Appx68-70. This transistor is used during the initialization phase. Appx130. The Board declined to reach the merits of the parties' dispute on whether Kimura renders this initialization transistor limitation obvious. Appx51. But it

made a procedural ruling affecting the dispute. Similar to its other procedural errors, the Board improperly barred BOE from providing "responsive … argument[]" to address Samsung's mischaracterizations and the Board's flawed reasoning in its institution decision. *Apple*, 949 F.3d at 706; *Everstar Merch. Co.*, 2022 WL 1089909, at *4.

BOE's petition analyzed representative claim 8, which recites "a sixth initialization transistor for discharging the data signal voltage stored in the capacitor in response to a scan signal just before the current scan signal upon initialization." Appx69 9:58-64; *see* Appx129-136. As BOE showed, Kimura's Figure 33 already disclosed a fifth transistor that "can also be used as an erasure [transistor]" that resets the capacitor voltage to a default initialization value. Appx130-131. But Kimura explains that doing so results in "unnecessary" light emission. Appx1011 [0666]. Thus, BOE proposed adopting the approach disclosed in Kimura's Figure 16-17, which directly resets the capacitor and solves the unnecessary light emission problem. Appx131.

In its preliminary response, Samsung argued (1) that BOE was erroneously conflating initialization with erasure and (2) that Kimura's initialization and erasure periods do not overlap. Appx205-209. In its

institution decision, the Board stated that Samsung's characterization of BOE's arguments "appears to be true." Appx314.

BOE's supplemental declaration sought to correct these misapprehensions, explaining that because the initialization phase repeats itself every time the first gate line signal pulses, the initialization period *does* overlap with, and occurs within, the erasure period. Appx363-364; Appx1910-1916. BOE offered declaration testimony responding to Samsung's mischaracterization and reliance on embodiments raised for the first time in its responsive briefing. Appx1916-1921. BOE was entitled to provide this directly responsive evidence. *See AMC Multi-Cinema*, 2021 WL 4470062, at *6, *8; *Apple*, 949 F.3d at 704-07.

Even while acknowledging that the majority of the supplemental information BOE proposed "does not change the theory or arguments in the Petition or the first declaration of Dr. Foty," the Board held that two paragraphs in the declaration "improperly seek[] to refine or bolster the positions taken by [BOE] in the Petition." Appx408-410. According to the Board—block-quoting Samsung's argument—these two paragraphs improperly changed BOE's theory by "acknowledg[ing] that

initialization period and erasure are <u>not</u> the same." Appx410. The Board reasoned that if initialization and erasure are not the same, then there was no reason for BOE to have originally relied on Figure 33's erasure transistor at all. Appx409-410. But that reasoning only shows the Board's misunderstanding. BOE's petition explained that it was the commonalities (namely, discharging the storage capacitor)—not the *differences*—between erasure and initialization that provided motivation to use the approach from Figures 16-17, which would provide similar, but superior, functionality by resetting the capacitor without emitting "undesired" light. Appx130-131. BOE's supplemental information did not change BOE's theory at all.

The Board's refusal to permit this responsive evidence was an abuse of discretion. Should this Court remand to the Board, it should correct this error so that the Board may consider the parties' dispute on the sixth initialization transistor with a complete evidentiary record.

## CONCLUSION

This Court should vacate and remand.

May 19, 2025

Respectfully submitted,


*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
Jonas Q. Wang
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

Richard Martinelli
Joseph R. Kolker
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Travis Jensen
Bas de Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Xiang Wang
ORRICK, HERRINGTON & SUTCLIFFE LLP
Number 1 Jianguomenwai Avenue
5701 China World Tower A
Beijing, Beijing 100004
People's Republic of China


*Counsel for Appellants*

**ADDENDUM**

Final Written Decision,
Paper No. 68, filed December 6, 2024 ........................................ Appx1

U.S. Patent No. 7,414,599 ............................................................. Appx58

[redacted]

Trials@uspto.gov
571-272-7822

Paper 68
Entered: December 6, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO. LTD., WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD., TIANMA MICROELECTRONICS CO. LTD, and VISIONOX TECHNOLOGY, INC.,
Petitioner,

v.

SAMSUNG DISPLAY CO., LTD.,
Patent Owner.

---

IPR2023-00941
Patent 7,414,599 B2

---

Before JAMESON LEE, TERRENCE W. MCMILLIN, and JOHN A. HUDALLA, *Administrative Patent Judges.*

LEE, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claim Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

We instituted an *inter partes* review of claims 1–18 ("challenged claims") of U.S. Patent No. 7,414,599 B2 (Ex. 1001, "the '599 patent") owned by Samsung Display Co., Ltd. ("Patent Owner"). Paper 12 ("Decision to Institute" or "Inst. Dec."). We have authority to conduct this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. We determine that Mianyang BOE Optoelectronics Technology Co., Ltd., Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd., Tianma Microelectronics Co., Ltd., and Visionox Technology, Inc. (collectively, "Petitioner") have not proved by a preponderance of the evidence that any of claims 1–18 of the '599 patent is unpatentable.

## *A. Background*

Petitioner filed a Petition requesting an *inter partes* review of the challenged claims pursuant to 35 U.S.C. §§ 311–319. Paper 1. Patent Owner filed a Preliminary Response. Paper 9 ("Prelim. Resp.").

The Decision to Institute was entered on December 15, 2023. Paper 12. Thereafter, Petitioner filed a Motion to Submit Supplemental Information seeking to submit three items, including a 35-page supplemental declaration (Ex. 1019) of Petitioner's expert, Daniel Foty, Ph.D. Paper 18. Patent Owner opposed the motion. Paper 19. We denied the Motion to Submit Supplemental Information and determined that the proposed supplemental information proceeded in a new direction and deviated from Petitioner's positions in the Petition by including new opinions regarding transistor 3612 in Kimura's Figure 36 embodiment. Paper 27, 9–10. We stated that "[t]he proposed supplemental declaration changes Petitioner's

theory of obviousness." *Id.* at 11. Petitioner did not seek rehearing of that denial.

Patent Owner filed a confidential Response (Paper 33, "PO Resp."); Petitioner filed a Reply (Paper 41, "Reply"); and Patent Owner filed a Sur-reply (Paper 45, "Sur-reply"). Patent Owner also filed a public version of its Response which includes redactions. Paper 32.[1]

Petitioner filed a Motion to Exclude Exhibits 2018, 2021–2043, 2047, 2049, 2051, 2052, and 2054, as well as paragraphs 136 and 138–144 of Exhibit 2008. Paper 59. Patent Owner filed an Opposition (Paper 61) to the Motion, and Petitioner filed a Reply (Paper 63) to that Opposition.

Patent Owner filed a Motion to Exclude Exhibit 1003 and 1029. Paper 58. Petitioner filed an Opposition (Paper 60) to that Motion, and Patent Owner filed a Reply (Paper 62) to that Opposition.

Petitioner filed a First Motion to Strike directed to portions of the Patent Owner Response that allegedly incorporate by reference material from Exhibits 2018, 2047, 2051, and 2052. Paper 37. Patent Owner filed an Opposition (Paper 38) to that Motion and Petitioner filed a Reply (Paper 39) to that Opposition.

Petitioner filed a Second Motion to Strike directed to arguments in Patent Owner's Sur-reply and Exhibit 2054 cited therein. Paper 46. Patent

[1] Patent Owner filed an Unopposed Motion to Seal and for Entry of Protective Order. Paper 31. We granted Patent Owner's Motion to Seal and granted-in-part and denied-in-part Patent Owner's Motion for Entry of Protective Order. Paper 55. A protective order governing the handling of confidential information in this proceeding has been entered. Paper 54.

Owner filed an Opposition (Paper 47) to that motion and Petitioner filed a Reply (Paper 50) to that Opposition.

An oral hearing was held on September 16, 2024. The hearing transcript has been entered as Paper 67.

We determine that Petitioner has not proven by a preponderance of the evidence that any of claims 1–18 of the '599 patent is unpatentable.

*B. Real Parties in Interest*

Petitioner identifies Mianyang BOE Optoelectronics Technology Co., Ltd. (BOE"), Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd., Tianma Microelectronics Co. Ltd., and Visionox Technology, Inc., and their subsidiaries as real parties in interest. Pet. 95. Patent Owner identifies only itself as the real party in interest. Paper 7, 2.

*C. Related Matters*

Patent Owner identifies the following litigations involving the '599 patent as related matters:

1. *Certain Active Matrix Organic Light-Emitting Diode Display Panels And Modules For Mobile Devices, and Components Thereof*, Inv. No. 337-TA-1351 (USITC);
2. *Samsung Display Co., Ltd. v. BOE Technology Co., Ltd.*, Case No. 2-23-cv-00309 (E.D. Tex.).

Paper 7, 2. Petitioner identifies the same investigation before the International Trade Commission, i.e., No. 337-TA-1351, as a related matter. Pet. 95.

*D. The '599 Patent*

The '599 patent issued on August 19, 2008, from Application No. 10/886,014, filed July 6, 2004, and claims priority to KR 10-2003-0045610, filed July 7, 2003. Ex. 1001, codes (21), (22), (30), (45).

The '599 patent is directed to a pixel circuit in an organic light emitting device, which self-compensates the threshold voltage of a driving transistor. Ex. 1001, code (57). The '599 patent describes a problem with preexisting organic light emitting devices, i.e., nonuniformity from pixel to pixel caused by a variation of the threshold voltage of the driving transistor in each pixel circuit, which leads to a difference in the current flowing through the electroluminescent element in each pixel circuit. *Id.* at 1:38–50.

The pixel circuit of the '599 patent includes an electroluminescent element for emitting light in response to an applied driving current, as well as a number of transistors and a capacitor. *Id.* at code (57). Figure 3 of the '599 patent, annotated by Petitioner (Pet. 7), is reproduced below:

FIG. 3



Figure 3 illustrates a pixel circuit according to one embodiment of the '599 patent. Ex. 1001, 5:65–67. Petitioner highlights transistors T32, T31, T33, T35, T36, and T34 in yellow and numbers them as 1, 2, 3, 4, 5, and 6, respectively, and highlights light-emitting element EL31 in blue. Pet. 7.

Transistor T32 switches data signal voltage VDATAm, applied to the associated data line, in response to current scan line signal SCAN[n] applied to the associated scan line. Ex. 1001, 6:24–27. Transistor T31 supplies a driving current to electroluminescent device EL31 in response to the data signal voltage from transistor T32. *Id.* at 6:27–31. Transistor T33 compensates for the threshold voltage of transistor T31. *Id.* at 6:31–33. Capacitor C31 stores the data signal that is applied to the gate of transistor T31. *Id.* at 6:33–34. Each pixel includes transistor T34 for initializing the data signal stored in capacitor C31 in response to a previous scan signal SCAN[n-1], which was applied to a scan line just before the associated scan line. *Id.* at 7:3–6. Transistor T35 provides power supply voltage VDD for driving transistor T31 in response to current light-emitting signal. *Id.* at 52–55. Transistor T36 provides a driving current, generated through transistor T31, for EL element EL31 in response to current light-emitting signal. *Id.* at 6:55–58.

The '599 patent describes three different operations for the pixel circuit of Figure 3: an initialization operation, a data program operation, and a light-emitting operation. Ex. 1001, 7:15–64. The initialization operation initializes the data signal stored in capacitor C31, which provides the gate voltage of driving transistor 31. *Id.* at 7:24–26. The '599 patent explains:

[redacted]



> First, in an initialization operation, during an initialization period in which previous scan signal SCAN[n-1] is of a low level, and current scan signal SCAN[n] and light-emitting signal EMI[n] are of high level as shown in FIG. 4, since transistor T34 is turned on by the low level of previous scan signal SCAN[n-1], and transistors T31-T33 and T35-T36 are turned off by the high level of current scan signal SCAN[n] and current light-emitting signal EMI[n], an initialization path (as indicated by a solid line shown in FIG. 5) is formed. Accordingly, the data signal that has been stored in capacitor C31, namely, a gate voltage of driving transistor T31, is initialized.

*Id.* at 7:15–26 (bracketed material in original). Figure 5 of the '599 patent is reproduced below:

FIG. 5




Figure 5 is a diagram for explaining the initialization operation of an embodiment of the pixel circuit of the '599 patent. *Id.* at 6:4–7.

The data programming operation applies a data voltage VDATAm to the gate of driving transistor T31 through threshold voltage compensation transistor T33. *Id.* at 6:41–44. The '599 patent explains:

> Next, in a data program operation, during a programming period in which previous scan signal scan [n-1] is at a high level, current scan signal SCAN[n] is at a low level and current light-emitting signal EMI[n] is at a high level as shown in FIG. 4, transistor T34 is turned off, and transistor T33 is turned on by the low level of current scan signal SCAN[n], such that driving transistor T31 is connected in the form of a diode.
>
> Since switching transistor T32 is also turned on by current scan signal SCAN[n], and switching transistors T35 and T36 are turned off by current light-emitting signal EMI[n], such that a data program path (as indicated by a solid line shown in FIG. 6) is formed. Accordingly, data voltage VDATAm applied to the associated data line is provided for the gate of driving transistor T31 through threshold voltage compensation transistor T33.
>
> Since driving transistor T31 is in the diode connection, VDATAm-$V_{TH(T31)}$ is applied to the gate of transistor T31 and the gate voltage is stored in capacitor C31, such that the program operation is completed.

*Id.* at 7:28–48 (bracketed material in original). Figure 6 of the '599 patent is reproduced below:

FIG. 6



Figure 6 is a diagram for explaining the data program operation of an embodiment of the pixel circuit of the '599 patent. *Id.* at 6:4–7.

The light-emitting operation causes emission of light from light-emitting element EL31 by a driving current generated through transistor T31 in response to the data signal voltage applied to the gate of driving transistor T31. *Id.* at 7:60–64. The '599 patent explains:

> Finally, in a light-emitting operation, during an light-emitting period in which previous scan signal SCAN[n-1] is of high level, current signal SCAN[n] becomes a high level, and then current light-emitting signal EMI[n] becomes a low level as shown in FIG. 4, an light-emitting path (as indicated by the solid line as shown in FIG. 7) is formed. That is, switching transistors T35 and T36 are turned on by the low level of current light-emitting signal EMI[n], initialization transistor T34 is turned off by the high level of previous scan signal SCAN[n-1], and threshold voltage compensation transistor T33 and switching transistor T32 are turned off by the high level of current scan signal SCAN[n]. Accordingly, a driving current generated in response to the data signal voltage applied to the gate of driving transistor T31 is provided through transistor T31 for organic EL element EL31, such that the light-emitting of organic EL element EL31 occurs.

*Id.* at 7:49–65 (bracketed material in original). Although this description references a solid line indicating a light-emitting path in Figure 7, the drawing figure labeled "Figure 7" in the '599 patent does not have such a solid line. In fact, Figure 7 appears to mistakenly duplicate Figure 6 of the '599 patent. In the Petition, Petitioner refers instead to Figure 7 of the Korean patent application to which the '599 patent claims priority in order to illustrate the textual description in the '599 patent for Figure 7. Pet. 6 n.1; *see also* Ex. 1001, code (30) (foreign priority data); Ex. 1003 ¶ 101 (Dr. Foty reproducing the Korean application version of Figure 7). Patent

Owner does not dispute that there is inaccuracy in that regard. We accept Figure 7 of the Korean priority application of the ’599 patent as Petitioner’s illustration of the textual description in the ’599 patent for Figure 7. We find that it is consistent with and also a reasonable depiction of the textual description in the ’599 patent for Figure 7. Figure 7 of the Korean priority application of the ’599 patent (as annotated by Petitioner) is reproduced below:




This figure is used by Petitioner to illustrate the textual description in the ’599 patent for the light-emitting operation of the pixel circuit. Pet. 10–11.

Claims 1, 7, 14, 15, and 17 are independent. Claim 7 and 14 are representative and reproduced below:[2]

> [Claim 7 Preamble] A pixel circuit in an organic light emitting device, comprising:

[2] The bracketed labels correspond to those used by Petitioner to reference the claim elements. *See* Pet. 23–49, 67–70. We use the same labels here for ease of reference, understanding, and consistency.

[7a] a first transistor for delivering a data signal voltage in response to a current scan line signal;

[7b] a second transistor for programming the data signal voltage and for generating a driving current in response to a programmed data signal when light is emitted;

[7c] a third transistor for providing the data signal voltage for the second transistor in response to the current scan signal;

[7d] a capacitor for maintaining the data signal voltage programmed onto the second transistor;

[7e] a fourth transistor for delivering a power supply voltage to the second transistor when the light is emitted;

[7f] a fifth transistor for delivering the driving current, provided from the second transistor, in response to the data signal voltage when the light is emitted; and

[7g] an electroluminescent element for emitting light corresponding to the driving current delivered through the fifth transistor,

[7h] wherein the third transistor connects the second transistor in the form of a diode in response to the current scan signal so that the second transistor detects and compensates its threshold voltage deviation in itself.

Ex. 1001, 9:35–58.

[Claim 14 Preamble] A pixel circuit in an organic light emitting device, comprising:

[14a] an electroluminescent element for emitting light in response to an applied driving current;

[14b] a first transistor for delivering a data signal voltage in response to a current scan line signal;

[14c] a second transistor for generating a driving current to drive the electroluminescent element in response to the data signal voltage;

> [14d] a third transistor for connecting the second transistor in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor;
>
> [14e] a capacitor for storing the data signal voltage delivered to the second transistor;
>
> [14f] a fourth transistor for delivering a power supply voltage to the second transistor in response to a current light-emitting signal; and
>
> [14g] a fifth transistor for providing the driving current, provided from the second transistor, for the electroluminescent element in response to the current light-emitting signal.

*Id.* at 10:29–49.

*E. Reference relied on by Petitioner and Declarations*

Petitioner relies on the following reference:

> "Kimura" -- U.S. Pub. Pat. App. 2003/0132931 A1, published July 17, 2003, based on Application No. 10/283,330, filed Oct. 30, 2002, and claims priority to JP 2002-298062, filed Oct. 10, 2002, and JP 2001-333575, filed Oct. 30, 2001. Ex. 1002, codes (21), (22), (30), (43).

Petitioner relies on the Declaration of Daniel Foty, Ph.D. (Ex. 1002) submitted with the Petition, and a Supplemental Declaration of Dr. Foty (Ex. 1029) submitted with Petitioner's Reply.

Patent Owner relies on the Declaration of Andrew Wolfe, Ph.D. (Ex. 2008 (filed in confidential and public version)), the Declaration of Aris Silzars, Ph.D. (Ex. 2043), and the Declaration of Kwangsae Lee (Ex. 2046 (filed in confidential and public version)), all submitted with the Patent Owner Response.

In support of its Opposition to Patent Owner's Motion to Exclude Evidence, Petitioner relies on the Declaration of Thomas L. Credelle, Ph.D. (Ex. 1035) which was provided by Petitioner as supplemental evidence. Paper 60, 3.

In support of its Opposition to Petitioner's Motion to Exclude Evidence, Patent Owner relies on a Supplemental Declaration of Dr. Wolfe. (Ex. 2055) which was filed by Patent Owner as supplemental evidence. Paper 61, 14.

*F. Asserted Ground of Unpatentability*

Petitioner asserts that the challenged claims of the '599 patent are unpatentable based on the following ground:

| Claims Challenged | 35 U.S.C. §[3] | Reference(s)/Basis |
|---|---|---|
| 1–18 | 103 | Kimura |

Pet. 2.[4]

[3] The Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103. Based on the record before us, we determine that the '599 patent has an effective filing date prior to the effective date of the applicable AIA amendments (March 16, 2013). We, therefore, refer to the pre-AIA version of 35 U.S.C. § 103.

[4] Petitioner actually states the ground of unpatentability as "over Kimura (EX1002) and Knowledge of POSITA [person of ordinary skill in the art]." Pet. 2. However, it is not necessary to expressly state "knowledge of a POSITA, because the obviousness determination is made form the perspective of "a person having ordinary skill in the art." 35 U.S.C. § 103.

## II. ANALYSIS

### *A. Burden of Proof*

The Petitioner has the burden of proving unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). That burden never shifts to Patent Owner except in limited circumstances not present here. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375 (Fed. Cir. 2016). "Preponderance of the evidence means the greater weight of evidence, evidence which is, more convincing than the evidence which is offered in opposition to it." *United States v. C.H. Robinson Co.*, 760 F.3d 1376, 1383 (Fed. Cir. 2014) (internal quotations omitted).

### *B. Level of Ordinary Skill in the Art*

Petitioner asserts the following with respect to the level of ordinary skill in the art:

> A person of ordinary skill in the art ("POSITA") in the technology field of the '599 patent would have had a Bachelor's degree in electrical engineering or similar discipline, along with 2-3 years of circuit design/analysis experience. *See* EX1003, ¶31. Lack of work experience can be remedied by additional education, and vice versa. *Id.*

Pet. 13 (citing Ex. 1003 ¶ 31).

Patent Owner proposes that a person of ordinary skill in the art "would have had a relevant technical degree in Electrical Engineering, Computer Engineering, Material Science, Physics, or the like, and experience in active matrix display design and electroluminescence." PO Resp. 7 (citing Ex. 2008 ¶¶ 45–49).

We need not resolve the difference between Petitioner's and Patent Owner's articulation of the level of ordinary skill in the art because, adopting Petitioner's articulation, we still determine that Petitioner failed to

prove by a preponderance of the evidence that any of the challenged claims is unpatentable. For our analysis below, we apply Petitioner's articulation of the level of ordinary skill in the art.[5]

### *C. Claim Construction*

We use the same claim construction standard that would be used to construe a claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b) (2022). The claim construction standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) is applicable.

Claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

The specification may reveal a special definition given to a claim term by the patentee, or the specification or prosecution history may reveal an intentional disclaimer or disavowal of claim scope by the inventor. *Id.* at 1316. If an inventor acts as his or her own lexicographer, the definition

[5] All of our findings and conclusions would still be the same, however, had we applied Patent Owner's articulation of the level of ordinary skill in the art.

must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). The disavowal, if any, can be effectuated by language in the specification or the prosecution history. *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner asserts that "no term requires construction for this proceeding." Pet. 14. Patent Owner asserts that "[f]or purposes of this proceeding, Patent Owner does not believe any specialized constructions are necessary." PO Resp. 7. We agree with the parties that it is not necessary to conduct express construction for any claim term.[6]

*D. Alleged Obviousness of Claims 1–18 over Kimura*

*1. The Law on Obviousness*

A claim is unpatentable under 35 U.S.C. § 103(a) "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

[6] We reach this conclusion after having considered the construction of certain claim terms in the '599 patent by the Administrative Law Judge in the related USITC Investigation No. 337-TA-1351 (Ex. 2005, 13–15, 37–48).

subject matter pertains." 35 U.S.C. § 103(a); *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations, including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

*2. Overview of Kimura*

Kimura relates to an active matrix light emitting device including a semiconductor device having a thin film transistor ("TFT"). Ex. 1002 ¶ 1. Kimura describes numerous embodiments of a pixel including a light-emitting device, some with the pixel including "first to third transistors" (*id.* ¶¶ 123, 139), some with the pixel including "first to fourth transistors" (*id.* ¶¶ 40, 54, 68, 82, 95, 110), and some with the pixel including "first to fifth transistors" (*id.* ¶¶ 156, 174, 192, 209, 228, 246).

The Abstract of Kimura describes:

> Brightness irregularities that develop in a light emitting device due to [dispersion] among pixels in the threshold values of TFTs used for supplying electric current to light emitting devices become obstacles to improved image quality of the light emitting device. As an image signal input to a pixel from a source signal line, a desired electric potential is applied to a gate electrode of a TFT for supplying electric current to an EL device, through a TFT having its gate and drain connected to each other. A voltage equal to the TFT threshold values is produced between the source and the drain of the TFT 105. An electric potential in which the image signal is offset by the amount of the threshold value is therefore applied to the gate electrode of the TFT. Further, TFTs are disposed in close proximity to each other within the pixel, so

> that dispersions in the TFT characteristics do not easily develop. A desired drain current can thus be supplied to the EL device even if there is dispersion in the threshold values of the TFTs among pixels, because this is offset by the threshold value of the TFT.

Ex. 1002, code (57).

We focus on the embodiment illustrated in Kimura's Figures 33A through 33E, referred to as Embodiment 9 in Kimura (Ex. 1002 ¶ 652), because Petitioner relies on this embodiment. Petitioner has annotated Figure 33A as shown below (Pet. 22):




Figure 33A is one of several figures, 33A–33E, used to illustrate an embodiment of Kimura's device. Ex. 1002 ¶ 339. In this annotated version of Kimura's Figure 33A, Petitioner has highlighted in yellow transistors 3306, 3308, 3309, 3307, and 3310, and numbered them in red as "1," "2," "3," "4," and "5," respectively (hereinafter Transistors 1–5), and also highlighted in blue electroluminescent ("EL") device 3313. Hereinafter, we

use the same numbering when referring to these transistors in Figures 33B, 33C, 33D, and 33E.

Figures 33B–33E of Kimura are reproduced below:




Figures 33B–33E are the remainder of the figures used to illustrate the same 9th embodiment of Kimura's device. Ex. 1002 ¶ 339. They show the ON/OFF states of each transistor, and the current path in bold.

As shown above in Figure 33A, TFT 3309 (Transistor 3) is connected between the gate electrode and the drain electrode of TFT 3308 (Transistor 2), and Transistor 2 exhibits the behavior of a diode connected TFT when Transistor 3 is on. *Id.* ¶ 654. Kimura explains:

> Operation is explained. First, the TFT 3306 turns on, and an image signal VData is input as shown in FIG. 33B. In addition, The TFT 3309 and a TFT 3310 turn on, and the *TFT 3308 thus behaves as a diode connected TFT*. When the TFT 3310 then turns off electric charge moves as shown in FIG. 33C. The voltage between the source and the drain of the TFT 3308, in other words the voltage between the gate and the source of the

> TFT 3308, eventually becomes equal to the threshold voltage, at which point the TFT 3308 turns off as shown in FIG. 33D.
>
> The TFTs 3307 and 3310 then turn on. The electric potential of a source region of the TFT 3308 increase from VData to VDD as the TFT 3307 turns on. The voltage between the gate and the source of the TFT 3308 therefore exceeds the threshold voltage to cause it to turn on, so that electric current flows in the EL device 3313 to cause it to emit light, as shown in FIG. 33E.
>
> Thus, an electric potential difference equal to the threshold value can be produced between the gate and the source of the driver TFT 3308 in advance in accordance with the above processes, so that even if there is dispersion in the threshold voltages of the TFTs 3308 between adjacent pixels, there is no dispersion in the voltages between the gate and the source of the driver TFTs 3308 of adjacent pixels. In addition, *correction of dispersions in the threshold values is performed in the foregoing embodiments by a method in which the threshold voltage of a diode connected TFT is added to the image signal*, and then input to the gate electrode of another driver TFT.

*Id.* ¶¶ 655–657 (emphasis added).

*3. Overview of the Technical Issues*

Three technical matters are at issue: (1) Petitioner's assertion that it would have been obvious to one of ordinary skill in the art to modify Kimura's Figure 33 embodiment to use only pMOS transistors (hereinafter "All pMOS Transistors Issue"); (2) Petitioner's accounting for a feature that requires shared control of 4th and 5th transistors in claim 13 which depends from claim 7 and in independent claims 14, 15, and 17, and 5th and 6th transistors in independent claim 1 (hereinafter "Shared Control of Two Transistors Issue"); and (3) Petitioner's accounting for a feature regarding an additional initialization transistor in dependent claims 2, 8, 16, and 18 (hereinafter "Initialization Transistor Issue"). As discussed below, Petitioner has not persuasively shown that a POSITA would have modified

Kimura's Figure 33 embodiment to use only pMOS transistors, which is dispositive as to all challenged claims. Petitioner also has not persuasively shown that a POSITA would have modified Kimura's Figure 33 embodiment to have two transistors driven by a shared input signal as the resulting circuit does not work or is inoperative for the pixel circuit, which is further dispositive as to claims 1–6 and 13–18. We do not reach the Initialization Transistor Issue.

4. *The All pMOS Transistors Issue*

Petitioner states: "Before the element-by-element patentability analysis, it is helpful to discuss a modification to Kimura Fig. 33 [Figs. 33A-33E]." Pet. 19. That is a modification which replaces all nMOS transistors with pMOS transistors such that the only transistors used in the embodiment shown Figures 33A–33E are pMOS transistors. Pet. 19–23. The modification is shown on page 22 of the Petition via a side-by-side illustration of the before and after views of the modification to Figure 33A, with colored annotations added by Petitioner, as reproduced below:




**ORIGINAL**




**MODIFIED**

In the version of Figure 33A on the left, labeled "ORIGINAL," Petitioner numbered in red Transistors 1–5 and colored them yellow, as well as colored EL element 3313 blue. In the modified version of Figure 33A on the right, labeled "MODIFIED," Petitioner changed the symbols for Transistors 1, 3, 4, and 5 from nMOS to pMOS, and pointed to them as "PMOS devices" with red arrows. Transistor 2 in the original version is pMOS and remains unchanged by the modification.

Petitioner uses the modified Figures 33A–33E (nMOS transistors 1, 3, 4, and 5 all changed to pMOS transistors so that all transistors are pMOS) to support its assertions of unpatentability of all challenged claims including each independent claim. *See, e.g.*, Pet. 24–49, 72–73, 76–78, 81, 86–93. Petitioner explicitly states immediately after the two side-by-side figures reproduced above: "*Petitioner uses the modified 'ALL-PMOS" version of Fig. 33 for the patentability analysis and includes the label 'All-PMOS' for clarity.*" *Id.* at 22 (emphasis added).

None of the independent claims includes an express limitation with regard to whether all of the recited transistors therein must be pMOS. Petitioner, however, asserts that based on the connections recited within them, independent claims 15 and 17 each require all recited transistors therein to be pMOS transistors. Pet. 71–72, 80. Patent Owner expresses no disagreement. Even for independent claims 1, 7, and 14, Petitioner relies on its all pMOS modification of Kimura's Figure 33 embodiment. Pet. 22 ("Petitioner uses the modified 'All-PMOS' version of Fig. 33 for the

patentability analysis . . . .”). Thus, to prevail on any challenged claim,[7] Petitioner must show that one with ordinary skill in the art would have had reason or motivation to convert Kimura’s Figure 33 embodiment to an all pMOS transistors version of the same embodiment.

Petitioner acknowledges that all transistors in Kimura’s unmodified “Figure 33” are nMOS transistors except for the driving transistor, i.e., transistor 3308 identified as Transistor 2, which is pMOS.[8] Pet. 39. Petitioner asserts:

> Kimura repeatedly and expressly teaches the interchangeability of NMOS and PMOS transistors used as switches, which is the case for all but the second transistor. *See, e.g.*, EX1002, [0438] (“Note that a structure is used [in Figs. 3B-3D] in which the TFTs 304 and 306 are n-channel TFTs. . . . **However, the TFTs 304 and 306 function as simple switching devices, and therefore any polarity may be used**.”); *id.*, [0396] (same for Figs. 1-2); *id.*, [0445] (same for Figs. 4B-4D); *id.*, [0649] (“All other TFTs are only used as switching devices for performing only on and off control, and therefore may be of any polarity.”); *id.*, [0362] (showing an all-PMOS driver circuit in Fig. 22); EX1003, ¶¶146-154.

*Id*. at 19–20 (alteration in original). Petitioner also asserts that the “interchangeability of NMOS and PMOS *switching transistors* was well-known by 2003.” *Id*. at 4 (citing Ex. 1004, 12:30–49) (emphasis added). Petitioner’s expert, Dr. Foty, testifies:

---

[7] Petitioner is the master architect of its own Petition. *See SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 366, 138 S. Ct. 1348, 1356 (2018) (“[T]he petitioner’s petition, not the Director’s discretion, is supposed to guide the life of the litigation.”).

[8] We understand that when Petitioner refers to Figure 33 of Kimura, Petitioner is referring to Kimura’s Figures 33A–33E, because there is no “Figure 33” in Kimura. We adopt the same usage to maintain consistency.

> *If the design need is for a transistor to be used as a simple on/off switch, then either an nMOS transistor or a pMOS transistor can be chosen* – since, as shown in the figure from Kang and Leblebici 2003 above, each can function as a simple on-off switch. As the primary operational difference between nMOS and pMOS (when a simple switch is desired) is that the on/off characteristics are the opposite of each other – and the on-off signals to be applied must be altered (i.e., reversed as it were) to account for this. In particular, as described in Section VII.A.1, nMOS devices turn on in response to a "high" voltage on the gate terminal and turn off when a "low" voltage is applied. This is known in the art as "active-high" signaling. pMOS transistors are just the opposite – they turn on when a "low" voltage is applied to the gate terminal and turn off in response to a "high" voltage on the gate. This is known in the art as "active-low" signaling. *Changing the polarity of a switching transistor (from nMOS to pMOS or vice versa) would require changing the polarity of the gate signal to achieve the same functionality, but doing so was easy and well-known to a POSITA.* In contrast, swapping an nMOS transistor that performs an analog-like function for a pMOS transistor (or vice versa) may be more difficult, no such change is proposed in this IPR.

*Id.* ¶ 57 (emphasis added) (cited at Pet. 4). Dr. Foty further explains that "if only one [transistor] species (nMOS or pMOS) is used exclusively in a circuit, then the [manufacturing] process complexity and the cost [of manufacturing] will be lower." *Id.* ¶ 58 (cited at Pet. 4). Dr. Foty testifies that if the change is made in Kimura to use only pMOS transistors, that "would result in a single-transistor-species circuit which would be simpler and less costly to manufacture." *Id.* ¶ 151 (cited at Pet. 20).

Petitioner additionally cites U.S. Patent No. 6,362,798 (Ex. 1004, "Kimura '798")[9] as supporting Petitioner's assertion that "interchangeability of NMOS and PMOS switching transistors was well-known by 2003." Pet. 4 (citing Ex. 1004, 12:30–49). The cited portion of Kimura '798 states:

> Moreover, the example shown in FIG. 1 is constructed with the mixture of a P channel type TFT and an N channel type TFT, however, every TFT can be N channel type TFTs or all TFTs can be P channel type TFTs. However, in consideration that the voltage/current characteristics and threshold characteristics of the driving TFTs 110 are compensated by the compensating TFT 120, it is advantageous to construct these driving TFTs 110 and compensating TFTs 120 by the same process as the same type TFTs. Particularly, if both TFTs are formed in the same film forming process, the degree of characteristics similarities between both TFTs generally increases, so that it becomes possible to provide the transistor circuit 100 on the same substrate with little or no variance in voltage/current characteristics and threshold characteristics. On the other hand, the resetting TFT 130 and *the switching TFT 140 can be either a P channel type TFT or an N channel type TFT without being dependent on whether the driving TFT 110 is a P channel type TFT or N channel type TFT*. However, it is often advantageous in manufacturing when all TFTs are of the same type.

Ex. 1004, 12:30–49 (emphasis added).

Petitioner asserts that one of ordinary skill in the art "would have had far more than a reasonable likelihood of success as making such changes [to use all pMOS transistors] was common place and well within a POSITA's skill." Pet. 21–22 (citing Ex. 1003 ¶ 154).

---

[9] Kimura '798 was issued Mar. 26, 2002, from Application 09/424,043, based on PCT/JP99/01342, filed Mar. 17, 1999, and claims priority to JP 10-069147, filed Mar. 18, 1998. Ex. 1004, codes (21), (22), (30), (45), (86).

We have considered Petitioner's rationale for modifying the embodiment in Kimura's Figures 33A–33E. It is based on two theories: (1) a first theory based on general interchangeability of nMOS and pMOS transistors which are used as *switching transistors*, and (2) a second theory that a single-transistor-species circuit is simpler and less costly to manufacture. We discuss them in sequence, first the general interchangeability rationale, and then the manufacturing benefits rationale.

*a) Interchangeability of nMOS and pMOS Transistors*

According to Petitioner, some transistors are "switching transistors" and some are not, and for "switching transistors," nMOS and pMOS configurations are interchangeable. Pet. 4, 19–20. On that basis, Petitioner asserts that using either an nMOS transistor or a pMOS transistor as a switching transistor is "a simple and obvious design choice" for one of ordinary skill in the art. Pet. 21.

Although the designation of a transistor as a "switching transistor" is critical to Petitioner's theory of obviousness, the Petition fails to explain what makes Transistor 3 in Kimura's Figure 33 embodiment merely a "switching transistor." Petitioner does not persuasively show that Kimura's Transistor 3 is a "switching transistor" consistent with its rationale for modifying a transistor from nMOS to pMOS.

Alternatively, even if Transistor 3 in Kimura's Figure 33A were a switching transistor, Petitioner still has not sufficiently shown a reason to modify Transistor 3 from nMOS to pMOS. Patent Owner presents persuasive evidence that, based on the particular role of Transistor 3 in Kimura's Figure 33 embodiment, Petitioner's proposed modification of Transistor 3 from nMOS to pMOS would result in consequential leakage

current effects that have not been addressed by Petitioner. The evidence Patent Owner has presented undermines Petitioner's reliance on a general theory of interchangeability in modifying Transistor 3 from nMOS to pMOS.

Patent Owner asserts that "A POSITA would have understood there were material differences between NMOS transistors and PMOS transistors relevant to, and that would affect the design and operation of, a pixel circuit for an AMOLED display." PO Resp. 13 (citing Ex. 2008 ¶¶ 63–68).

Patent Owner explains:

> Kimura discloses pixel circuits comprised of polysilicon thin-film transistors. *See, e.g.*, Kimura at ¶357; Ex. 2008, ¶63. In polysilicon TFTs, it was known that NMOS transistors were less susceptible to leakage current relative to PMOS transistors. Ex. 2008, ¶63; *see, e.g.*, Ex. 2049, Study of Leakage Current in n-channel and p-channel Polycrystalline Silicon Thin-Film Transistors by Conduction and Low Frequency Noise Measurements, C.T. Angelis, et al., J. Appl. Phys. 82, 4095–4101 (1997) ("The substantially lower leakage current observed in the n-channel polysilicon TFT is explained by the development of positive fixed charges at the interfaces near the drain junction which suppress the electric field."); E. 2050 (Foty Tr.) at 98:14–20. NMOS TFTs were further known to have higher mobility, and therefore to be faster, than PMOS TFTs. Ex. 2008, ¶64; Ex. 2050 at 92:20–93:20 (acknowledging a roughly 2:1 higher electron mobility in NMOS transistors). And at this time a POSITA would have understood that NMOS TFTs had the advantage of being smaller than comparable PMOS TFTs. Ex. 2008, ¶65; Ex. 2050 at 93:21–94:18.

PO Resp. 13–14.

Patent Owner further explains:

> For example, the difference in leakage current may present significant operational issues if transistor 3309 in Figure 33 [Transistor 3 as referred to by Petitioner] were modified to be PMOS (i.e., the transistor in Kimura that Petitioner claims

> corresponds to the "third" transistor of the '599 Patent). As Dr. Wolfe explains, *the "third" transistor controls charge flow to the capacitor and holds the programmed data for the pixel to maintain the intended brightness level*. Ex. 2008, ¶70. Kimura discloses that this transistor is NMOS. Kimura Fig. 33A. Nowhere does Kimura suggest that this transistor (or a transistor arranged in this way) may be modified from NMOS to PMOS. Ex. 2008, ¶70. On the contrary, the potential for greater leakage current in the PMOS transistor would be particularly significant for this "third" transistor, as any leakage could alter the stored brightness level, where Kimura was attempting to secure emission at an intended brightness level. *Id.*
>
> In addition, the faster speed of NMOS transistors would need to be taken into account with respect to the circuit's timing. Their difference in size would also influence the overall size (i.e., area) of the circuit, an important issue in display design. As Dr. Foty acknowledged, a reduction in circuit area allows for a larger aperture ratio. Ex. 2050 at 39:6–18; Ex. 2008, ¶65. A POSITA would have had no motivation to make unnecessary circuit modifications that would increase the circuit area, thus lowering the display's aperture ratio.

*Id.* at 14–15 (emphasis added).

In its Reply, Petitioner responds to Patent Owner's assertion regarding leakage by stating:

> Concerning leakage, Samsung asserts that replacing Kimura's "third transistor" (3309) with a PMOS transistor was nonobvious because it "could alter the stored brightness level" during light emission due to higher PMOS leakage. POR, 14. First, neither the '599 patent (EX1001, EX1028, 174:8-10) nor Kimura (Ex1002) say anything about leakage, reflecting it wasn't a meaningful concern. Second, Dr. Wolfe admitted that leakage does "not necessarily" affect pixel brightness "in a perceptible manner." EX1028, 173:21-174:3. Moreover, Samsung omits that the capacitor is intentionally discharged and then recharged **every cycle** during initialization and programming. *See* Kimura, Figs. 33B/36B, 33C/36C, [0655];

> EX1001, Figs. 5-6, 7:15-48; EX1028, 176:2-178:18. Thus, the capacitor need not hold charge for an extended time, making modest leakage unimportant. EX1029, ¶¶44-54.

Reply 6–7.

Petitioner's reply misses the point made by Patent Owner. It is not Patent Owner's burden to show nonobviousness. Nor has Patent Owner presented a nonobviousness argument. Rather, Patent Owner is noting technical and material differences between nMOS and pMOS transistors, in the context and application of a pixel circuit for an OLED, that undermine Petitioner's rationale for applying the general principle of interchangeability between an nMOS transistor and pMOS transistor.

Petitioner does not dispute that a pMOS transistor would have additional leakage current compared to an nMOS transistor. Nor does Petitioner dispute that this excess leakage current may affect pixel brightness and thus the operation of a pixel circuit for an AMOLED display. Petitioner characterizes this fact as "unimportant." Reply 7. We agree with Patent Owner that "leakage was a relevant consideration that needed to be assessed (and controlled) to avoid operational problems." Sur-reply 16. Dr. Wolfe explains that "[t]he idea is to design something so that the impact of the leakage is imperceptible." Ex. 1028, 174:2–3. We credit that testimony and are persuaded thereby.

Equally misplaced and unpersuasive is Petitioner's argument that neither the '599 patent itself nor Kimura "say anything about leakage, reflecting it wasn't a meaningful concern." Reply 7. Patent Owner correctly notes:

> While Kimura may not identify leakage current concerns in its actual embodiments, at issue are Petitioner's proposed

> modifications to Kimura's embodiments, modifications Kimura does not discuss nor contemplate. Significantly, Kimura identifies the particular transistors that could be either NMOS or PMOS, and it never states the transistor in Figure 33 that Petitioner maps to the claimed "third" transistor could be a PMOS transistor.

Sur-reply 16. Additionally, that the '599 patent itself does not discuss leakage current issues with respect to pMOS transistors does not mean there are none. At most it could just mean the leakage does not render the pMOS transistor unusable in a pixel circuit. The silence does not render nMOS and pMOS transistors technical equivalents for all roles within a pixel circuit.

Petitioner also notes that the '599 patent itself identifies no benefits or drawbacks of pMOS versus nMOS transistors and even states: "the pixel circuit can be configured of a NMOS transistor, a CMOS transistor or the like other than the PMOS transistor." Reply 4 (quoting Ex. 1001, 8:36–38). According to Petitioner, "[t]his passing statement reflects that a POSITA would have known about PMOS/NMOS interchangeability; otherwise the claims lack enablement and/or written description." *Id.* at 4–5.

Petitioner's argument is misplaced and unpersuasive. The cited statement does not refer to any particular transistor within the pixel circuit. Moreover, the Petition neither references the cited statement nor discusses how an ordinarily skilled artisan would have applied the same to the transistors in Kimura's pixel circuit. Further, if we were to assume that the cited statement refers to a non-switching transistor, then it does not aid Petitioner's theory of interchangeability for switching transistors. If we were to assume that the cited statement refers to a switching transistor, it is also of little help to Petitioner who, as discussed above, has failed to

establish that Transistor 3 in Kimura's Figure 33 embodiment is a switching transistor.

Also, the referenced statement is a description of additional embodiments of the '599 patent, i.e., the invention of the '599 patent, and not a description or acknowledgement of what would have been known to one of ordinary skill in the art. Further, it is not an admission by the inventors of the '599 patent that changing a transistor from one configuration to another would have no consequences and would be free of performance considerations. We also disagree that the '599 patent would lack enabling disclosure or written description support unless all transistors are deemed to be interchangeable between nMOS and pMOS configurations. Petitioner does not cite any supporting authority for that proposition. Nor does Petitioner provide meaningful reasoning. Accordingly, we do not agree that the issues of enabling disclosure and adequate written description are necessarily tied to the alleged interchangeability of nMOS and pMOS transistors in the manner suggested by Petitioner.

For these reasons, the vague statement in the Specification of the '599 patent does not sufficiently aid Petitioner in proving that one of ordinary skill in the art would have wanted to change transistor T3 in Kimura's Figure 33 embodiment from nMOS to pMOS.

We need not analyze other alleged differences between an nMOS transistor and a pMOS transistor in the context of a pixel circuit, e.g., alleged faster speed and smaller size of nMOS transistors,[10] because the leakage

[10] Petitioner asserts that "PMOS transistors could be the same size as NMOS transistors without perceptibly impacting refresh rate." Reply 6 n.5.

current issue alone raises sufficient doubt about Petitioner's rationale. Even if one could still have an operational pixel circuit by forming transistor 3309 with a pMOS transistor rather than an nMOS transistor, the larger leakage current of a pMOS transistor, in that context, still imparts a meaningful difference between the two configurations. The record is devoid of evidence showing countervailing benefits from making this change. We find that the potential disadvantage of added leakage current undermines Petitioner's alleged general principle of interchangeability between nMOS and pMOS transistors.

For the foregoing reasons, we determine that Petitioner has not persuasively shown that Kimura would have suggested to one of ordinary skill in the art that Kimura's Transistor 3 could be changed from nMOS to pMOS based on an alleged general interchangeability principle for "switching transistors."

*b) Alleged Manufacturing Benefits for Forming All Transistors from a Single Species of Transistors*

In the Decision on Institution, we questioned the completeness of Petitioner's second theory for forming all transistors in Kimura's Figure 33 embodiment with pMOS transistors. Inst. Dec. 31. We stated:

> The second theory appears incomplete because what is shown in Figures 33A–33E is merely a pixel circuit and does not include other components which are fabricated on the same substrate. Patent Owner notes that in addition to the pixel circuit, Kimura discloses a CMOS driver circuit, separate from the pixel circuit, on the same semiconductor substrate, which includes complementary nMOS and pMOS transistors. [Prelim. Resp.] 36. Petitioner has not asserted, much less explained, the interchangeability of a CMOS pair of nMOS and pMOS transistors with either two nMOS transistors or two pMOS transistors.

> At this stage, the record does not show sufficiently how a circuit would stay operative if a CMOS pair of nMOS and pMOS transistors were replaced with two nMOS transistors or two pMOS transistors. Petitioner does not explain how two nMOS transistors or two pMOS transistors would provide the same outputs, as seen from the other connected elements in the circuit, as a CMOS pair of complementary nMOS and pMOS transistors. The parties may further develop this issue subsequent to institution of trial. On the current record, we are not persuaded by Petitioner's second theory in support of an all p-MOS version of Kimura's Figure 33 embodiment.

Inst. Dec. 31–32.

Despite our inviting the parties to address our concern on Petitioner's second theory, Petitioner chose not to provide any further briefing. Petitioner's Reply does not include any further explanation or clarification. Thus, we continue to have the same concerns and the same doubts with respect to Petitioner's second theory for converting all nMOS transistors in Kimura's Figure 33 embodiment to pMOS transistors on the basis that it would have manufacturing benefits for using transistors of a single species, e.g., nMOS or pMOS, for all of the transistors in the Figure 33 embodiment.

In its Response, Patent Owner essentially reiterates its arguments from the Preliminary Response, asserting:

> Thus, even assuming there could be any "advantage[] in manufacturing when all TFTs are of the same type" in designs like those of the unrelated reference of Exhibit 1004 (Ex. 1004 at 12:30–49), any such advantage would not apply to Kimura's Figure 33. Ex. 2008, ¶77. Kimura's active matrix substrates include both NMOS and PMOS transistors in the driver portion, and thus even an all-PMOS redesign of Figure 33 (which is solely the pixel portion of the substrate) would not result in a substrate containing "all TFTs . . . of the same type" (Ex. 1004 at 12:30–49).

PO Resp. 25. Patent Owner further notes that while Petitioner cites to Kimura '798 (Ex. 1004) for its mentioning of "advantageousness in manufacturing" transistors of the same type, the advantages are for the circuits of Kimura '798, not for all circuits. *Id.* at 24. Patent Owner additionally asserts:

> As the Board observed in its institution decision, the single paragraph in the Petition relating to purported manufacturing benefits stemming from using a single species of transistor is "incomplete," and "Petitioner has not asserted, much less explained, the interchangeability of a CMOS pair of nMOS and pMOS transistors with either two nMOS transistors or two pMOS transistors." ID at 31.

PO Resp. 20.

Patent Owner describes Kimura in additional detail, to explain how Kimura's active matrix devices include a separate circuit, apart from the pixel circuit shown in Figure 33, that includes CMOS pairs of nMOS and pMOS transistors:

> Petitioner's theory of an alleged manufacturing benefit to an all-PMOS circuit has no support. Indeed, it is inconsistent with Kimura's disclosures. Kimura is directed to active matrix devices formed using CMOS technology—i.e., circuitry that by its definition requires *both* PMOS and NMOS transistors. *See, e.g.*, Ex. 1011 at 5; Kimura at ¶¶547, 582. As Dr. Wolfe explains, a POSITA would not look to a reference teaching an improved CMOS process, like Kimura, only to abandon its CMOS design and teachings and implement a single-species modification. Ex. 2008, ¶ 76.
>
> Kimura includes extensive disclosures of using CMOS circuits, including detailed and specific manufacturing instructions to form pixel circuits and driver circuits that are both CMOS. Indeed, as noted above, Kimura expressly teaches that its process is directed to "*active matrix* light emitting device[s],"

Kimura at ¶1 (emphasis added), and Kimura explains that its "active matrix" devices necessarily includes CMOS circuitry:

> In this specification, a substrate in which [i] a driver circuit **including a CMOS circuit** and [ii] a pixel part having a switching TFT and a drive TFT are formed on the same substrate **is called an active matrix** substrate as a matter of convenience.

Kimura at ¶502 (emphasis added). Accordingly, Kimura teaches that its disclosed pixel circuits (the "pixel par")—including the embodiments relied upon by Petitioner—are used alongside CMOS driver circuits (e.g., for driving the signal line voltages), as part of the same substrate. Ex. 2008, ¶¶74–78. This can be seen in Figure 14D:




Kimura Fig. 14D (annotated)

PO Resp. 21–23. Figure 14D of Kimura is one of several diagrams illustrating a process of manufacturing a light emitting device according to Kimura. Ex. 1004 ¶ 320. Petitioner has highlighted the labels for the N-type TFT and the P-type TFT within the driving circuit portion.

Patent Owner further explains:

> Because the CMOS driver circuit and pixel circuits are formed together on the same active matrix substrate, the pixel circuits are (like the driver circuit) formed in a process that involves making both NMOS and PMOS transistors. Ex. 2008, ¶¶74–78. Indeed, Kimura includes detailed process steps for manufacturing its active matrix substrate consisting of both the driver circuit and pixel circuit, which results in the creation of both NMOS and PMOS TFT. Kimura at ¶¶502–615, Figs. 13–

> 15. Kimura explains that, by following its disclosed processing steps. "as shown in Fig. 14D, the driver circuit portion including the CMOS circuit composed of the N-channel TFT and the P-channel TFT and the pixel part including the switching TFT and the drive TFT can be formed on the same substrate." *Id.* at ¶547; *see id.* at ¶582. Even more, Kimura teaches that following its disclosed CMOS processing steps entails a manufacturing advantage—"the process is shortened and it can contribute to the reduction in manufacturing cost and the improvement of a yield." *Id.* at ¶571.

PO Resp. 23–24.

Patent Owner's assertions are rational and supported by the cited evidence. They are also unrebutted by Petitioner who chose not to address these issues in its Reply. We find that the substrate containing Kimura's pixel circuit also includes a driving circuit portion that includes both nMOS and pMOS transistors in a CMOS configuration. Accordingly, Petitioner's proposed all-PMOS redesign of Kimura's Figure 33 embodiment, which is only the pixel portion of the substrate, would not result in a substrate containing all transistors of the same type.

Thus, Petitioner does not persuade us that one of ordinary skill in the art would have changed all nMOS transistors in Kimura's Figure 33 to pMOS transistors to obtain manufacturing benefits of forming only transistors of a single type, i.e., pMOS. Additionally, Petitioner also has not balanced, from the perspective of one of ordinary skill in the art, the proposed modification of Figure 33 transistors to all be of a single type with Kimura's focus on and preference for having a CMOS design which includes both nMOS and pMOS transistors. *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (when "one motivating benefit

comes at the expense of another benefit, [. . .] the benefits, both lost and gained, should be weighed against one another.”).

*5. Shared Control of Two Transistors Issue*

We need not reach this issue, because on the All pMOS Transistors Issue discussed above in Section II.D.4, we already decided against Petitioner, and that is dispositive of all challenged claims 1–18.

However, although not necessary, we nonetheless still address the Shared Control of Two Transistors Issue, which is further dispositive of claims 1–6 and 13–18.

The issue is based on a limitation commonly recited in dependent claim 13, and independent claims 1, 14, 15, and 17. Petitioner specifically discusses the limitation in the context of dependent claim 13, and then, for the corresponding limitation in independent claims 1, 14, 15, and 17, refer back to its analysis for dependent claim 13. Pet. 64–65, 69–71, 74–75. We analyze claim 13 first as representative and then add further discussion for claims 1, 15, and 17.

Claim 13 depends from claim 7 and further recites:

> wherein the *fourth transistor* composed of a PMOS transistor including *a gate to which the current light-emitting signal is applied*, a source to which a power supply voltage is applied, and a drain coupled to the second transistor; and
>
> the *fifth transistor* is composed of a PMOS transistor including *a gate to which the current light-emitting signal is applied*, a source coupled to the second transistor, and a drain coupled to the electroluminescent element.

Ex. 1001, 10:20–28 (emphasis added). Petitioner acknowledges that claim 13 requires the gates of both the fourth and fifth transistors to be

controlled by "the current light emitting signal." Pet. 63. For that requirement, Petitioner relies on an "all-PMOS version of Kimura Fig. 36." *Id.* at 62–63. Petitioner explains:

> *Although Fig. 33B shows the fourth and fifth transistors controlled by different signals (viz., fourth transistor OFF while fifth transistor ON), that is not the case for Fig. 36.* EX1003, ¶257. *In all operation states of Fig. 36* (*viz.*, Fig. 36B (initialization), Figs. 36C-D (programming), and Fig. 36E (light emission)), *the fourth and fifth transistors are always ON/OFF together*. EX1003, ¶257. *Thus a POSITA would have understood (or at least found it obvious) that Kimura uses a shared light-emitting signal to control them*. EX1003, ¶256-259. Kimura itself provides one reason for doing so—reducing the number of control lines improves aperture ratio. *See, e.g.*, EX1002, [0429]; *see also id.*, [0421]-[0422] (control scheme with fewer signals reduces "surface area occupied by wirings in a pixel"). Additionally, the fourth and fifth transistors must both be active during light emission, otherwise the electroluminescent element will not emit light. EX1003, ¶¶138-140; *see also* EX1002, [0659] (signals "turn[ing] on and off at the same timing . . . can therefore be controlled by using the same gate signal line"). This, too, would have naturally led a POSITA to use a shared light-emitting signal. EX1003, ¶¶ 258-259.
>
> Moreover, Kimura discloses a timing diagram and control scheme utilizing only two signals (*i.e.*, first and second gate signals which map to the claimed "scan line signal" and "light emitting signal" respectively). *See* EX1002, Figs. 16-17 and explanation at [0420]-[0429]; EX1003, ¶259. This disclosure would have motivated a POSITA to use a shared light emitting signal for the fourth and fifth transistors and provided a reasonable expectation of success. EX1003, ¶259.

*Id.* at 64–65 (emphasis added).

In the Decision on Institution, we provided the following analysis:

> We agree that if the fourth and fifth transistors are always turned on and off together, as Petitioner asserts is the case for the

embodiment of Figures 36A–36E, there is reason for one of ordinary skill in the art to drive the fourth and fifth transistors by the same control signal, i.e., reducing the number of control lines and improving aperture ratio.

However, Petitioner's argument is questionable, because Petitioner's reasoning only has application to the embodiment of Figures 36A–36E, where the fourth and fifth transistors are always on and off together, and does not apply to the embodiment of Figures 33A–33E in which the fourth and fifth transistors do not always turn on and off together. If the fourth and fifth transistors in the Figure 33 embodiment were to be controlled by the same shared signal, such that they have to be turned on and off together, they would produce outputs and make current connections and disconnections inconsistent with what the other components in the pixel circuit of the Figure 33 embodiment expect from them. Petitioner does not explain the effect this inconsistency has on the operation of the Figure 33 embodiment, e.g., whether anything useful results from the change.

The Figure 36 embodiment is also different structurally from the Figure 33 embodiment in that it makes use of six transistors, not five as in the case of the Figure 33 embodiment. In accounting for claim 7, Petitioner relied on the Figure 33 embodiment to meet each of the limitations regarding the first, second, third, fourth, and fifth transistors. It is questionable whether the Figure 33 embodiment, after being modified to make the fourth and fifth transistor always turn on and off together, as Petitioner proposes based on the Figure 36 embodiment, would still meet all the requirements of the first, second, third, fourth, and fifth transistor, as recited in claim 7. Based on the present record, we find that Petitioner has not provided an adequate explanation as to this potential discrepancy.

Notably, we find the circumstance here to be different from Petitioner's proposal to modify all transistors of the nMOS type in Kimura's Figure 33 embodiment to pMOS type. In that proposal, the output of the switching transistor remains the same after the modification, and the other components in the pixel

> circuit, connected to the switching transistors, are unaffected by the modification. Here, the architecture differences between the embodiments in Kimura's Figures 33 and 36 result in different connections made and output signals provided to the other components in the pixel circuit. At this stage, Petitioner has not shown sufficiently that operations that used to be governed by a particular output from the fourth or fifth transistor in Figure 33 would continue to operate the same as they used to operate, when the output provided from the fourth or fifth transistor is different.
>
> For the foregoing reasons, we question Petitioner's reasoning presented to account for claim 13. The parties may further develop the issue subsequent to institution of trial.

Inst. Dec. 51–52 (footnote omitted).

In its Reply, Petitioner provided its response to the deficiency we noted above. Reply 9–18. However, for reasons discussed below, we are not persuaded by Petitioner's explanation. The same infirmities we articulated in the Decision on Institution, and as reproduced above, apply and undermine the Petition with respect to the Shared Control of Two Transistors Issue. The analysis from the Decision on Institution and reproduced above is adopted herein as a part of this Final Written Decision.

Petitioner does not dispute the reasoning we provided, as explained above, which leads to the conclusion that when modifying Kimura's Figure 33 embodiment to have transistors 4 and 5 driven by a shared input signal the resulting circuit does not work or is inoperative for the pixel circuit. Reply 10. Patent Owner's expert, Dr. Wolfe, has testified that the modification would result in an inoperable circuit. Ex. 2008 ¶ 97.

Petitioner appears to contend that the Petition already acknowledges that the modification would result in an inoperable circuity. Reply 10 (citing Pet. 64). We have again reviewed page 64 of the Petition and find that it

only conveys, as we previously understood, that the unmodified Figure 33 embodiment does not meet the required limitation. Fundamental to Petitioner's reply is Petitioner's assertion that it never proposed to change Kimura's Figure 33 embodiment. Reply 10. Petitioner asserts, rather, that it relied completely on Kimura's Figure 36 embodiment, to the exclusion of the Figure 33 embodiment, which does meet the requirement of controlling transistors 4 and 5 with a shared control signal. Reply 11. For numerous reasons, Petitioner's obviousness contentions necessarily rely on Kimura's Figure 33 embodiment, as explained below.

First, we revisit how the Petition begins its substantive analysis already discussed above in Section II.D.4.

Petitioner states: "Before the element-by-element patentability analysis, it is helpful to discuss a modification to Kimura Fig. 33 [Figs. 33A-33E]." Pet. 19. The modification is shown on page 22 of the Petition via a side-by-side illustration of the before and after views of the modification to Figure 33A, with colored annotations added by Petitioner, as reproduced below:




**ORIGINAL** **MODIFIED**

In the version of Figure 33A on the left, labeled "ORIGINAL," Petitioner numbered in red Transistors 1–5 and colored them yellow, as well as colored EL element 3313 blue. In the modified version of Figure 33A on the right, labeled "MODIFIED," Petitioner changed the symbols for Transistors 1, 3, 4, and 5 from nMOS to pMOS, and pointed to them as "PMOS devices" with red arrows. Petitioner explicitly states immediately after the two side-by-side figures reproduced above: "*Petitioner uses the modified 'ALL-PMOS" version of Fig. 33 for the patentability analysis and includes the label 'All-PMOS' for clarity.*" *Id.* at 22 (emphasis added).

Second, because claim 13 depends from independent claim 7 and thus incorporates all of the limitations from claim 7, we review how the Petition addresses claim 7. For limitation [7a], Petitioner relies on an all-PMOS version of Kimura's Figure 33C. Pet. 24–27. For limitation [7b], Petitioner relies on an all-pMOS version of Kimura's Figures 33C, 33D, and 33E. Pet. 30–32. For limitation [7c], Petitioner relies on an all-pMOS version of Kimura's Figures 33A and 34B. Pet. 32–36. For limitation [7d], Petitioner relies on an all-pMOS version of Kimura's Figures 33C and 33D. Pet. 37. For limitation [7e], Petitioner relies on an all-PMOS version of Kimura's Figures 33A and 33E. Pet. 39, 41. For limitation [7f], Petitioner relies on an all-PMOS version of Kimura's Figures 33A and 33E. Pet. 42–44. For limitation [7g], Petitioner relies on an all-PMOS version of Kimura's Figures 33A. Pet. 45. For limitation [7h], Petitioner relies on an all-PMOS version of Kimura's Figures 33A and 33D. Pet. 47–48.

As discussed above, Petitioner's analysis for claim 7 is tied exclusively to Kimura's Figure 33 embodiment. Further, Petitioner acknowledges that claim 13 depends from claim 7 (Pet. 62), and Petitioner's

obviousness contentions for claim 13 build upon and incorporate the claim 7 analysis. *Id.* at 62–67. Indeed, nothing in Petitioner's analysis for claim 13 indicates that Petitioner intended to depart from or otherwise modify its reliance on Figure 33 for teaching the limitations of the base claim. *See id.*

Petitioner identifies the following statement on pages 62–63 of the Petition: "the all-PMOS version of Kimura Fig. 36, discussed below, renders claim 13 obvious." Reply 11 & n.9 (quoting Pet. 62–63). However, by that statement Petitioner seems to rely on Figure 36 only for teaching the added limitations of claim 13, and Petitioner never states how such teachings would be reconciled with the Figure 33 teachings on which Petitioner relies for base claim 7. Also, in Petitioner's discussion of Kimura's Figure 36 embodiment with respect to claim 13, Petitioner does not revisit any of previously addressed limitations of claim 7 based on Kimura's Figure 33 embodiment.

In its Reply, Petitioner also notes that the Petition states that "Kimura Fig. 36 is merely an extension of Fig. 33 and discussion of one applies equally to the other unless noted." Pet. 15 n.3. The footnote appears in Section VI.A of the Petition which is titled "Description of Kimura," prior to and outside of the substantive analysis of any claim. It does not reasonably convey that Petitioner's substantive analysis for claim 13, as we explained above, is completely based on Kimura's Figure 36 embodiment and not at all on Kimura's Figure 33 embodiment.

Although Petitioner determines what it argues and thus is the master architect of its own Petition, *see SAS Inst.*, 584 U.S. at 366, Petitioner has a corresponding obligation and responsibility to make clear the positions it has taken and to not leave it to speculation and conjecture. It is too far a stretch,

and not a reasonable position to take, for Petitioner to assert that one should read its Petition as representing that for claim 13 Petitioner has jettisoned all reliance on Kimura's Figure 33 embodiment, and has based its analysis solely on Kimura's Figure 36 embodiment. Further, we note that Petitioner did not seek rehearing of our Decision on Institution, in which we expressed the same problem.

Third, Petitioner asserts that in our Decision on Institution, we invited Petitioner to develop the record on whether Kimura's Figure 36 embodiment would still meet all the requirements of the first, second, third, fourth, and fifth transistor in base claim 7. Reply 14 (citing Inst. Dec. 51–52). On that basis, Petitioner submitted additional testimony from its expert, Dr. Foty, Ex. 1029 ¶¶ 55–71, and discussed the same on pages 15 to 18 of the Reply. However, we did not make such an invitation.[11]

The Consolidated Trial Practice Guide (Nov. 2019) ("CTPG")[12] provides:

> Generally, a reply or sur-reply may only respond to arguments raised in the preceding brief. 37 C.F.R. § 42.23, except as noted above. "Respond," in the context of 37 C.F.R. § 42.23(b), does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing. While replies and sur-replies can help crystalize issues for decision, a reply or sur-reply that raises a new issue or belatedly presents evidence

---

[11] We authorized the parties to further address whether "operations that used to be governed by a particular output from the fourth or fifth transistor in Figure 33 would continue to operate the same as when they used to operate, when the output provided from the fourth or fifth transistor is different." Inst. Dec. 52. We expected Petitioner to address how the Figure 33 embodiment would operate when and if modified to have the fourth and fifth transistors share the same control input.

[12] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

> may not be considered. The Board is not required to attempt to sort proper from improper portions of the reply or sur-reply.

CTPG at 74.

To the extent that Petitioner's Reply purports to analyze claim 13 (and claim 7 from which it depends) based entirely on Kimura's Figure 36, we find that this represents a new direction with a new approach as compared to the positions Petitioner took in the Petition. *See id.* Accordingly, the submissions of Petitioner purportedly made in response to the Board's invitation, i.e., paragraphs 55–71 of Dr. Foty's reply Declaration (Exhibit 1029) and corresponding arguments discussed on pages 15–18 of the Reply, are not entitled to consideration and are not considered.

Fourth, another problem undermines Petitioner's assertion that it relied solely on Kimura's Figure 36 embodiment when accounting for claim 13 (and claim 7 from which it depends). The problem relates to Petitioner's analysis for claim 8 which, like claim 13, depends from claim 7. In that analysis for claim 8, Petitioner proposes adding an "initialization transistor" to Kimura's Figure 33 embodiment because the design of Figure 33 is susceptible to "undesired light emission." Pet. 51. Yet, as noted by Patent Owner, Kimura's Figure 36 embodiment already provides a solution to the undesirable light emission problem. Patent Owner explains:

> Petitioner's theory for adding an "initialization transistor" to Kimura Figure 33 notes that the design of Figure 33 "is less desirable" because of "undesired light emission." Pet. at 51. Kimura acknowledges this shortcoming in Paragraph 665:
>
> > In the structures shown FIGS. 33 to 35, there are cases in which ***electric current flows in the EL device to cause light emission***, before or after threshold voltage acquisition, that is ***during a period that is not the normal light emitting period***.

> . . . [T]his therefore causes errors to develop between the actual brightness and the target brightness.

> Kimura at ¶665. However, Kimura provides its solution to this problem in the very next paragraph—namely, the circuit of Figure 36:

>> ***A TFT 3612 is therefore added as shown in FIG. 36A*** . . . An electric current path to the L device 3615 is cut off by a TFT 3611, and therefore the EL device 3615 does not emit light. ***Light emission by the EL device during unnecessary periods can thus be prevented by using this type of structure***.

> Kimura at ¶666 (emphasis added). Indeed, Petitioner elsewhere acknowledges that "Kimura solves this problem . . . as shown in Fig. 36B." Pet. at 19. Ex. 2008, ¶95.

PO Resp. 34–35. These assertions are supported by the cited evidence and not rebutted by Petitioner.

Petitioner's treatment of claim 8 reflects that Petitioner relied on Kimura's Figure 33 embodiment for all the limitations of independent claim 7, which also are incorporated into dependent claim 13.

Claim 14 is substantially the same as claim 7, except for limitations [14f] and [14g]. Claim 14 via limitation [14f] additionally requires the fourth transistor to deliver a power supply voltage to the second transistor "in response to a current light-emitting signal." Ex. 1001, 10:44–46. Claim 14 via limitation [14g] additionally requires the fifth transistor to provide drive current "in response to the current light-emitting signal." *Id.* at 10:47–49. These additional features of claim 14 are essentially the same as those required by claim 13, which recites that the fourth transistor includes "a gate to which the current light-emitting signal is applied," and that the fifth transistor includes "a gate to which the current light-emitting

signal is applied." *Id*. at 10:20–28. Like in the case of claim 7 from which claim 13 depends, Petitioner accounts for the other limitations of claim 14 by reliance on Kimura's Figure 33 embodiment. Pet. 67–69.

Claim 15 differs from claim 7 in its recitation of the fourth and fifth transistors. According to claim 15, the fourth transistor includes "a gate to which a current light-emitting signal is applied," and the fifth transistor also includes "a gate to which the current light-emitting signal is applied." Ex. 1001, 10:60–67. These additional features of claim 15 are the same as those required by claim 13, which recites that the fourth transistor includes "a gate to which the current light-emitting signal is applied," and that the fifth transistor includes "a gate to which the current light-emitting signal is applied." *Id*. at 10:20–28. Like in the case of claim 7 from which claim 13 depends, Petitioner accounts for the other limitations of claim 15 by reliance on Kimura's Figure 33 embodiment. Pet. 74–76.

Claim 17, like claim 15, recites that the fourth transistor includes "a gate to which a current light-emitting signal is applied," and that the fifth transistor includes "a gate to which the current light-emitting signal is applied." Ex. 1001, 12:4–11. These additional features of claim 17 are the same as those required by claim 13, which recites that the fourth transistor includes "a gate to which the current light-emitting signal is applied," and that the fifth transistor includes "a gate to which the current light-emitting signal is applied." *Id*. at 10:20–28. Like in the case of claim 7 from which claim 13 depends, Petitioner accounts for the other limitations of claim 17 by reliance on Kimura's Figure 33 embodiment. Pet. 83–86.

Claim 1 is similar to claim 7, but differs in several respects. Although, like claim 7, claim 1 recites five different transistors, claim 1

refers to them as first, second, third, *fifth, and sixth* transistors, rather than first, second, third, *fourth, and fifth* transistors as in claim 7. Petitioner refers to the skipping of the designator "fourth" as an "unusual numbering scheme," and as "an artifact from prosecution" where dependent claim 3 was rewritten into independent form. Pet. 11–12, 23. Specifically, application claim 1 had recited first, second, and third transistors, and application claim 3 depended from application claim 1 and further recited fifth and sixth transistors without reciting a fourth transistor. Ex. 1005, 415–416.

Because Petitioner regards the "fifth" and "sixth" identification of transistors simply as a numbering scheme without other significance, Petitioner performs its analysis as though "fifth" and "sixth" read the same as "fourth" and "fifth" in independent claim 7, and relies on the same reasoning as it presents for independent claim 7 to account for these differently named transistors of claim 1. Pet. 86–93. Patent Owner has not expressed disagreement with Petitioner's approach, and does not present arguments additional to those it presents for claim 7.

On this record, we accept that the designators "first," "second," "third," "fourth," "fifth," and "sixth" for the recited transistors in the claims merely identify particular transistors and do not, by themselves, set forth other requirements that need to be accounted for by Petitioner. *See 3M Innovative Properties Co. v. Avery Dennison Corporation*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) (noting that the use of ordinals in a claim "is a common patent-law convention to distinguish between repeated instances of an element or limitation").

Claim 1 requires both the "fifth transistor" and "sixth transistor" to activate "in response to" the "current light-emitting signal." To account for

this requirement, Petitioner relies on the same reasoning it presents for essentially the same limitation in claim 13, that the fourth and fifth transistors each include "a gate to which the current light-emitting signal is applied." Pet. 91. Like in the case of claim 7 from which claim 13 depends, Petitioner accounts for the other limitations of claim 1 by reliance on Kimura's Figure 33 embodiment. *Id.* at 86–93.

Thus, the Shared Control of Two Transistors Issue is common to dependent claim 13 and independent claims 1, 14, 15, and 17. The deficiency discussed above for claim 13 equally applies to independent claims 1, 14, 15, and 17. This deficiency also applies to claims 2–6 which depend from claim 1, claim 16 which depends from claim 15, and claim 18 which depends from claim 17. Ex. 1001, 9:8–34, 11:8–13, 12:18–24.

Additionally, Petitioner's treatment of dependent claims 2, 16, and 18, which depend from claims 1, 15, and 17, respectively, further disproves that Petitioner intended to rely solely on Kimura's Figure 36 embodiment for claims 1, 15, and 17. Each of claims 16 and 18 requires an additional "sixth transistor" for performing initialization. Ex. 1001, 11:8–13, 12:18–24. Claim 2 requires an additional "fourth transistor"[13] for performing initialization. *Id.* at 9:8–12. Petitioner specifically discusses claim 8 and applies the same analysis to claims 2, 16, and 18. Pet. 49–56, 78–79, 86, 93.

Petitioner states: "[I]ncorporating the initialization transistor from Figs. 16-17 into Fig. 33 renders claim 8 obvious." Pet. 50–51. Petitioner again states: "Kimura Fig. 33 combined with the initialization transistor

---

[13] No "fourth transistor" is recited in claim 1 from which claim 2 depends. Ex. 1001, 8:53–9:7. Petitioner has treated the "fourth transistor" in claim 2 the same as it has treated the "sixth transistor" in claim 8. Pet. 93.

1607 from Fig. 16 renders claim 8 obvious." *Id.* at 56. These statements, as applied to claims 2, 16, and 18, contradict Petitioner's assertion that it relied solely on Kimura's Figure 36 embodiment to account for independent claims 1, 15, and 17.

Also, in accounting for the sixth transistor of claim 16 and 18 and the fourth transistor of claim 2, Petitioner's stated reason for adding the initialization transistor of Figures 16/17 to the Figure 33 embodiment is that the initialization performed in the Figure 33 embodiment is undesirably performed by the fifth transistor because "during initialization the current discharges through the light emitting element causing undesired light emission." Pet. 51. Petitioner further states:

> A POSITA would have been motivated to combine the initialization approach disclosed in Kimura Figs. 16-17 with Kimura Fig. 33 by adding a dedicated initialization transistor (*i.e.*, the sixth transistor as illustrated below). Ex.1003, ¶¶221-230 and ¶¶155-158. Such an approach is readily applicable to the baseline circuit of Fig. 33. *Id.*; *see also id.*, ¶¶141-143.

*Id.* at 52. These statements contradict Petitioner's assertion that it relied solely on Kimura's Figure 36 embodiment to account for independent claims 1, 15, and 17.

Had Petitioner actually based its analysis of the shared control limitations of the independent claims solely on Kimura's Figure 36 embodiment, then Kimura's ready-made solution to the light emission problem would nullify Petitioner's stated motivation in the context of dependent claims 2, 16, and 18, to look to Kimura's Figures 16/17 embodiment to add an initialization transistor.

*6. Sixth Initialization Transistor Issue*

This issue pertains only to dependent claims 2, 8, 16, and 18, which require a sixth initialization transistor and which depend from independent claims 1, 7, 15, and 17, respectively. Because we determine, as explained above in Section II.D.4, that Petitioner has not proved that Kimura would have suggested an all-pMOS version of Kimura's Figure 33 embodiment, which Petitioner relies on to account for all challenged claims 1–18, we need not reach the Sixth initialization Transistor Issue. We also have decided against Petitioner on the Shared Control of Two Transistors Issue, which is further dispositive of claims 1–6 and 13–18.

*7. Secondary Considerations of Obviousness*

We need not reach the issue of Patent Owner's objective evidence of nonobviousness because, for reasons discussed above, Petitioner's evidence of obviousness based on the teachings of Kimura does not support Petitioner's assertion that the challenged claims would have been obvious over Kimura. *See Magnavox Co. v. Activision Inc.*, 848 F.2d 1244, 1988 WL 44721 *1 (Fed. Cir. 1988) (unpublished). Even without considering Patent Owner's evidence of nonobviousness, we determine that Petitioner has not proved obviousness of any challenged claim by a preponderance of the evidence.

*8. Patent Owner's Motion to Exclude Evidence (Paper 58)*

Patent Owner seeks to exclude the declaration testimony of Dr. Foty (Exs. 1003, 1029) on the ground that Dr. Foty "lacks even ordinary skill in the art." Paper 58, 1. We need not reach this motion, because even assuming that Dr. Foty possesses at least ordinary skill in the art we determine that Petitioner has not proved by a preponderance of the evidence

that any challenged claim is unpatentable. Thus, we dismiss Patent Owner's motion to exclude as moot.

*9. Petitioner's Motion to Exclude Evidence (Paper 59)*

By this motion, Petitioner seeks to exclude paragraphs 136 and 138–144 of Exhibit 2008, and Exhibits 2018, 2021–2043, 2047, 2049, 2051, 2052, and 2054. Paper 59, i.

Paragraphs 136 and 138–144 of Exhibit 2008, and Exhibits 2018, 2021–2043, 2047, 2051, and 2052 all pertain to Patent Owner's arguments regarding secondary considerations of nonobviousness. Given that Petitioner has failed to prove obviousness of any challenged claim even before assessing any objective evidence of nonobviousness presented by Patent Owner, we need not and do not consider paragraphs 136 and 138–144 of Exhibit 2008, and Exhibits 2018, 2021–2043, 2047, 2051 and 2052. Thus, we dismiss Petitioner's motion to exclude this evidence as moot.

Exhibit 2049 is a journal article.[14] When making its objection to the exhibit, Petitioner stated: "Petitioner objects that this exhibit lacks proper authentication. Petitioner further objects on the grounds of hearsay, relevan[ce], and F.R.E. 403." Paper 35, 5.

Regarding alleged lack of proper authentication, Patent Owner explains:

> Exhibit 2049 is a technical article regarding leakage current in NMOS and PMOS transistors "published in [a] peer-reviewed professional publication[]" i.e., the Journal of Applied Physics—an established journal that "provide[s] specific publication numbers, printing dates and publisher information, all of which

[14] C.T. Angelis, et al., *Study of Leakage Current in n-channel and p-channel Polycrystalline Silicon Thin-Film Transistors by Conduction and Low Frequency Noise Measurements*, 82 J. Appl. Phys. 4095 (1997).

> are indicia understood, at least under Rule 902(6), as characteristics of self-authenticating documents," and is thus "self-authenticating under Federal Rule of Evidence 902(6)."

Paper 61, 12. Petitioner provides no corresponding rebuttal. We agree that Exhibit 2049 is a self-authenticating document for the same reasons mentioned by Patent Owner.

Exhibit 2049 is also not irrelevant. It is underlying material on which Patent Owner's expert, Dr. Wolfe, relies on for his opinion that one of ordinary skill in the art would have understood that there were other meaningful differences between nMOS and pMOS transistors. *See* Ex. 2008 ¶ 63. Furthermore, Petitioner does not provide explanation of why Exhibit 2049 fits this description of excludable relevant evidence: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needless presenting cumulative evidence." Fed. R. Evid. 403. We are not persuaded that Exhibit 2049 should be excluded under Rule 403.

Regarding hearsay, Petitioner has not identified any particular statement within Exhibit 2049 for evaluation of the hearsay question. For that reason alone, the motion lacks merit regarding the assertion of hearsay. Further, the following constitutes a hearsay exception: "A statement in a document that was prepared before January 1, 1998 and whose authenticity is established." Fed. R. Evid. 803(16). Patent Owner notes that Exhibit 2049 has a publication date of October 15, 1997, and thus falls within the ancient documents exception of Rule 803(16). Paper 61, 13. Petitioner provides no corresponding rebuttal. We agree with Patent Owner that the hearsay exception under Rule 803(16) applies. In addition, we note further

that the facts and data on which Dr. Wolfe relies to formulate his opinion need not themselves constitute admissible evidence. Fed. R. Evid. 703. Petitioner has not shown any prejudicial effect of Exhibit 2049 that outweighs its probative value. *See id.*

Exhibit 2054 is an Order from the Administrative Law Judge in related ITC proceeding finding "that Dr. Foty does not meet the level of ordinary skill in the art for the '599 and '593 patents . . . ." Ex. 2054, 5. We need not reach Petitioner's Motion to Exclude as it relates to Exhibit 2054 because, as noted above, even assuming that Dr. Foty possesses at least ordinary skill in the art, we determine that Petitioner has not proved by a preponderance of the evidence that any challenged claim is unpatentable.

For the foregoing reasons, Petitioner's Motion to Exclude is *denied* with respect to Exhibit 2049, and *dismissed* with respect to Paragraphs 136 and 138–144 of Exhibit 2008, and Exhibits 2018, 2021–2043, 2047, 2051, 2052, and 2054.

*10. Petitioner's First Motion to Strike (Paper 37)*

Petitioner filed a Motion to Strike directed to portions of the Patent Owner Response which allegedly incorporate by reference material from Exhibits 2018, 2047, 2051, and 2052. Paper 37. Patent Owner filed an opposition to that motion (Paper 38) and Petitioner filed a reply (Paper 39).

Exhibits 2018, 2051, and 2052 are claim charts mapping challenged claims to respective device. They are relied on by Patent Owner in connection with Patent Owner's presentation of objective evidence of nonobviousness. PO Resp. 54–55, 60–61. Exhibit 2047 is the Complaint in related civil action *Samsung Display Co., Ltd. v. BOE Technology Co., Ltd.*, Case No. 2-23-cv-00309 (E.D. Tex.). Patent Owner relies on paragraphs

31–50 of the Complaint to support its assertion of copying by Petitioner as objective evidence of nonobviousness. PO Resp. 59–60.

We need not reach this motion because, as explained above, in the circumstances of this case we need not and have not considered Patent Owner's objective evidence of nonobviousness.

*11. Petitioner's Second Motion to Strike (Paper 46)*

Petitioner filed a Second Motion to Strike directed to arguments in Patent Owner's Sur-reply and Exhibit 2054 cited therein. Paper 46. The arguments sought to be stricken are those which assert that Dr. Foty, Petitioner's expert, lacks even ordinary skill in the art. "Petitioner is moving to strike Patent Owner's evidence (EX2054) and related argument that Dr. Foty does not **qualify as a POSITA**." *Id.* at 2 (emphasis in original).

We need not reach this motion, because even assuming that Dr. Foty possesses at least ordinary skill in the art, we determine that Petitioner has not proved by a preponderance of the evidence that any challenged claim is unpatentable.

## III. CONCLUSION

We determine that Petitioner has not proved by a preponderance of the evidence that any of claims 1–18 of the '599 patent is unpatentable.

In summary:

| **Claims** | **35 U.S.C. §** | **References/Basis** | **Claims Shown Unpatentable** | **Claims Not shown Unpatentable** |
|---|---|---|---|---|
| 1–18 | 103 | Kimura | | 1–18 |
| **Overall Outcome** | | | | 1–18 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–18 of the ’599 patent have not been proved unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude (Paper 58) is *dismissed*;

FURTHER ORDERED that Petitioner’s Motion to Exclude (Paper 59) is *denied* with respect to Exhibit 2049, and *dismissed* with respect to paragraphs 136 and 138–144 of Exhibit 2008, and Exhibits 2018, 2021–2043, 2047, 2051, 2052, and 2054;

FURTHER ORDERED that Petitioner’s First Motion to Strike (Paper 37) is *dismissed*;

FURTHER ORDERED that Petitioner’s Second Motion to Strike (Paper 46) is *dismissed*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Travis Jensen
Xiang Wang
Johannes Hsu
ORRICK, HERRINGTON & SUTCLIFFE, LLP
T61PTABDocket@orrick.com
XW0PTABDocket@orrick.com
PTABDocketJ1H1@orrick.com

FOR PATENT OWNER:

David A. Garr
Scott C. Weidenfeller
Jared R. Frisch
Derek J. Andros
COVINGTON & BURLING LLP
dgarr@cov.com
sweidenfeller@cov.com
jfrisch@cov.com
dandros@cov.com

US007414599B2

(12) **United States Patent**
**Chung et al.**

(10) **Patent No.: US 7,414,599 B2**
(45) **Date of Patent: Aug. 19, 2008**

(54) **ORGANIC LIGHT EMITTING DEVICE PIXEL CIRCUIT AND DRIVING METHOD THEREFOR**

(75) Inventors: **Ho-Kyoon Chung**, Yongin-si (KR); **Yang-Wan Kim**, Seoul (KR); **Choon-Yul Oh**, Gunpo-si (KR); **Oh-Kyong Kwon**, Seoul (KR); **Sang-Moo Choi**, Suwon-si (KR)

(73) Assignee: **Samsung SDI Co., Ltd.**, Suwon-si (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 674 days.

(21) Appl. No.: **10/886,014**

(22) Filed: **Jul. 6, 2004**

(65) **Prior Publication Data**

US 2005/0017934 A1 Jan. 27, 2005

(30) **Foreign Application Priority Data**

Jul. 7, 2003 (KR) ...................... 10-2003-0045610

(51) **Int. Cl.**
***G09G 3/30*** (2006.01)

(52) **U.S. Cl.** ...................................... **345/76**; 315/169.3

(58) **Field of Classification Search** ... 315/169.1–169.4; 345/76–83

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,091,203 | A | 7/2000 | Kawashima et al. | |
| 6,229,506 | B1 * | 5/2001 | Dawson et al. ................ | 345/82 |
| 6,362,798 | B1 | 3/2002 | Kimura et al. | |
| 2003/0067424 | A1 | 4/2003 | Akimoto et al. | |
| 2004/0041750 | A1 * | 3/2004 | Abe ............................ | 345/76 |

(Continued)

FOREIGN PATENT DOCUMENTS

CN 1361510 A 7/2002

(Continued)

OTHER PUBLICATIONS

Korean Patent Abstracts, Publication No. 1020020025842 A, dated Apr. 4, 2002, in the name of Katsuya Anzai et al.

(Continued)

*Primary Examiner*—Alexander Eisen
*Assistant Examiner*—Hoai-Quan T Ho
(74) *Attorney, Agent, or Firm*—Christie, Parker & Hale, LLP

(57) **ABSTRACT**

A pixel circuit in an organic light emitting device capable of realizing high gradation representation by self-compensating a threshold voltage, and a method for driving the same. The pixel circuit includes an electroluminescent element for emitting light in response to an applied driving current. A first transistor delivers a data signal voltage in response to a current scan line signal. A second transistor generates a driving current to drive the electroluminescent element in response to the data signal voltage. A third transistor connects the second transistor in the form of a diode in response to a current scan signal to self-compensate the threshold voltage of the second transistor. A capacitor stores the data signal voltage delivered to the second transistor. A fourth transistor delivers a power supply voltage to the second transistor in response to a current light-emitting signal. A fifth transistor provides the driving current, provided from the second transistor, for the electroluminescent element in response to the current light-emitting signal.

**18 Claims, 5 Drawing Sheets**



U.S. PATENT DOCUMENTS

2004/0145547 A1 * 7/2004 Oh .............................. 345/76

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1 220 191 | 7/2002 |
| JP | 2000-347621 | 12/2000 |
| JP | 2002-215096 | 7/2002 |
| JP | 2002-244617 | 8/2002 |
| JP | 2003-173165 | 6/2003 |
| JP | 2003-202833 | 7/2003 |
| JP | 2003-223138 | 8/2003 |
| JP | 2004-133240 | 4/2004 |
| KR | 2002-0025842 | 4/2002 |

OTHER PUBLICATIONS

Office Action dated Dec. 1, 2006 for corresonding Chinese Patent Application No. 200410063736.X (including English translation).

Korean Patent Abstracts, Publication No. 1020020056353 A; Publication Date: Jul. 10, 2002; in the name of Kwon.

European Search Report dated Apr. 23, 2007, for EP 04090270.2, in the name of Samsung SDI Co., Ltd.

Patent Abstracts of Japan, Publiction No. 2000-347621, dated Dec. 15, 2000, in the name of Yuji Kondo, et al.

Patent Abstracts of Japan, Publiction No. 2002-215096, dated Jul. 31, 2002, in the name of Oh-Kyong Kwon.

Patent Abstracts of Japan, Publiction No. 2002-244617, dated Aug. 30, 2002, in the name of Naoaki Furumiya.

Patent Abstracts of Japan, Publiction No. 2003-173165, dated Jun. 20, 2003, in the name of Aoki Yoshiaki.

Patent Abstracts of Japan, Publiction No. 2003-202833, dated Jul. 18, 2003, in the name of Hajime Kimura, et al.

Patent Abstracts of Japan, Publiction No. 2003-223138, dated Aug. 8, 2003, in the name of Hajime Kimura.

Patent Abstracts of Japan, Publiction No. 2004-133240, dated Apr. 30, 2004, in the name of Shin Asano.

* cited by examiner

FIG. 1
(PRIOR ART)




FIG. 2
(PRIOR ART)



FIG. 3


VDD
VDATAm
T35
T32
C31
T31
scan[n-1]
T34
T33
scan[n]
emi[n]
T36
EL31
Vinit
VSS

FIG. 4


scan[n-1]
scan[n]
emi[n]
INITIALIZATION PERIOD
PROGRAMMING PERIOD
EMITTING PERIOD

FIG. 5






Mianyang BOE Ex. 1001
Case No. IPR2023-00941
Page 5 of 13

FIG. 6






Mianyang BOE Ex. 1001
Case No. IPR2023-00941
Page 6 of 13

FIG. 7






Mianyang BOE Ex. 1001
Case No. IPR2023-00941
Page 7 of 13

# ORGANIC LIGHT EMITTING DEVICE PIXEL CIRCUIT AND DRIVING METHOD THEREFOR

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit of Korean Patent Application No. 2003-45610, filed Jul. 7, 2003, the disclosure of which is hereby incorporated herein by reference in its entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a flat panel display and, more specifically, to a pixel circuit in an organic light emitting device capable of realizing high gradation by self-compensating a threshold voltage of a transistor that drives an electroluminescent (EL) element, and a method for driving the same.

2. Description of the Related Art

Normally, an organic light emitting device may be classified into a passive matrix organic light emitting diode (OLED) and an active matrix OLED (AMOLED), and can be classified into a current driving OLED and a voltage driving OLED depending on the manner in which the EL element is driven.

A typical AMOLED is generally composed of a plurality of gate lines, a plurality of data lines, a plurality of power lines, and a plurality of pixels connected to the lines and arranged in a matrix form. Each pixel is normally composed of: an EL element; two transistors, in which one is a switching transistor for transferring a data signal while the other is a driving transistor for driving the EL element depending on the data signal; and one capacitor for maintaining the data voltage.

Although this AMOLED has an advantage in that power consumption is low, current intensity flowing through the EL element changeing over time, causing display nonuniformity, can be a problem. This results from a change in voltage between the gate and the source of the driving transistor for driving the EL element, namely, the threshold voltage of the driving transistor, which leads to a change in the current flowing through the EL element. Since the threshold voltage of a thin film transistor for the driving transistor changes depending on manufacturing process parameters, it becomes difficult to manufacture transistors in the AMOLED so that all of the transistors have the same threshold voltage. Thus, there are threshold voltage deviations between pixels.

In order to solve this voltage deivation problem, a method has been developed for compensating the threshold voltage depending on manufacturing process parameters by adding a transistor for threshold voltage compensation. U.S. Pat. No. 6,229,506 ('506 patent) discloses an organic light emitting device for compensating the threshold voltage deviation. The '506 patent discloses a pixel structure in which a current source adjusts a voltage between the source and the gate of a driving transistor with respect to an overdrive voltage thereof and compensates the threshold voltage deviation of the driving transistor. The organic light emitting device in the '506 patent performs a two-step operation involving a data load (data write) step and a continuous light-emitting step, in which a current source adjusts a voltage between the source and the gate of the driving transistor with respect to the overdrive voltage and compensates the threshold voltage deviation of the driving transistor.



However, the organic light emitting device as described above employs a current driving approach for driving the EL element which depends on a data signal current level applied from the current source and has difficulty in charging a data line. Because a parasitic capacitance of the data line is relatively larger while the current level of the data signal provided from the current source is relatively smaller, the data becomes unstable as well as considerably long time is required to charge the data line.

In order to solve the data line charging problem in the current driving approach, an organic light emitting device having a mirror type pixel structure has been proposed. FIG. **1** shows a pixel circuit of a voltage driving manner having a mirror type in a conventional voltage driving organic light emitting device.

Referring to FIG. **1**, the pixel circuit comprises first P-type transistor T**11** in which the gate of the first transistor is connected to current scan signal SCAN[n] applied to an associated scan line of a plurality of gate lines. Data signal VDATAm applied to an associated data line of a plurality of data lines is applied to its source. Second P-type transistor T**12** in which a previous scan signal SCAN[n-1] is applied to a scan line just before the current scan line is applied to its gate. Initialization voltage Vinti is applied to its drain. Third and fourth P-type transistors T**13** and T**14** have a mirror type configuration. Fifth N-type transistor T**15** in which previous scan signal SCAN[n-1] is applied to its gate has its drain coupled to the drain of fourth transistor T**14**. EL element EL**11** is connected between fifth transistor T**15** and ground voltage VSS. First capacitor C**11** is connected between the gate and the source of fourth transistor T**14**.

Operation of the pixel in the organic light emitting device having the above-described structure will be described with reference to an operation waveform diagram of FIG. **2**. Here, it is assumed that a scan line to be currently driven is the n-th scan line. A scan signal applied to the n-th scan line is SCAN [n]. A scan line driven before the current scan line is the (n-1)th scan line. A scan signal applied to the (n-i)th scan line is SCAN[n-1].

First of all, in initializing the operation, if predetermined levels of previous scan signal SCAN[n-1] and current scan signal SCAN[n] are applied thereto, that is, if a low level of previous scan signal SCAN[n-1] and a high level of current scan signal SCAN[n] are applied thereto, transistor T**12** is turned on and transistors T**11** and T**15** are turned off, such that mirror-type transistors T**13** and T**14** are also turned off. Accordingly, the data stored in capacitor C**11** is initialized through transistor T**12** to initialization voltage Vinti.

Meanwhile, in programming data, if predetermined levels of previous scan signal SCAN[n-1] and current scan signal are applied thereto, that is, if a high level of previous scan signal SCAN[n-1] and a low level of current scan signal SCAN[n] are applied thereto, transistor T**12** is turned off and transistor T**11** is turned on, such that mirror-type transistors T**13** and T**14** are turned on.

Thus, a data signal voltage level VDATAm applied to the data line is transferred through transistor T**13** to the gate of driving transistor T**14**. At this time, since transistor T**15** is turned on by previous scan signal SCAN[n-1], a driving current corresponding to the data signal voltage VDATAm applied to the gate of driving transistor T**14** flows into EL element EL **11** for its light-emitting.

The voltage applied to the gate of transistor T**14** becomes $VDATA-V_{TH(T13)}$, and the current flowing through EL element EL**11** is represented by the following Expression 1.

$$I_{EL11} = \frac{\beta}{2}(V_{GS(T14)} - V_{TH(T14)})^2 = \frac{\beta}{2}(V_{DD} - V_{DATA} + V_{TH(T13)} - V_{TH(T14)})^2 \quad (1)$$

Where, $I_{EL\ 11}$ represents the current flowing through organic EL element EL **11**, $V_{GS(T14)}$ represents a voltage between the source and the gate of transistor T**14**, $V_{TH(13)}$ represents a threshold voltage of transistor T**13**, $V_{DATA}$ represents a data voltage, and β represents a constant value, respectively.

At this time, if threshold voltages of transistors T**13** and T**14** for the current mirror are identical with each other, i.e., if $V_{TH(T13)}=V_{TH(T14)}$, the threshold voltage of the transistor can be compensated, thereby maintaining the driving current of EL element EL **11** to be uniform.

However, although transistors T**13** and T**14** configuring the current mirror are arranged adjacent to each other on a substrate in the voltage driving manner of the current mirror type as described above, it is very difficult to obtain the same threshold voltage due to the manufacturing process parameters of TFT. Therefore, there is a problem that it is difficult to obtain a uniform driving current due to deviation of the threshold voltage of TFT, resulting in degraded image quality.

A technique for solving the image quality degradation due to the threshold voltage deviation between TFTs for the current mirror in the voltage driving manner of the current mirror type as described above is disclosed in U.S. Pat. No. 6,362,798 ('798 patent). In the '798 patent, a compensating thin film transistor having a diode form is connected to a gate of the driving transistor in order to compensate the threshold voltage of the driving transistor. However, there is a problem with the '798 patent that when threshold voltages of the thin film transistor for compensation and the thin film transistor for driving EL element drive are different from each other, threshold voltage deviation of the driving transistor is not compensated, as well.

## SUMMARY OF THE INVENTION

The present invention, therefore, addresses the aforementioned problem of the prior art, and provides a pixel circuit in an organic light emitting device capable of detecting and self-compensating threshold voltage deviations, and a method for driving the same.

Further in accordance with the present invention a pixel circuit in an organic light emitting device is provided capable of compensating threshold voltage deviations regardless of manufacturing process parameters, and a method for driving the same.

Still further in accordance with the present invention a pixel circuit in an organic light emitting device is provided which is capable of allowing a driving current flowing through an EL element to be uniform regardless of threshold voltage deviation between respective pixels, and a method for driving the same.

Yet still further in accordance with the present invention a pixel circuit in an organic light emitting device is provided capable of realizing high gradation representation regardless of threshold voltage deviation between respective pixels, and a method for driving the same.

According to one aspect of the invention, there is provided a pixel circuit in an organic light emitting device. A first transistor delivers a data signal voltage in response to a current scan line signal. A second transistor generates a driving current depending on the data signal voltage delivered through the first transistor. A third transistor detects and self-compensates threshold voltage deviations in the second transistor. A capacitor for stores the data signal voltage delivered to the second transistor. An electroluminescent element emits light corresponding to the driving current generated through the second transistor.

According to another aspect of the invention, there is provided a pixel circuit in an organic light emitting device. A first transistor delivers a data signal voltage in response to a current scan line signal. A second transistor programs the data signal voltage and generates a driving current in response to the programmed data signal when light is emitted. A third transistor provides the data signal voltage for the second transistor in response to the current scan signal. A capacitor maintains the data signal voltage programmed onto the second transistor. A fourth transistor delivers a power supply voltage to the second transistor when the light is emitted. A fifth transistor delivers the driving current, provided from the second transistor, depending on the data signal voltage when the light is emitted. An electroluminescent element emits light corresponding to the driving current delivered through the fifth transistor. The third transistor connects the second transistor in the form of a diode in response to the current scan signal, so that the second transistor detects and compensates its threshold voltage deviation in itself.

The first transistor is composed of a PMOS transistor including a gate to which the current scan line signal is applied, a source to which the data signal voltage is applied, and a drain coupled to the second transistor. The second transistor is composed of a PMOS transistor including a gate coupled to one terminal of the capacitor, a source coupled to the first transistor, and a drain coupled to the electroluminescent element. The third transistor is composed of a PMOS transistor including a gate to which the current scan signal is applied, and a drain and a source which are coupled to the gate and the drain of the second transistor, respectively, so that the second transistor is connected in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor. The fourth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the second transistor. The fifth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source coupled to the second transistor, and a drain coupled to the electroluminescent element.

According to yet another aspect of the invention, there is provided pixel circuit in an organic light emitting device. An electroluminescent element emits light depending on an applied driving current. A first transistor delivers a data signal voltage in response to a current scan line signal. A second transistor for generates a driving current to drive the electroluminescent element in response to the data signal voltage. A third transistor connects the second transistor in the form of a diode in response to a current scan signal to self-compensate a threshold voltage of the second transistor. A capacitor stores the data signal voltage delivered to the second transistor. A fourth transistor delivers a power supply voltage to the second transistor in response to a current light-emitting signal. A fifth transistor provides the driving current, provided from the second transistor, for the electroluminescent element in response to the current light-emitting signal.

According to yet still another aspect of the invention, there is provided a pixel circuit in an organic light emitting device.

A first transistor includes a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied. A second transistor has its source coupled to a drain of the first transistor. A third transistor has its drain and source connected between a gate and a drain of the second transistor. A fourth transistor includes a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the source of the second transistor. A fifth transistor includes a gate to which the current light-emitting signal is applied, a source coupled to the drain of the second transistor, and a drain coupled to one terminal of an electroluminescent element. The electroluminescent element has one terminal coupled to the drain of the fifth transistor and the other terminal grounded. A capacitor has one terminal coupled to the gate of the second transistor. A power supply voltage is applied to the other terminal of the capacitor.

According to yet still another aspect of the invention, there is provided a pixel circuit in an organic light emitting device having a plurality of data lines, a plurality of scan lines, a plurality of power lines, and a plurality of pixels each connected to one associated data line, scan line and power line of the plurality of data lines, scan lines and power lines. Each pixel comprises: a first transistor including a gate to which a current scan signal to be applied to the associated scan line is applied, and a source to which a data signal voltage from the data line is applied; a second transistor whose source is coupled to a drain of the first transistor; a third transistor whose drain and source are connected between a gate and a drain of the second transistor, respectively; a fourth emitting transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage from the power line is applied, and a drain coupled to the source of the second transistor; a fifth transistor including a gate to which the current light-emitting signal is applied, and a source coupled to the drain of the second transistor; an electroluminescent element including one terminal coupled to the drain of the fifth transistor and the other terminal grounded; and a capacitor including one terminal coupled to the gate of the second transistor, and the other terminal to which the power supply voltage from the power line is applied.

According to yet still another aspect of the invention, there is provided a method of driving a pixel in an organic light emitting device having a plurality of data lines, a plurality of scan lines, a plurality of power lines, and a plurality of pixels each connected to an associated one data line, scan line and power line of the plurality of data lines, scan lines and power lines. The method comprises: performing initialization in response to a scan signal applied to a scan line just before the associated scan line; compensating threshold voltage deviation in response to a scan signal applied to the associated scan line, and programming a data voltage applied from the associated data line, regardless of the threshold voltage deviation; and generating a driving current corresponding to the data voltage to emit an electroluminescent (EL) element in response to a current light-emitting signal.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a circuit construction of a pixel in a conventional organic light emitting device.

FIG. **2** is a waveform diagram for explaining operation of the pixel in the conventional organic light emitting device.

FIG. **3** illustrates a circuit construction of a pixel in an organic light emitting device according to an embodiment of the present invention.

FIG. **4** is a waveform diagram for explaining operation of the pixel in the organic light emitting device according to the embodiment of the present invention, as shown in FIG. **3**.

FIGS. **5** to **7** are circuit construction diagrams for explaining initialization operation, program operation and light-emitting operation of a pixel in an organic light emitting device according to an embodiment of the present invention.

## DETAILED DESCRIPTION

The organic light emitting device in accordance with the present invention includes a plurality of gate lines; a plurality of data lines; a plurality of power lines; and a plurality of pixels each arranged in an associated gate line, data line and power line of the plurality of gate lines, data lines and power lines. FIG. **3** shows only one pixel arranged in an associated gate line (the n-th gate line), data line (the m-th data line) and power line (the m-th power line).

Referring to FIG. **3**, each pixel in the organic light emitting device according to the present invention is composed of six transistors T**31**-T**36**, one capacitor C**31** and electroluminescent (EL) element EL**31**. That is, each pixel includes organic electroluminescent device EL**31** for emitting light corresponding to an applied driving current; first switching transistor T**32** for switching data signal voltage VDATAm, applied to the associated data line, in response to current scan line signal SCAN[n] applied to the associated scan line; driving transistor T**31** for supplying a driving current of the organic electroluminescent device corresponding to the data signal voltage inputted to its gate through first switching transistor T**32**; threshold voltage compensation transistor T**33** for compensating the threshold voltage of driving transistor T**31**; and capacitor C**31** for storing the data signal that is applied to the gate of driving transistor T**31**.

First switching transistor T**32** is composed of a P-type thin film transistor in which current scan signal SCAN[n], applied to the associated scan line, is applied to its gate, data signal voltage VDATAm, applied to the associated data line, is applied to its source, and its drain is connected to the source of driving transistor T**31**.

Driving transistor T**31** is composed of a P-type thin film transistor in which its gate is connected to one terminal of capacitor C**31** and its drain is connected to one terminal of EL element EL**31**. Threshold voltage compensation transistor T**33** is composed of a P-type thin film transistor in which its drain and source are connected to the gate and drain of driving transistor T**31**, respectively, and a current scan signal scan [n] is applied to the gate of transistor T**33**. Power supply voltage VDD from the associated power line is provided for the other side of capacitor C**31**.

Further, each pixel comprises second switching transistor T**35** for providing power supply voltage VDD for driving transistor T**31** in response to current light-emitting signal EMI[n], and third switching transistor T**36** for providing a driving current, generated through driving transistor T**31**, for EL element EL**31** in response to current light-emitting signal EMI[n].

Second switching transistor T**35** is composed of a P-type thin film transistor in which current light-emitting signal EMI [n] is applied to its gate, the power supply voltage from the associated power supply voltage line is applied to its source, and its drain is connected to the source of driving transistor T**32**. Third switching transistor T**36** is composed of a P-type thin film transistor in which current light-emitting signal EMI [n] is applied to its gate, its source is coupled to the drain of driving transistor T**31**, and the drain of transistor T**36** is

coupled to one terminal of EL element EL**31**. The other terminal of EL element EL**31** is grounded.

Moreover, each pixel includes initialization transistor T**34** for initializing the data signal stored in capacitor C**31** in response to a previous scan signal SCAN[n-1] applied to a scan line just before the associated scan line. Transistor T**34** is composed of a P-type thin film transistor in which previous scan signal SCAN[n-1] is applied to its gate, its source is coupled to the one terminal of capacitor C**31**, and initialization voltage Vinti is applied to its drain.

Operation of the pixel having the above-described configuration according to the present invention will be described with reference to FIGS. **4** to **7**.

First, in an initialization operation, during an initialization period in which previous scan signal SCAN[n-1] is of a low level, and current scan signal SCAN[n] and light-emitting signal EMI[n] are of high level as shown in FIG. **4**, since transistor T**34** is turned on by the low level of previous scan signal SCAN[n-1], and transistors T**31**-T**33** and T**35**-T**36** are turned off by the high level of current scan signal SCAN[n] and current light-emitting signal EMI[n], an initialization path (as indicated by a solid line shown in FIG. **5**) is formed. Accordingly, the data signal that has been stored in capacitor C**31**, namely, a gate voltage of driving transistor T**31**, is initialized.

Next, in a data program operation, during a programming period in which previous scan signal scan [n-1] is at a high level, current scan signal SCAN[n] is at a low level and current light-emitting signal EMI[n] is at a high level as shown in FIG. **4**, transistor T**34** is turned off, and transistor T**33** is turned on by the low level of current scan signal SCAN[n], such that driving transistor T**31** is connected in the form of a diode.

Since switching transistor T**32** is also turned on by current scan signal SCAN[n], and switching transistors T**35** and T**36** are turned off by current light-emitting signal EMI[n], such that a data program path (as indicated by a solid line shown in FIG. **6**) is formed. Accordingly, data voltage VDATAm applied to the associated data line is provided for the gate of driving transistor T**31** through threshold voltage compensation transistor T**33**.

Since driving transistor T**31** is in the diode connection, VDATAm-$V_{TH(T31)}$ is applied to the gate of transistor T**31** and the gate voltage is stored in capacitor C**31**, such that the program operation is completed.

Finally, in a light-emitting operation, during an light-emitting period in which previous scan signal SCAN[n-1] is of high level, current scan signal SCAN[n] becomes a high level, and then current light-emitting signal EMI[n] becomes a low level as shown in FIG. **4**, an light-emitting path (as indicated by the solid line as shown in FIG. **7**) is formed. That is, switching transistors T**35** and T**36** are turned on by the low level of current light-emitting signal EMI[n], initialization transistor T**34** is turned off by the high level of previous scan signal SCAN[n-1], and threshold voltage compensation transistor T**33** and switching transistor T**32** are turned off by the high level of current scan signal SCAN[n]. Accordingly, a driving current generated in response to the data signal voltage applied to the gate of driving transistor T**31** is provided through transistor T**31** for organic EL element EL**31**, such that the light-emitting of organic EL element EL**31** occurs.

At this time, the current into organic EL element EL**31** is represented by the following Expression 2.

$$I_{EL31} = \frac{\beta}{2}(V_{GS} - V_{TH(M31)})^2 = \frac{\beta}{2}(V_{DD} - V_{DATA} + V_{TH(M31)} - V_{TH(M31)})^2 \quad (2)$$

Where, $I_{EL31}$ represents the current flowing into organic EL element EL**31**, $V_{GS}$ represents a voltage between the source and the gate of transistor T**31**, $V_{TH(T31)}$ represents a threshold voltage of transistor T**31**, $V_{DATA}$ represents a data voltage, and β represent a constant value, respectively.

As can be seen from the Expression 2, the driving current flows through EL element EL**31**, corresponding to the data signal voltage applied to the data line regardless of the threshold voltage of current driving transistor T**31**. That is, because the present invention detects and self-compensates the threshold voltage deviation in current driving transistor T**31** through transistor T**33**, it is possible to finely control the current flowing into the organic EL element, thereby providing the high gradation of the organic EL element.

Further, if the data for a previous frame time has a high level of voltage and the data for a next frame time has a low level of voltage, the data signal can be no longer applied to the gate node of transistor T**31** owing to the diode connection property of transistor T**31**, and thus switching transistor T**34** is placed to initialize the gate node of transistor T**31** into a predetermined level Vinti per frame.

As described above, driving transistor T**31** in the present invention can self-compensate the threshold voltage deviation by detecting its own threshold voltage.

Although the embodiment of the present invention illustrates the pixel circuit composed of six transistors and one capacitor, the present invention is applicable to all constructions for detecting and self-compensating a threshold voltage. Moreover, the pixel circuit can be configured of a NMOS transistor, a CMOS transistor or the like other than the PMOS transistor.

According to the embodiment of the present invention as described above, there are advantages that it is possible to realize high gradation by detecting and self-compensating the threshold voltage deviation in the driving transistor as well as to solve a charging problem in the data line by driving the driving transistor in the voltage driving manner.

Although the present invention has been described with reference to the exemplary embodiments thereof, it will be appreciated by those skilled in the art that it is possible to modify and change the present invention variously without departing from the spirit and scope of the present invention as set forth in the following claims.

What is claimed is:

**1**. A pixel circuit in an organic light emitting device, comprising:

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for generating a driving current depending on the data signal voltage delivered through the first transistor;

a third transistor for detecting and self-compensating threshold voltage deviation in the second transistor;

a fifth transistor for providing a power supply voltage for the second transistor in response to a current light-emitting signal;

a sixth transistor which is coupled in series between the second transistor and an electroluminescent element and for providing the driving current for the electrolumines-

cent element through the second transistor in response to the current light-emitting signal; and

a capacitor for storing the data signal voltage delivered to the second transistor,

wherein the electroluminescent element emitts light corresponding to the driving current generated through the second transistor.

**2**. The pixel circuit in the organic light emitting device of claim **1**, further comprising:

a fourth initialization transistor for discharging the data signal voltage stored in the capacitor in response to a scan signal just before the current scan signal.

**3**. The pixel circuit in the organic light emitting device of claim **1**, wherein the first transistor is composed of a PMOS transistor including a gate to which the current scan line signal is applied, a source to which the data signal voltage is applied, and a drain coupled to the second transistor.

**4**. The pixel circuit in the organic light emitting device of claim **1**, wherein the second transistor is composed of a PMOS transistor including a gate coupled to one terminal of the capacitor, a source coupled to the first transistor, and a drain coupled to the electroluminescent element.

**5**. The pixel circuit in the organic light emitting device of claim **4**, wherein the third transistor is composed of a PMOS transistor including a gate to which the current scan signal is applied, and a drain and a source which are coupled to the gate and the drain of the second transistor, respectively, so that the third transistor connects the second transistor in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor.

**6**. The pixel circuit in the organic light emitting device of claim **1**, further comprising:

a voltage source for providing the data signal voltage through the first transistor for the second transistor.

**7**. A pixel circuit in an organic light emitting device, comprising:

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for programming the data signal voltage and for generating a driving current in response to a programmed data signal when light is emitted;

a third transistor for providing the data signal voltage for the second transistor in response to the current scan signal;

a capacitor for maintaining the data signal voltage programmed onto the second transistor;

a fourth transistor for delivering a power supply voltage to the second transistor when the light is emitted;

a fifth transistor for delivering the driving current, provided from the second transistor, in response to the data signal voltage when the light is emitted; and

an electroluminescent element for emitting light corresponding to the driving current delivered through the fifth transistor,

wherein the third transistor connects the second transistor in the form of a diode in response to the current scan signal so that the second transistor detects and compensates its threshold voltage deviation in itself.

**8**. The pixel circuit in the organic light emitting device of claim **7**, further comprising:

a sixth initialization transistorfor discharging the data signal voltage stored in the capacitor in response to a scan signal just before the current scan signal upon initialization.

**9**. The pixel circuit in the organic light emitting device of claim **7**, wherein the first transistor is composed of a PMOS transistor including a gate to which the current scan line signal is applied, a source to which the data signal voltage is applied, and a drain coupled to the second transistor.

**10**. The pixel circuit in the organic light emitting device of claim **7**, wherein the second transistor is composed of a PMOS transistor including a gate coupled to one terminal of the capacitor, a source coupled to the first transistor, and a drain coupled to the electroluminescent element.

**11**. The pixel circuit in the organic light emitting device of claim **10**, wherein the third transistor is composed of a PMOS transistor including a gate to which the current scan signal is applied, and a drain and a source which are coupled to the gate and the drain of the second transistor, respectively, so that the third transistor connects the second transistor in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor.

**12**. The pixel circuit in the organic light emitting device of claim **7**, further comprising:

a voltage source for providing the data signal voltage through the first transistor for the second transistor.

**13**. The pixel circuit in the organic light emitting device of claim **7**, wherein the fourth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the second transistor; and

the fifth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source coupled to the second transistor, and a drain coupled to the electroluminescent element.

**14**. A pixel circuit in an organic light emitting device, comprising:

an electroluminescent element for emitting light in response to an applied driving current;

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for generating a driving current to drive the electroluminescent element in response to the data signal voltage;

a third transistor for connecting the second transistor in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor;

a capacitor for storing the data signal voltage delivered to the second transistor;

a fourth transistor for delivering a power supply voltage to the second transistor in response to a current light-emitting signal; and

a fifth transistor for providing the driving current, provided from the second transistor, for the electroluminescent element in response to the current light-emitting signal.

**15**. A pixel circuit in an organic light emitting device, comprising:

a first transistor including a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied;

a second transistor whose source is coupled to a drain of the first transistor;

a third transistor whose drain and source are connected between a gate and a drain of the second transistor;

a fourth transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the source of the second transistor;

a fifth transistor including a gate to which the current light-emitting signal is applied, a source coupled to the drain of the second transistor, and a drain coupled to one terminal of an electroluminescent element;

the electroluminescent element having the one terminal coupled to the drain of the fifth transistor and the other terminal grounded; and

a capacitor in which one terminal of the capacitor is coupled to the gate of the second transistor and a power supply voltage is applied to the other terminal of the capacitor.

**16**. The pixel circuit in the organic light emitting device of claim **15**, further comprising:

a sixth transistor including a gate to which a scan signal just before the current scan signal is applied;

a source coupled to the one terminal of the capacitor; and

a drain to which an initialization voltage is applied.

**17**. A pixel circuit in an organic light emitting device having a plurality of data lines, a plurality of scan lines, a plurality of power lines, and a plurality of pixels each connected to one associated data line, scan line and power line of the plurality of data lines, scan lines and power lines, each pixel comprising:

a first transistor including a gate to which a current scan signal to be applied to the associated scan line is applied, and a source to which a data signal voltage from the data line is applied;

a second transistor whose source is coupled to a drain of the first transistor;

a third transistor whose drain and source are connected between a gate and a drain of the second transistor, respectively;

a fourth emitting transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage from the power line is applied, and a drain coupled to the source of the second transistor;

a fifth transistor including a gate to which the current light-emitting signal is applied, and a source coupled to the drain of the second transistor;

an electroluminescent element including one terminal coupled to the drain of the fifth transistor and the other terminal grounded; and

a capacitor including one terminal coupled to the gate of the second transistor, and the other terminal to which the power supply voltage from the power line is applied.

**18**. The pixel circuit in the organic light emitting device of claim **17**, further comprising:

a sixth transistor including a gate to which a scan signal to be applied to a scan line just before the associated scan line is applied, a source coupled to the one terminal of the capacitor, and a drain to which an initialization voltage is applied.

* * * * *

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 13,978 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
*Counsel for Appellants*