**No. 25-1426**

# United States Court of Appeals for the Federal Circuit

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD.; WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD.; TIANMA MICROELECTRONICS CO. LTD., VISIONOX TECHNOLOGY, INC.

*Appellants,*

v.

SAMSUNG DISPLAY CO., LTD.

*Appellee.*

On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board No. IPR2023-00941

## APPELLEE'S RESPONSIVE BRIEF

Jeffrey H. Lerner
Scott C. Weidenfeller
Richard L. Rainey
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St NW
Washington, DC 20001
(202) 662-6000

Date: July 30, 2025

*Counsel for Samsung Display Co., Ltd.*

## CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 7,414,599, Illustrative claims 1-2 and 15-16

1. A pixel circuit in an organic light emitting device, comprising:

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for generating a driving current depending on the data signal voltage delivered through the first transistor;

a third transistor for detecting and self-compensating threshold voltage deviation in the second transistor;

a fifth transistor for providing a power supply voltage for the second transistor in response to a current light-emitting signal;

a sixth transistor which is coupled in series between the second transistor and an electroluminescent element and for providing the driving current for the electroluminescent element through the second transistor in response to the current light-emitting signal; and

a capacitor for storing the data signal voltage delivered to the second transistor, wherein the electroluminescent element emitts [*sic*] light corresponding to the driving current generated through the second transistor.

2. The pixel circuit in the organic light emitting device of claim 1, further comprising:

a fourth initialization transistor for discharging the data signal voltage stored in the capacitor in response to a scan signal just before the current scan signal.

15. A pixel circuit in an organic light emitting device, comprising:
a first transistor including a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied;

a second transistor whose source is coupled to a drain of the first transistor;
a third transistor whose drain and source are connected between a gate and a drain of the second transistor;

a fourth transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the source of the second transistor;

a fifth transistor including a gate to which the current light-emitting signal is applied, a source coupled to the drain of the second transistor, and a drain coupled to one terminal of an electroluminescent element;

the electroluminescent element having the one terminal coupled to the drain of the fifth transistor and the other terminal grounded; and

a capacitor in which one terminal of the capacitor is coupled to the gate of the second transistor and a power supply voltage is applied to the other terminal of the capacitor.

16. The pixel circuit in the organic light emitting device of claim 15, further comprising:

a sixth transistor including a gate to which a scan signal just before the current scan signal is applied;

a source coupled to the one terminal of the capacitor; and

a drain to which an initialization voltage is applied.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1426

**Short Case Caption** Mianyang BOE Optoelectronics Technology Co., Ltd. v. Samsung Display Co., Ltd.

**Filing Party/Entity** Samsung Display Co., Ltd.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/30/2025

Signature: /s/ Jeffrey H. Lerner

Name: /s/ Jeffrey H. Lerner

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Samsung Display Co., Ltd. | | Samsung Electronics Co., Ltd. |
| | | Samsung SDI Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| COVINGTON & BURLING LLP | David A. Garr | Jared R. Frisch |
| Derek J. Andros | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST

TABLE OF AUTHORITIES ........ iii

STATEMENT OF RELATED CASES ........ v

INTRODUCTION ........ 1

COUNTERSTATEMENT OF THE ISSUES ........ 5

COUNTERSTATEMENT OF THE CASE ........ 6

SUMMARY OF THE ARGUMENT ........ 14

ARGUMENT ........ 15

STANDARD OF REVIEW ........ 15

I. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS UNDERLYING ITS REJECTION OF BOE'S ALL-PMOS MODIFICATION THEORY ........ 17

A. Substantial Evidence Supports the Board's Finding that a POSITA Would Not Consider a pMOS Transistor Interchangeable for Kimura's Transistor 3. ........ 20

1. Kimura's Transistor 3 is not a simple switching transistor. ........ 20

2. The functional requirements of Transistor 3 discourage modifying it to pMOS. ........ 26

3. BOE's assertions that the Board erred are meritless. ........ 27

B. The Board Correctly Rejected BOE's "incomplete" Theory of Alleged Manufacturing Benefits, which BOE Failed to Develop or Even Argue in Its Reply. ........ 32

II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S REJECTION OF BOE'S THEORY REGARDING "SHARED CONTROL" OF TWO TRANSISTORS. ........ 39

A. BOE's Petition Relies on Figure 33 for the "shared control" Claims. 40

B. The Petition's Proposed Modification to the Figure 33 Circuit Would Render the Circuit Inoperable. 44

C. The Board Correctly Rejected BOE's Attempts to Shift to an Entirely New Theory Based on the Figure 36 Embodiment. 47

D. The Board Did Not Err in Rejecting BOE's New Arguments Based on Figure 36. 51

III. THE BOARD DID NOT ABUSE ITS DISCRETION IN DENYING BOE'S ATTEMPT TO PROVIDE NEW ARGUMETN UNDER THE GUISE OF SUPPLEMENTAL INFORMATION. 53

A. The Board Properly Rejected BOE's Attempt to Provide New Argument as Supposed Supplemental Information. 53

CONCLUSION 60

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almirall, LLC v. Amneal Pharms. LLC*,
28 F.4th 265 (Fed. Cir. 2022) ....................15

*Am. Well Corp. v. Teladoc Health, Inc.*,
IPR2021-00748, Paper 23 (PTAB Feb. 28, 2022)....................54

*Azure Gaming Macau, Ltd. v. MGT Gaming, Inc.*,
IPR2014-01288, Paper 9 (PTAB Dec. 4, 2014) ....................37

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ....................31

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)....................15

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)....................16

*Corephotonics, Ltd. v. Apple Inc.*,
84 F.4th 990 (Fed. Cir. 2023) ....................17

*Elekta Ltd. v. ZAP Surgical Sys., Inc.*,
81 F.4th 1368 (Fed. Cir. 2023) ....................16

*In re Gal*,
980 F.2d 717 (Fed. Cir. 1992) ....................24

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....................15

*Handi Quilter, Inc. v. Bernina Int'l AG*,
IPR2013-00364, Paper 30 (PTAB June 12, 2014) ....................37

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ....................50

*Intelligent Bio-Sys. v. Illumina Cambridge*,
821 F.3d 1359 (Fed. Cir. 2016) ....................16

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
22 F.4th 1369 (Fed. Cir. 2022) ....................................................................3

*Netflix, Inc. v. DivX, LLC*,
80 F.4th 1352 (Fed. Cir. 2023) ..................................................................52

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ................................................................29

*Ooma, Inc. v. Deep Green Wireless LLC*,
IPR2017-01541, Paper 14 (PTAB Jan. 23, 2018) ..........................................54

*Parus Holdings, Inc. v. Google LLC*,
70 F.4th 1365 (Fed. Cir. 2023) ..................................................................29

*PGS Geophysical AS v. Iancu*,
891 F.3d 1354 (Fed. Cir. 2018) ................................................................16

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ................................................................16

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015) ...........................................................16, 53

*Redline Detection, LLC v. Star Envirotech, Inc.*,
IPR2013-00106, Paper 35 (PTAB Sept. 11, 2013).........................................53

*Yeda Rsch. and Dev. Co. v. Mylan Pharms. Inc.*,
906 F.3d 1031 (Fed. Cir. 2018) (PTAB Sept. 11, 2013) ..................................29

**Other Authorities**

37 C.F.R. § 42.64(b)(2)..................................................................................37

37 C.F.R. § 42.123 ........................................................................................37

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding was previously before this or any other appellate court.

This Court's decision may directly affect or be directly affected by the following cases that involve the same patent that is at issue in this appeal: *In the Matter of Certain Active Matrix Organic Light-Emitting Diode Display Panels and Modules for Mobile Devices and Components Thereof*, Inv. No. 337-TA-1351 (U.S.I.T.C.), appeal pending, *Samsung Display Co., Ltd. v. International Trade Commission*, No. 25-1791 (Fed. Cir.); *Samsung Display Co., Ltd. v. BOE Tech. Grp. Co., Ltd. et al.*, Case No. 1:25-cv-00908-RDA-LRV (E.D. Va.).

## INTRODUCTION

The Patent Trial and Appeal Board issued a thorough and well-supported Final Written Decision rejecting the grounds presented in BOE's petition[1] for *inter partes* review of U.S. Patent No. 7,414,599 (the "'599 Patent"). BOE argued that the inventions of the '599 Patent were allegedly obvious based on a single reference, the Kimura reference. Rejecting this argument based on its careful analysis of the record, the Board concluded that BOE had "not proved by a preponderance of the evidence that any of claims 1-18 of the '599 patent is unpatentable." Appx2. As the Board explained, for the majority of claims the petition's theories fail for multiple independent reasons. On appeal, BOE identifies no legal errors in the Board's Final Written Decision, nor could it. And there is no dispute over claim construction. Instead, BOE tries to challenge the Board's detailed factual findings. But those findings are supported by substantial evidence.

The obviousness arguments in BOE's petition proceed from a "baseline" circuit, Kimura's Figure 33 circuit, which Kimura expressly recognized as having a flawed design that emits light at unintended times—a fundamental failing for an

---

[1] Although the petition names Mianyang BOE Optoelectronics Technology Co., Ltd. ("BOE"), Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd., Tianma Microelectronics Co. Ltd., and Visionox Technology Inc. as petitioners, Appellants' brief refers to the petition as "BOE's petition." *E.g.*, Opening Brief of Appellants, ECF No. 11 ("OB") 16. For consistency, SDC will likewise refer to the petition as "BOE's petition."

OLED pixel circuit that would distort the intended image. As the Board found, Kimura's Figure 33 circuit was designed as a CMOS circuit, using a combination of nMOS and pMOS transistors, as were the other circuits Kimura described as circuits of its invention. Yet to argue obviousness, BOE posited as a starting point that its "baseline" circuit of Kimura's Figure 33 would be changed to exclusively pMOS transistors, eliminating its CMOS character and introducing potential operational problems such as those from leakage (all while not addressing the circuit's problem of spurious light emission).

The Board found, based on a robust factual record and careful consideration of the issues, that a POSITA would have had no reason to make these modifications, which are at odds with Kimura's disclosures. These were not the only modifications required by BOE's obviousness theories. BOE's theories further required a series of additional modifications to its hypothetical all-pMOS circuit, which as the Board explained, a POSITA would have had no motivation to make and were also inconsistent with Kimura's disclosures. For example, BOE's petition argued for modifying the circuit of Figure 33 to implement shared control of two transistors,

yet as the Board found, the circuit would not work with such a modification. BOE's own alleged expert[2] admitted the modification would render the circuit inoperable.

There is also no merit to BOE's secondary argument that the Board allegedly abused its discretion by rejecting BOE's attempts to make a midstream change in theories from those originally presented in its petition. After BOE filed its petition, Samsung Display (SDC) identified in its patent owner preliminary response significant deficiencies in the petition's theories. The Board then noted a number of problems with BOE's theories in its institution decision. Following institution, BOE filed a motion to submit "supplemental information" that attempted to raise new theories and new arguments not presented in its petition. The Board carefully considered BOE's motion and properly denied it because BOE was attempting to introduce new arguments that were not in its petition. As the Board explained, "the proposed supplemental information proceed[ed] in a new direction," Appx404-405, and "chang[ed] [the] theory of obviousness," Appx407. The Board's denial of BOE's motion was well within its discretion.

---

[2] In the parallel investigation before the International Trade Commission, the Administrative Law Judge found that BOE's alleged expert, Dr. Foty, failed to meet the level of ordinary skill in the art for the '599 Patent, and therefore excluded his testimony. Appx4161; Appx4164; *see Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376-77 (Fed. Cir. 2022) ("To offer expert testimony from the perspective of a skilled artisan in a patent case—like for claim construction, validity, or infringement—a witness must at least have ordinary skill in the art.").

Lacking any valid basis to challenge the Board's procedural ruling, BOE attempts to gloss over its shifting positions before the Board through selective quotations and citations. For instance, BOE continues to claim that the Board "invited" BOE's changed theories when the Board—aware of what it had and had not "invited" in its institution decision—considered and specifically rejected this claim. The Board had a fully developed record on these issues, and its finding that BOE was improperly raising new theories was correct and well within its discretion.

BOE's shifting approach is illustrated by its attempt to change from the petition's reliance on its "baseline" circuit of Figure 33 to a new theory relying on modifying Kimura's different circuit of Figure 36. The Board's final written decision explains at length that BOE's petition relied on the circuit of Figure 33 as the starting point for modification in all its grounds, and not the circuit of Figure 36. BOE fails to address the full set of reasons provided by the Board for its determination, and even the argument BOE raises on appeal necessarily fails as it would leave a glaring internal inconsistency in its obviousness theory. In particular, a number of claims, including claims 2, 16, and 18, require *both* initialization and shared control of specified transistors. BOE's brief acknowledges that its theory as to the "initialization" limitation rests on modification of its "baseline" circuit, Kimura's Figure 33 circuit. In contrast, BOE claims that its theory as to the "shared control" limitations rests on starting from a *different* circuit, Kimura's Figure 36 circuit. As

the Board recognized, this "doesn't compute." Appx890. There cannot be two different starting points for the same claim. BOE's petition did not argue for starting from Kimura's Figure 36 circuit and modifying that circuit, and as the Board explained in detail, BOE's attempts to claim otherwise cannot withstand scrutiny.

Thus, the Board made extensive factual findings and correctly found that BOE did not show that any claim of the '599 Patent is obvious. While BOE contests how the Board resolved certain factual disputes, the Board's findings are well reasoned and amply supported by the record. BOE's neglect of evidence contrary to its desired positions does not show otherwise and certainly does not establish a lack of substantial evidence for the Board's findings. And BOE's claims that the Board allegedly did not consider certain evidence or arguments are belied by the record. As to BOE's challenge to the Board's ruling on a motion to submit supplemental information, the record demonstrates the Board did not abuse its discretion in denying BOE's attempt to change theories from those presented in its petition, particularly after SDC and the Board had identified critical flaws in those theories.

The Board's decision should therefore be affirmed.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether substantial evidence supports the Board's finding that BOE's modification of a CMOS circuit to be all-pMOS (relied upon for all challenged claims) was not a simple substitution of interchangeable transistors, where Kimura

does not disclose or suggest changing the claimed third transistor to pMOS and the record evidence demonstrates that a POSITA would recognize that changing the polarity of the third transistor would hinder operation of the circuit.

2. Whether substantial evidence supports the Board's finding that Kimura does not render obvious claims 1-6 and 13-18 because it does not teach or suggest "shared control of two transistors" under the theory BOE raised in its petition.

3. Whether the Board acted within its discretion in rejecting BOE's attempts to change its theories and present new arguments and concepts—different from those in the petition and its expert's declaration attached to the petition—under the guise of supplemental information and in its reply brief.

## COUNTERSTATEMENT OF THE CASE

The '599 Patent is directed to a novel design for a pixel circuit for active matrix organic light emitting diode (AMOLED) displays. In an AMOLED display, each pixel has a dedicated pixel circuit that takes inputs from the mobile device to output a desired intensity of light. The '599 Patent's pixel circuit structure contains transistors and a capacitor configured so that the circuit can compensate for deviations in the threshold voltage of a driving transistor (i.e., a transistor controlling the amount of current provided to the OLED for light emission) caused by inherent manufacturing variability and the aging of thin-film transistors (TFTs) during use. The pixel circuit structure of the '599 Patent further ties specific transistors to

specific control lines, uses specific initialization, and employs shared control of specific transistors, allowing for an overall reduction in the number of control lines, reduced physical size of the circuit, and improved performance. *See, e.g.*, Appx67-68, 6:19-7:11; Appx61, Fig. 3; Appx68-70, cls. 1-2, 7, 13, 15-16. The '599 Patent's pixel circuit provided improved uniformity of light output and image quality in a structure especially well-suited to mobile devices. *See, e.g.*, Appx68, 7:12-8:21.

The '599 Patent's inventive pixel circuits marked a key advance for AMOLEDs, succeeding where many others had not. For example, a 2008 textbook titled "Mobile Display Technology and Applications," Appx3214, explains that a significant hurdle for mass-producibility of AMOLED displays was luminance non-uniformity, because unavoidable imperfections in the low-temperature polysilicon manufacturing process for TFTs would yield AMOLED panels having TFTs with nonuniform electrical characteristics. *See* Appx3239-3244. Non-uniformity in light emission due to the pixel circuits had been recognized as a "major bottleneck[]" to "commercialization activities" for AMOLEDs. Appx3265. The textbook recounts the years-long efforts by display industry and academic research groups to design pixel circuits that could pave the way for commercially suitable AMOLED displays. The inventors of the '599 Patent succeeded where others (including Kimura) had not by devising a novel circuit that provided compensation for deviations in the threshold voltage of the driving transistor while reducing the number of control lines

and the size of the circuit. They met a longstanding need for pixel circuits suitable for mobile devices such as smartphones that would provide superior image quality in mass-producible AMOLED displays with reduced footprints, and overcame industry skepticism about the suitability of AMOLED displays for mobile devices.

For their achievements, Samsung Display and the inventors received praise and awards, including from the prestigious Society for Information Display (SID) and the President of South Korea. Appx3517; Appx3524. For example, inventor Dr. Oh-Kyong Kwon was awarded the Korea Best Scientist and Engineer Award by the President of South Korea for "develop[ing] pixel circuits … for AMOLED displays that can be accurately controlled to very low current levels, which were considered practically impossible, enabling the mass production of AMOLEDs for mobile devices." Appx3517.

Since the inventions of the '599 Patent, the patented pixel circuit design has been implemented in a wide range of commercially successful mobile device products, including the Samsung Galaxy Series and Apple iPhones. Appx535, Appx542-544. The design has also been widely copied. Appx546-550.

In its petition, BOE relied on a theory that a "baseline" pixel circuit shown in Figure 33 of Kimura, a CMOS circuit comprising both nMOS and pMOS

transistors,[3] would allegedly have been converted into an "all-pMOS" circuit. Appx95, Appx102. While BOE now asserts that "many challenged claims do not even specify the polarity" of a particular transistor, OB 2, BOE specifically relied upon its modified "baseline" pixel circuit for its challenges to all of the claims. *See, e.g.*, Appx102 ("Petitioner uses the modified "All-PMOS" version of Fig. 33 for the patentability analysis."); Appx862-863 ("I would emphasize that because there are some claims that require all-PMOS transistors, **we proceeded with an all-PMOS embodiment…for all of the claims.**") (emphasis added); Appx20-22; OB 18. That modified circuit would require changing the polarity of all transistors of the pixel circuit to pMOS.

However, Kimura never teaches or suggests that its Figure 33 circuit could use all pMOS transistors. While BOE points to select passages of Kimura describing that particular transistors can be changed from nMOS to pMOS, BOE omits that in those same passages Kimura requires that specific transistors (i.e., the "fourth" and "fifth" transistors) be of *different* polarities from one another in order to reduce the number of signal lines required to drive the circuit. *See, e.g.*, Appx1011, ¶[0659]; Appx3146-3147, ¶71. In other words, Kimura emphasizes the circuits have a CMOS

---

[3] CMOS, or "complementary metal oxide semiconductor" circuits, are "complementary" because they include both nMOS (negative MOS) and pMOS (positive MOS) transistors.

design with both nMOS and pMOS transistors, in which particular transistors (but not all of them) could be changed from nMOS to pMOS provided others are of the opposite polarity. Additionally, Kimura never states nor suggests that the polarity of its "third" transistor can be changed. Appx3145-3146, ¶70.

Further, while BOE seeks to liken the operation of what it calls Kimura's "baseline" Figure 33 circuit to the invention of the '599 Patent, Kimura's circuit operates differently. BOE attempts to describe the operation of Kimura's circuit in terms of the three phases—initialization, programming, and light emission—taught by the '599 Patent; however, Kimura does not have the same phases of operation. *See, e.g.*, Appx3132-3135, ¶¶41-44; Appx3151-3162, ¶¶79-96. BOE's repeated references to the '599 Patent, attempting to describe the operation of the prior art or to explain or justify its arguments, only underscore the hindsight-driven approach BOE has taken in this proceeding.

For example, in the '599 Patent's "initialization" phase, the capacitor of the pixel circuit is initialized to a known voltage. *See, e.g.*, Appx68, 7:15-26. During Kimura's alleged "initialization" step, in contrast, there is no indication that the capacitor is "initialized" to a default voltage. Appx2096-2097, 203:4-5, 203:20, 205:6. Instead, in what BOE describes as Kimura's "initialization" phase, a data signal (VData) is provided to the pixel circuit. *See, e.g.*, Appx970, Fig. 33B; Appx2096-2097, 203:4-5, 203:20, 205:6. Thus, this phase is more akin to a

programming (or pre-programming) phase, in which data is provided to the pixel circuit and stored in the capacitor. *Id; see also, e.g.*, Appx68, 7:27–48.

For certain claims requiring “shared control” of particular transistors by one signal line, BOE relied upon Kimura’s Figure 33 circuit, which BOE further modified not only to have all pMOS transistors but also to connect one signal line to the gates of both the identified “fourth” and “fifth” transistors. Appx144-146. As the Board found in the institution decision, this was the only theory presented in the petition regarding these claims. Appx318-319 (“It is questionable whether the Figure 33 embodiment, after being modified to make the fourth and fifth transistor always turn on and off together, as Petitioner proposes based on the Figure 36 embodiment, would still meet all the requirements of the first, second, third, fourth, and fifth transistor, as recited in claim 7.”); *see also generally* Appx268-332; Appx22 (“Petitioner uses the modified Figures 33A-33E…to support its assertions of unpatentability of all challenged claims including each independent claim.”).

While BOE seeks to trivialize the differences between the Figure 33 and Figure 36 circuits,[4] its arguments run counter to Kimura’s disclosures. Kimura

---

[4] While BOE points to a single footnote asserting that the Figure 36 circuit is “merely an extension” of the Figure 33 circuit, as discussed below, the Figure 36 circuit is a different circuit and BOE never attempts to show how the Figure 36 circuit, with its different connections and circuit elements, would map back to the Figure 33 circuit. Nor does BOE show how each limitation of the independent claims—for which BOE (continued…)

specifically describes Figure 36 as a modified circuit that corrects a problem with unintended light emission present in the Figure 33 circuit. To do so, the Figure 36 circuit includes an additional transistor and associated connections and signal lines, as well as different transistor operation states relative to the Figure 33 circuit. *See, e.g.*, Appx3161-3162, ¶¶95-96; *see also* Appx45-46. It is these changes that allow the Figure 36 circuit to address the unintended light emission problem inherent to the circuit of Figure 33. BOE does not even attempt to explain these differences. Moreover, BOE's stated motivation for modifying the Figure 33 circuit—reducing the number of necessary signal lines—conflicts with its proposed all-pMOS modification. Specifically, BOE points to Kimura's discussion of changing either the first or the fourth transistor in the Figure 33 circuit to be pMOS. OB 19. But Kimura makes clear that in order to reduce the number of necessary signal lines only one of the transistors' polarities can be made to be pMOS, while the other transistor must remain nMOS. Appx1011, ¶[0659]; *see also* Appx3146-3147, ¶71. Indeed, it is the combination of these *different* polarities that allows a reduction in signal lines, i.e., a single gate signal line to control both transistors. Appx3146-3147, ¶71.

---

exclusively relies upon its modified Figure 33 circuit—would be satisfied by the different circuit of Figure 36. This is unsurprising, because as the Board found, Kimura teaches that the transistors in the respective circuits operate differently, Appx318-319, and there are differences in signal lines.

In the institution decision, the Board noted these concerns with the petition's theory regarding "shared control," and invited the parties to further develop the record on this issue, i.e., whether the Figure 33 embodiment, after being modified based on the Figure 36 embodiment, would still meet all of the requirements of the claims:

> It is questionable whether **the Figure 33 embodiment, after being modified** to make the fourth and fifth transistor always turn on and off together, **as Petitioner proposes based on the Figure 36 embodiment, would still meet all the requirements** of the first, second, third, fourth, and fifth transistor, as recited in claim 7. Based on the present record, we find that Petitioner has not provided an adequate explanation as to this potential discrepancy.

Appx317-318 (emphasis added). Rather than address the Board's question, however, BOE attempted to pivot to a new and different argument, one that omitted Kimura's Figure 33 embodiment and that was instead based entirely on Kimura's Figure 36 circuit. To do so, BOE selectively quoted the Board's invitation, purposefully misstating the Board's request:

> At institution, the Board agreed but observed that Fig. 36 "[uses] six transistors, not five as in the case of the Figure 33 embodiment," and invited the parties to develop the record on **whether the "Figure 36 embodiment, would still meet all the requirements** of the first, second, third, fourth, and fifth transistor" in base claim 7. ID, 51-52. The unequivocal answer is "yes."

Appx615 (emphasis added). As shown above, the Board never invited a change to a new theory based entirely on a "Figure 36 embodiment" as a starting point for

modification; the Board instead asked for an explanation of how BOE's proposed modification of "*the Figure 33 embodiment*" "based on the Figure 36 embodiment" would meet all of the requirements of the claims at issue. Appx317-318. The Board properly rejected BOE's attempt to change its theories on Reply. Appx44 (noting "we did not make such an invitation"). In any event, BOE still never explains how the underlying independent claims would be met by the different circuit structure of Figure 36.

## SUMMARY OF THE ARGUMENT

Substantial evidence supports the Board's findings underlying its obviousness determinations. BOE does not seriously challenge the substantiality of the evidence underlying the Board's final written decision; it just argues that the Board erred in finding certain facts or in rejecting BOE's proposed findings. Indeed, nearly all of the headings in BOE's Argument allege such errors. When BOE does address the evidence on which the Board relied, it dismisses the Board as selectively quoting the record, not relying on certain evidence, and not concluding that the *prior art* failed to identify the problem SDC's expert identified. These arguments are all flawed. But even if this Court were to accept these arguments, they would not establish that the Board lacked substantial evidence in support of its findings.

Recognizing as much, BOE further argues that the Board abused its discretion in denying BOE's attempts to advance new theories and evidence of supposed

unpatentability under the guise of a motion to submit "supplemental information." But BOE does not even address the Board's reasoning or factual findings in its order denying the motion, much less establish that the Board abused its discretion in finding BOE's proposed supplemental information improper. Indeed, BOE's only citations to the order in its argument largely quibble with how the Board block-quoted the parties' arguments with which it expressly agreed, and ignore the Board's additional reasoning. *See* OB 74-75, 78-79. The closest BOE comes to addressing the Board's reasoning is to argue that the Board misunderstood BOE's arguments, or that the reasoning was based on a misconception. *See id.* at 59, 79. BOE is wrong, as a review of the record shows. Moreover, BOE's arguments fall far short of establishing an abuse of discretion.

## ARGUMENT

## STANDARD OF REVIEW

This Court reviews factual findings for substantial evidence. *Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 271-72 (Fed. Cir. 2022). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

"Whether a claimed invention is unpatentable as obvious under § 103 is a question of law based on underlying findings of fact." *In re Gartside,* 203 F.3d at 1316. The underlying facts include "the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). "[T]he question of what [the prior art reference] teaches . . . is a factual question." *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1364 (Fed. Cir. 2018) (citation omitted). Additionally, "[w]hether a skilled artisan would have been motivated to combine references or would have had a reasonable expectation of success in combining references are questions of fact reviewed for substantial evidence." *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1374 (Fed. Cir. 2023).

"Decisions related to compliance with the Board's procedures are reviewed for an abuse of discretion." *Intelligent Bio-Sys. v. Illumina Cambridge*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). The Board's determination to deny a motion to present supplemental information is reviewed for an abuse of discretion. *See Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 444 (Fed. Cir. 2015) ("[W]hether the Board grants a motion to submit supplemental information …

‘depend[s] upon the Boards determination that, in its discretion, the action sought by the movant is consistent with the Boards statutory mandate.’”); *see generally Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1002-03 (Fed. Cir. 2023) (“We review the Board’s assessments of what has been argued to and put before it in an IPR for abuse of discretion.”).

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD’S FINDINGS UNDERLYING ITS REJECTION OF BOE’S ALL-PMOS MODIFICATION THEORY.

For its challenges to all claims, BOE relied on a theory that a “baseline” pixel circuit of Figure 33 of Kimura, a CMOS circuit, would be changed so as to convert it into an “all-PMOS” circuit.[5] Appx102. The Board found that a POSITA would not have modified Kimura’s circuit of Figure 33 to use all pMOS transistors, and its finding is supported by substantial evidence. Appx26-32.

SDC presented both evidence from Kimura and expert opinion credited by the Board explaining that a POSITA would not have had reason to modify Kimura’s CMOS Figure 33 circuit to use all pMOS transistors. Appx497-508; Appx3141-3151.

[5] BOE’s suggestion that it chose this approach “[e]ven though not required by most of the challenged claims” because it “believed it would be non-controversial and would streamline the proceedings,” OB 19, strains credulity. In any event, BOE’s suggestion is facially inconsistent with the discussion in the petition, which shows that BOE affirmatively chose to rely on this “All-PMOS” modified circuit as the starting point for its theories for all challenged claims. Appx102.

For example, SDC presented extensive evidence showing that for particular transistors in the pixel circuits at issue, there are material differences between nMOS transistors and pMOS transistors—including in their leakage current, speed, and size—that would affect the design and operation of a pixel circuit for an AMOLED display. Appx501-502. In particular, while Kimura disclosed that the polarities of certain "simple switching devices" could be modified, Kimura did not state or suggest that Kimura's Transistor 3 is such a "simple switching" transistor, nor that it would otherwise be modified from nMOS to pMOS. Appx502. To the contrary, SDC's expert, Dr. Wolfe, provided detailed analysis credited by the Board explaining that Kimura's Transistor 3 does *not* operate as a simple switching transistor, and describing operational differences in Transistor 3 that explain why Kimura never discusses modifying the polarity of that transistor. Appx501-503; Appx3145-3146.

Significantly, Kimura expressly identifies which particular transistors could be either nMOS or pMOS, and it never states that Transistor 3, which BOE maps to the claimed "third" transistor, could be a pMOS transistor. As Dr. Wolfe explained, a POSITA would be concerned about leakage current through this transistor because, based on its location in the circuit (i.e., its connection to the capacitor), leakage could change the brightness of the pixel from its intended value, and it was known to

POSITAs that leakage current was higher in pMOS than nMOS transistors. Appx3145-3146, ¶70; Appx3143, ¶63.

Likewise, Kimura's disclosures cannot support a theory of "general interchangeability" that would apply to *all* the transistors in Kimura that BOE seeks to modify. BOE and its expert merely cited to passages from Kimura that reference changing "simple switching devices" from nMOS to pMOS in other embodiments (not the embodiment shown in Figure 33), but identified no disclosure stating or suggesting that TFT 3309 (the alleged "third" transistor or Transistor 3 in Figure 33) or its counterpart in other embodiments—which Kimura never identifies as a "simple switching device"—could be similarly modified. Appx99-101; Appx606; Appx1099-1101, ¶¶147-50.

BOE is also incorrect in asserting that Kimura describes all of the transistors as either a "driving" transistor or "switching" transistor. Regardless, BOE fails to acknowledge that Kimura describes transistor 3309—which BOE identifies as Transistor 3—as a *drive* transistor, not a switching transistor. Appx1011, ¶[0654] ("TFT 3309 behaves as a driver TFT for performing control of electric current supplied to an EL device 3313"). Thus, under even BOE's own dichotomy (which Kimura does not support), Transistor 3 is not a simple switching transistor.

Finally, substantial evidence supports the Board's finding that purported "manufacturing benefits" would not have motivated a POSITA to modify Kimura to

use an all-pMOS pixel circuit. While BOE appeared to abandon this argument only to raise it again on appeal, as the Board found, the purported benefits of using all pMOS transistors in the pixel circuit would not have been obtained in modifying the Figure 33 circuit of Kimura. Appx32-37. As the Board explained, Kimura teaches a CMOS manufacturing process in which transistors of both polarities (i.e., nMOS and pMOS) are used in drive circuitry manufactured together with the pixel circuit. *Id.; see also, e.g.*, Appx508-513; Appx3148-3151, ¶¶74-78.

### A. Substantial Evidence Supports the Board's Finding that a POSITA Would Not Consider a pMOS Transistor Interchangeable for Kimura's Transistor 3.

#### 1. Kimura's Transistor 3 is not a simple switching transistor.

BOE's main theory of obviousness did not offer any reason why a POSITA would allegedly be motivated to modify Kimura's CMOS Figure 33 circuit to employ all pMOS transistors, and instead relied on a theory that "simple switching devices" are "swappable." Appx81; *see also, e.g.*, Appx26. For this simple-design-choice theory, BOE presumed that each pixel in an OLED drive circuit is either a "driving transistor" or a "simple switching device[]," and that it would have been obvious to change the polarity of any switching transistor because they are allegedly

interchangeable. OB 20, 40.[6] As the Board correctly recognized, BOE's theory fails. Setting aside the lack of support in Kimura for BOE's binary construct, Kimura never describes its alleged Transistor 3 (TFT 3309) as a switching transistor let alone a "simple switching device[]."

There is substantial evidence, considered by the Board in finding that BOE had not established interchangeability, that certain relevant transistors in Kimura's pixel circuits do not function as simple switching devices. It is undisputed that the driving transistor does not, OB 40, nor does Transistor 3. As Dr. Wolfe explained:

> As shown in Figure 33, the "third" transistor is located within the pixel circuit such that it controls the flow of charge to the capacitor during programming and holds charge on the capacitor during emission. Kimura Fig. 33. The charge on the capacitor in turn determines the brightness of the pixel.

Appx3145-3146, ¶70. "[A] POSITA would have recognized that leakage current in the third transistor could alter the charge stored on the capacitor," and "[i]t would thus be particularly important to mitigate any potential leakage current for this transistor." *Id*. "The idea is to design something so that the impact of the leakage is imperceptible." Appx2089, 174:2-3. While BOE asserts that a certain amount of leakage in TFT 3309 may be tolerable, OB 50, leakage through this transistor, which

---

[6] BOE also implies that each driver circuit has only a single "driving transistor," and "the remaining transistors" function as "switching transistors." OB 40. However, as is clear from Kimura, a driver circuit can comprise multiple driving transistors. *E.g.*, Appx1012, ¶[0672] ("The driver TFTs 3708 and 3710 have a connection . . . ."); *id*., ¶[0683] ("TFTs 3908 and 3911 are connected in series as driver TFTs . . . .").

results in a change in the voltage on the capacitor, underscores that the transistor is not serving in the circuit as a "simple switching device[]." Consistent with this, Kimura never describes this transistor TFT 3309 (or its counterpart in any other embodiment) as a "simple switching device[]."

Tellingly, nowhere in BOE's purported "extensive" evidence does Kimura describe Transistor 3 as either a "simple switching device[]," or even as a "switching transistor." *See, e.g.*, Appx867 (providing bare attorney argument in response to the Board's recognition that Transistor 3 "looks very different from the other ones" and the Board's question of "where's the explanation that transistor 3 works just like the other simple switching transistors and not like the driving transistor?").[7]

Kimura's only description of the function of Transistor 3 (TFT 3309) contradicts BOE's position that it is a "switching transistor." Kimura explains instead that "TFT 3309 behaves as a ***driver*** TFT." Appx1011, ¶[0654] (emphasis added). And even BOE acknowledges that a driver (or driving) TFT is not a "simple switching device[]." OB 41-42.

---

[7] *See also* Appx1068 (no mention of Transistor 3); Appx100 (making no mention of Transistor 3); Appx115 (no mention of Transistor 3 being a "switching transistor"); Appx126-127 (no mention of Transistor 3 being a "switching transistor"); Appx611-614 (no mention of Transistor 3); Appx1091-1095 (describing alleged general operation of the circuitry and making no mention of Transistor 3 being a "switching transistor"); Appx1116 (no mention of Transistor 3 being a "switching transistor"); Appx1099-1100 (no mention of Transistor 3).

Further supporting the fact that there was substantial evidence for the Board to find that it would not have been obvious to modify the polarity of Transistor 3, Kimura never describes or suggests doing so. Notably, while Kimura is explicit about the polarity of transistors in its circuits, BOE can only cite one statement in Kimura that relates to BOE's baseline circuit of Figure 33, arguing that "Kimura expressly contemplates substituting nMOS transistors for pMOS transistors for the first and fourth transistor in Fig. 33." OB 43-44 (citing Appx1011, ¶[0659]). But even this disclosure belies BOE's "All-PMOS" theory and highlights that the selection of an nMOS or pMOS transistor in relation to these other transistors is no simple "design choice." Kimura teaches that *one* of these transistors can be pMOS provided that the *other* is nMOS—i.e., provided that the two transistors have opposite polarities. Kimura teaches that it is the combination of two *different* polarities that allows a gate signal line to be removed:

> [T]he TFT 3306 and the TFT 3307 are controlled so as to turn on and off at mutually opposite timings, and therefore the polarity of one of the TFTs may be made opposite to the polarity of the other TFT, and both of the TFTs can thus be controlled by the same gate signal line 3402, as shown in FIG. 34A.

Appx1011, ¶[0659]. Crucially, it is a combination of nMOS and pMOS for TFTs 3306 and 3307 in Figure 33's circuit (the alleged "first" and "fourth" transistors) that allows a single gate signal line to control them. Appx3146-3147, ¶71. This is

illustrated in Figure 34A, where nMOS TFT 3405 and pMOS TFT 3406 are controlled by a single gate line, 3402:




Kimura Fig. 34A
(annotated)

Appx3147 (annotating Kimura Fig. 34A). If anything, this disclosure demonstrates that a POSITA would not have been motivated to make *both* of those transistors—much less all of the transistors in the Figure 33 circuit—pMOS, because doing so would sacrifice the ability to reduce the number of gate signal lines (a purported motivation that BOE relies on elsewhere). *See, e.g.*, Appx3146-3148, ¶¶71-73. The relevant structural and operational differences between nMOS and pMOS transistors in the pixel circuits at issue preclude reliance on a "simple design choice" theory. *See, e.g.*, *In re Gal*, 980 F.2d 717, 719-20 (Fed. Cir. 1992) (reversing Board finding of "obvious design choice" where the claimed structure and the function it performs are different from the prior art).

BOE asserts that the Board violated the APA based on a claim that the Board made its finding that BOE failed to establish general interchangeability as to Transistor 3 "without citing any of the parties' evidence or explaining why it was rejecting BOE's showing." OB 39. Puzzlingly, BOE cites as support for this proposition only "Appx26; *see* Appx30-31," omitting pages 27-29 of the Board's final written decision. OB 39. Those omitted pages extensively address both parties' arguments, quote much of the evidence cited by the parties, and explain the Board's determination that BOE's arguments are "misplaced and unpersuasive," Appx29. *See* Appx27-29. Indeed, the Board expressly "credit[s]" Dr. Wolfe's testimony and indicates that it is "persuaded thereby." Appx29.

BOE's purported "extensive showing of the general interchangeability of nMOS and pMOS switching transistors," OB 43, likewise does not withstand scrutiny, and certainly does not show a lack of substantial evidence for the Board's findings. *See, e.g.*, Appx26 ("The evidence Patent Owner has presented undermines Petitioner's reliance on a general theory of interchangeability in modifying Transistor 3 from nMOS to pMOS."). That changing from nMOS to pMOS transistors may be suitable in *certain* circumstances, for certain transistors, does not mean that the two types of transistors are interchangeable in *all* circumstances; in particular where, as here, the structure and operation of the specific circuit at issue dictates otherwise (*see infra* Section I.A.2).

Finally, as the Board correctly found, BOE's reliance on a single statement from the '599 Patent's disclosure of its invention, *see* OB 44, (relying on Appx68, 8:36-38) is unavailing, Appx30-31. First, as the Board recognized, it represents a hindsight analysis—"the referenced statement is a description of additional embodiments of the '599 patent, i.e., the invention of the '599 patent, and not a description or acknowledgement of what would have been known to one of ordinary skill in the art." Appx31. Second, "it is not an admission by the inventors of the '599 patent that changing a transistor from one configuration to another would have no consequences and would be free of performance considerations." *Id*. And third, even putting aside that the argument is based on impermissible hindsight, the cited statement "does not refer to any particular transistor within the pixel circuit" and BOE failed to establish that Transistor 3 is a transistor that could be changed to pMOS without negative consequences. Appx30.

**2. The functional requirements of Transistor 3 discourage modifying it to pMOS.**

The Board also found, based on considerable evidence of record, that significant operational differences for Transistor 3 would have discouraged a POSITA from modifying it to be pMOS. Appx26-32. The Board credited SDC's showing that nMOS transistors were less susceptible to leakage current relative to pMOS transistors. Appx29; Appx3143, ¶63; *see also, e.g.*, Appx3738. BOE's expert admitted as much at deposition. Appx3843, 98:14–20. In addition to material

differences in leakage current, SDC showed that nMOS transistors were known to have higher mobility (and therefore be faster) and also had the advantage of being smaller relative to pMOS transistors. *See, e.g.*, Appx501-502; Appx3143-3144, ¶¶63-65; Appx3843, 98:14-20; Appx3837-3839, 92:20-94:18. As the record shows, a POSITA would have been aware of these differences between nMOS and pMOS transistors. *See, e.g.*, Appx3143-3145, ¶¶63-68.

These operational differences are particularly important given the location and operation of Kimura's Transistor 3. Transistor 3 is connected to the capacitor that holds the programmed data for the pixel, thereby maintaining the intended brightness level for the pixel. Appx3145-3146, ¶70. As Dr. Wolfe explained, because Kimura's Transistor 3 controls the charge flow to that capacitor, it is important that Transistor 3 not allow leakage current, as leakage could alter the intended brightness level by changing the charge stored on the capacitor. *Id.* Notably, Kimura specifically discloses this transistor as being nMOS, and as discussed above, never states or suggests that this transistor (or any other transistor connected to the capacitor in the same way as Transistor 3) could be modified from nMOS to pMOS. *Id.*

### 3. BOE's assertions that the Board erred are meritless.

BOE asserts that the Board erred in four ways in finding that leakage concerns would discourage a POSITA from modifying Kimura's Transistor 3 from nMOS to

pMOS. Each of BOE's arguments lacks merit and disregards considerable evidence of record.

First, BOE's assertion that the Board failed to consider BOE's showing that leakage was not a concern is directly belied by the record. OB 46-47. In the Final Written Decision, the Board block quoted the entirety of BOE's argument and addressed each of BOE's arguments in finding leakage current a consideration that cut against BOE's theory of general interchangeability of transistors. Appx28-31. As the Board correctly noted:

> Petitioner does not dispute that a pMOS transistor would have additional leakage current compared to an nMOS transistor. Nor does Petitioner dispute that this excess leakage current may affect pixel brightness and thus the operation of a pixel circuit for an AMOLED display. Petitioner characterizes this fact as "unimportant."

Appx29. The Board fully considered the record evidence, which included substantial evidence supporting its finding that operational differences cut against BOE's rationale of general interchangeability.

BOE cites Appx607-608, where BOE asserted that leakage "wasn't a meaningful concern," "does 'not necessarily' affect pixel brightness 'in a perceptible manner,'" and that "modest leakage [would be] unimportant." Appx607-608. Again, the Board did not fail to consider BOE's argument. On the contrary, the Board directly quoted and addressed the argument on Appx607-608 in the Final Written Decision. Appx29. Moreover, nowhere does BOE dispute that pMOS transistors

were known to be more susceptible to leakage current than nMOS transistors, or assert that this would present no concern to a POSITA. *Id.* Nor could it, given its expert's confirmation of that known characteristic of pMOS transistors. Appx3843, 98:14-20. BOE's criticism of a 1997 article cited by SDC as further background support for this known characteristic of pMOS transistors similarly misses the point. Indeed, BOE mischaracterizes that article as the "predicate" for the assertion that leakage was a concern, when it was no such thing. BOE neglects to mention, for instance, its expert Dr. Foty's unqualified admission that pMOS transistors were more susceptible to leakage current, as well as Dr. Wolfe's testimony making the same point. Appx3843, 98:14-20; Appx3143-3145, ¶¶63-68. Additionally, BOE raised no concerns about that article in its reply, and failed even to cite to its expert's discussion of the article. It is well established that the Board should not be forced to "play arch[a]eologist with the record." *Parus Holdings, Inc. v. Google LLC*, 70 F.4th 1365, 1372 (Fed. Cir. 2023) (internal quotation marks and citation omitted); *see also, e.g.*, *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017) ("[T]here is no requirement that the Board expressly discuss each and every negative and positive piece of evidence lurking in the record to evaluate a cursory argument."); *Yeda Rsch. and Dev. Co. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1046 (Fed. Cir. 2018) ("[The Board] is not required . . . to address every argument raised by a party or explain every possible reason supporting its conclusion.") (cleaned up).

Second, BOE's assertion that the Board's findings on leakage current lacked substantial evidence is similarly belied by the record, as the foregoing demonstrates. BOE repeats its assertion that neither the '599 Patent nor Kimura specifically discuss leakage, but again fails to acknowledge that the Board addressed and refuted this argument in its final written decision. *See, e.g.*, Appx29 ("Equally misplaced and unpersuasive is Petitioner's argument that neither the '599 patent itself nor Kimura 'say anything about leakage, reflecting it wasn't a meaningful concern.'"). SDC had further refuted this argument in its sur-reply. Appx670-674. BOE is also notably silent regarding its expert's admission that pMOS transistors were known to be more susceptible to leakage current. Appx3843, 98:14-20. BOE asserts that leakage could be addressed by making adjustments to the pixel circuit, OB 49, but fails to explain *why* a POSITA would have been motivated to make the change to a pMOS transistor in the first place, when doing so would necessitate having to make additional modifications as a result. Indeed, the Board found that "[t]he record is devoid of evidence showing countervailing benefits from making this change" (i.e., switching from nMOS to pMOS), Appx32, let alone any motivation to then make the additional changes BOE belatedly argues could be made to account for leakage current.

BOE also erroneously references Kimura's disclosure relating to converting Transistors 1 and 4 to pMOS. OB 49. As discussed above, Kimura's disclosure—which explains that these transistors must be of opposite polarities from one

another—actually reinforces that a POSITA would *not* have had reason to make each transistor in the circuit of Figure 33 (a CMOS circuit) pMOS. *See supra* Section I.A.1. In any event, Kimura's disclosure about Transistors 1 and 4 says nothing about the specific operational considerations for *Transistor 3*, described above, that render leakage current a particular concern for that transistor: Transistors 1 and 4 are not connected to the capacitor, while Transistor 3 is, and that is a relevant difference. Appx3145-3147, ¶¶69-71.

Third, BOE's argument that the Board committed legal error in finding a lack of motivation for the nMOS to pMOS modification is unfounded. OB 51. BOE makes the bare assertion that "there can be no question that BOE's proposed modification was 'suitable.'" *Id.* But BOE overlooks the considerable evidence credited by the Board in reaching its determination that a POSITA would not have been motivated to modify Kimura's Figure 33 circuit to use all pMOS transistors. *See, e.g.*, Appx26-32. Indeed, "obviousness concerns whether a skilled artisan not only could have made but would have been motivated to make the combinations or modifications of prior art to arrive at the claimed invention." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015).

Fourth, BOE's insinuation that the Board imposed a requirement of "complete technical equivalency," OB 55, is refuted by the record. Contrary to BOE's representations, the Board found material operational differences applicable to

Transistor 3, which contradicted BOE's argument that nMOS and pMOS transistors were simply interchangeable. Appx26-29. That finding is supported by substantial evidence, as discussed above.

### B. The Board Correctly Rejected BOE's "incomplete" Theory of Alleged Manufacturing Benefits, which BOE Failed to Develop or Even Argue in Its Reply.

The petition provided a single paragraph positing purported manufacturing benefits in using a single species of transistor, citing an unrelated patent to a different inventor (also coincidentally named Kimura), Kimura '798, with different pixel circuits. Kimura '798 stated in connection with its particular designs that it was "often advantageous" in manufacturing when all of the transistors are of the same type (i.e., have the same polarity). Appx101. In its preliminary response, SDC showed that Kimura '798 was an unrelated reference to a different individual; that BOE failed to explain why or how these statements in an unrelated reference with an entirely different circuit structure would have provided motivation for modifying Kimura's Figure 33 circuit in the manner proposed by BOE; and that Kimura extensively discusses the benefits of its CMOS approach, in which both pMOS and nMOS transistors are utilized, which BOE's proposed modifications would eliminate. *See, e.g.*, Appx508-513; Appx3148-3151, ¶¶74-78. SDC further explained that even if the pixel circuit were changed to be all-pMOS, the drive circuitry Kimura teaches would still utilize CMOS transistors, and Kimura teaches

that the drive circuitry and pixel circuit are manufactured together on the same substrate; as such, the purported manufacturing benefit of using only pMOS transistors that BOE had suggested based on the unrelated reference with different circuits would not be realized in modifying Kimura's circuits. *Id.*

In its institution decision the Board observed that the petition's argument of purported manufacturing benefits was "incomplete," and "Petitioner has not asserted, much less explained, the interchangeability of a CMOS pair of nMOS and pMOS transistors with either two nMOS transistors or two pMOS transistors." Appx298. The Board invited the parties to "further develop this issue subsequent to institution of trial." Appx299.

But rather than address the Board's question about interchangeability of a CMOS pair of nMOS and pMOS transistors with either two nMOS transistors or two pMOS transistors, BOE attempted to change to a new and different theory under the guise of supplemental information. The Board recognized this and rejected BOE's attempt to shift to a new argument. Appx411-412 ("Patent Owner correctly notes that Dr. Foty's proposed supplemental declaration does not answer our questions, and that Petitioner 'does not even attempt to explain how [Dr. Foty's] new opinions are relevant to the Board's questions, which they are not.'"). BOE never answered the Board's question or elaborated on the theory presented in its petition with any additional explanation responsive to the Board's questions.

Substantial evidence supports the Board's finding that "manufacturing benefits" would not motivate a POSITA to make BOE's all-pMOS modification. The record shows that, in the context of Kimura's circuits, there would not be a manufacturing benefit to modifying the circuit of Figure 33 to be all pMOS transistors. Appx32-37; Appx3148-3151, ¶¶74-78. For example, Kimura teaches that its disclosed pixel circuits (the "pixel part")—including the specific embodiments relied upon by BOE—are manufactured and used together with CMOS driver circuits (e.g., for driving the signal line voltages), as part of the same substrate. This can be seen in Figure 14D:

Fig.14D




Appx511, Kimura Fig. 14D (annotated).

Because the CMOS driver circuit and pixel circuits are formed together on the same substrate, the pixel circuits are (like the driver circuit) formed in a process that involves making both nMOS and pMOS transistors. Appx3148-3151, ¶¶74-78. Kimura includes a lengthy disclosure explaining detailed process steps for

manufacturing its CMOS active matrix substrate consisting of both the driver circuit and pixel circuit, which entails the deposition of both nMOS and pMOS TFTs. Appx1000-1008, ¶¶[0502]-[0615]; Appx950-952, Figs. 13-15. Kimura explains that, by following its disclosed processing steps, "as shown in Fig. 14D, the driver circuit portion including the **CMOS circuit composed of the N-channel TFT and the P-channel TFT** and the pixel part including the switching TFT and the drive TFT can be formed on the same substrate." Appx1004, ¶[0547] (emphasis added); *see* Appx1006, ¶[0582]. Further, Kimura touts that following its disclosed *CMOS* processing steps entails a manufacturing advantage—"the process is shortened and it can contribute to the reduction in manufacturing cost and the improvement of a yield." Appx1005, ¶[0571]. Because Kimura's active matrix substrate includes both nMOS and pMOS transistors in the driver portion, an all-pMOS redesign of Figure 33's circuit (which is solely the pixel portion of the substrate) would not result in a substrate containing "all TFTs … of the same type" as Kimura '798 describes for its different circuit. Appx1280, 12:30-49.

In its incomplete and unsupported theory of "manufacturing benefits," BOE never addresses these contradictions with the disclosures of Kimura. Having provided no substantive discussion of this theory in its reply, BOE was asked at oral argument whether it had abandoned the theory. *See* Appx862-863. While BOE stated it had not, it then declined to elaborate on what the Board had already termed its

"incomplete" theory, resting on the single passing reference in the petition that the Board had already indicated in the institution decision was inadequate. *Id*. BOE now argues on appeal that its expert described other benefits of single-species pixel circuits, citing only his reply declaration. OB 57 (citing Appx2189). BOE fails to mention that in its reply to the Board, and in the oral argument, BOE never cited or discussed this portion of its expert's reply declaration. Additionally, his reply declaration discusses purported benefits where all transistors are of the same polarity, not "where those circuits share a substrate with other, mixed transistor-type circuits." *Id.*

BOE argues the Board erred in finding "zero manufacturing benefits," OB 57, but this argument misstates the record. The Board noted that BOE had not developed this argument or addressed the concerns raised in the institution decision regarding this theory, in explaining that BOE had not shown a motivation to make its proposed modifications:

> Despite our inviting the parties to address our concern on Petitioner's second theory, Petitioner chose not to provide any further briefing. Petitioner's Reply does not include any further explanation or clarification. Thus, we continue to have the same concerns and the same doubts with respect to Petitioner's second theory for converting all nMOS transistors in Kimura's Figure 33 embodiment to pMOS transistors on the basis that it would have manufacturing benefits for using transistors of a single species, e.g., nMOS or pMOS, for all of the transistors in the Figure 33 embodiment.

Appx33.

BOE also argues that the Board erred in not allowing BOE to submit "supplemental evidence." OB 58. Initially, BOE's argument is imprecise. BOE filed a motion to submit "supplemental information," not supplemental evidence. Appx356. "[S]upplemental evidence' is a term of art in *inter partes* review proceedings, governed by 37 C.F.R. § 42.64(b)(2). Such evidence is to be served, not filed, and only in response to an evidentiary objection.'" *Azure Gaming Macau, Ltd. v. MGT Gaming, Inc.*, IPR2014-01288, Paper 9, at 3 (PTAB Dec. 4, 2014). "Supplemental information, on the other hand, is evidence a party intends to support an argument on the merits. Such evidence may only be filed if a [37 C.F.R. § 42.123] motion is both authorized and granted." *Handi Quilter, Inc. v. Bernina Int'l AG*, IPR2013-00364, Paper 30 at 2-3 (PTAB June 12, 2014). Thus, as the Board found, the evidence was improper for "presenting new arguments and concepts that are absent from the Petition and Dr. Foty's first declaration," rather than supporting an *existing* argument on the merits. Appx413.

Tellingly, in attempting to explain how the purported supplemental information would have addressed the concerns raised by the Board in the institution decision, BOE tacitly admits that its supplemental information in fact would have presented a new theory not found in the petition. Specifically, in the institution decision, the Board noted that "in addition to the pixel circuit, Kimura discloses a

CMOS driver circuit, separate from the pixel circuit, on **the same semiconductor substrate**," and invited additional development of whether the "manufacturing benefits" rationale supported "an all p-MOS version of Kimura's Figure 33 embodiment." Appx298-299 (emphasis added).

Rather than address this question, the supplemental information sought to introduce a new prior art reference and to present new theories, and additionally sought to describe alleged benefits where the driver circuitry was formed on one substrate and the pixel array was formed on a *separate substrate*. While BOE acknowledges that this was the theory presented in the supplemental information, OB 58-59, it fails to acknowledge that this was a wholly new theory never presented in the petition. BOE further fails to acknowledge that this submission was not responsive to the question actually raised by the Board in the institution decision. BOE's shifting arguments again only underscore the deficiencies in, and lack of support for, the petition's actual theories.

The cases BOE cites for the proposition that a petitioner may *in reply* respond to a patent owner's arguments, are inapposite. OB 59-60. As the Board noted, BOE did *not* raise these arguments in its reply, nor did it even address this theory in its reply. Rather, BOE attempt to inject new arguments under the guise of supplemental information, which the Board properly rejected. If BOE truly thought that these theories were simply further elaboration on the petition's theories offered to rebut

SDC's arguments in its Response, it could have provided them in the Reply. It did not do so, nor did it even raise these theories in the oral argument before the Board.

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S REJECTION OF BOE'S THEORY REGARDING "SHARED CONTROL" OF TWO TRANSISTORS.

The Board's finding that a POSITA would not have been motivated to modify Figure 33's circuit to incorporate a signal line used for "shared control" of two transistors is supported by substantial evidence. The petition was clear that its theory was that the baseline Figure 33 circuit could be modified based on the Figure 36 embodiment to implement shared control. Appx143. The developed record shows, however, that this modification would render the Figure 33 circuit "inoperable," as BOE's expert admitted in deposition. Appx3816-3818, 71:21-72:15, 72:21-73:7. SDC's expert Dr. Wolfe also explained that BOE's proposed modification would render the circuit inoperable. Appx3163-3167, ¶¶97-105. This testimony was cited and credited by the Board. Appx40.

When BOE recognized this fatal defect in its theory, it attempted to argue, inaccurately, that it never intended to rely on Figure 33 for the claims requiring "shared control" and that it instead sought to rely on the separate Figure 36 circuit. BOE resorted to selectively quoting the Board's statements in the institution decision to argue that the Board had requested that BOE present this new argument. The Board—well aware of what it had stated in its institution decision—rejected BOE's

attempts to shift to an entirely new argument. The Board subsequently explained at length that BOE's petition demonstrates that it did not rely on the Figure 36 circuit as a starting point for modification.

### A. BOE's Petition Relies on Figure 33 for the "shared control" Claims.

Limitations of claims 1-6 and claims 13-18 require that the current light-emitting signal is used to control the gates of both of two specified transistors in the pixel circuit (the "fifth" and "sixth" transistors as numbered in claims 1-6, and the "fourth" and "fifth" transistors as numbered in claims 13-18). This limitation was cited among the reasons for allowance of the claims during prosecution. Appx2854-2868; Appx2873.

The petition's theory for the shared "current light-emitting signal" limitations entailed implementing a shared signal line in Kimura's Figure 33 embodiment, as the Board observed in denying BOE's motion to submit supplemental information and rejecting BOE's attempt to shift to a different theory:

> The Petition explains that although the Figure 33 embodiment of Kimura shows the fourth and fifth transistors controlled by different signals, the Figure 36 embodiment of Kimura uses shared light-emitting signal to control the fourth and fifth transistors. Pet. 64-65. On the basis of the use of a shared light emitting signal in the Figure 36 embodiment to control the fourth and fifth transistors, Petitioner concludes that it would have been obvious to use a shared light emitting signal in the Figure 33 embodiment to control the fourth and fifth transistors.

> *Id*. No other modification to the Figure 33 embodiment was proposed by Petitioner to account for this feature.

Appx403-404. As the Board explained, "[n]either the Petition nor the first declaration of Dr. Foty proposed any modification of the Kimura's Figure 33 embodiment, in connection with the shared light emitting signal feature of claim 13, beyond simply applying the same light emitting-signal to the gates of transistors 4 and 5." Appx406.

The Board's finding that the petition's theory for the "shared control" claims was based on Figure 33 is well supported. First, the petition explained that "Petitioner uses the modified 'All-PMOS' version of Fig. 33 for the patentability analysis." Appx102. Indeed, the petition explained that "[t]he baseline circuit for Petitioners' patentability analysis is Kimura Fig. 33."[8] Appx95. BOE never departed from this approach for the "shared control" claims, or otherwise indicated that it was basing its analysis for those claims on a different circuit. As the Board found, "[f]or numerous reasons, Petitioner's obviousness contentions necessarily rely on Kimura's Figure 33 embodiment." Appx41; *see also* Appx42-50 (addressing each of the "numerous reasons").

---

[8] BOE points to a single footnote in the petition suggesting the Figure 36 circuit is "merely an extension" of the Figure 33 circuit, but this footnote provides no analysis of any claim or claim limitation, nor does it address the material differences between these circuits (including in transistors and signal lines).

Second, for the independent claims on which the dependent claims including the "shared control" requirement depend, the petition provided the analysis only based on the Figure 33 circuit. *See, e.g.*, Appx104-128 (relying on Figure 33 embodiment for analysis of independent claim 7). As the Board found in the Final Written Decision, "Petitioner's analysis for claim 7 is tied exclusively to Kimura's Figure 33 embodiment" and "nothing in Petitioner's analysis for claim 13 indicates that Petitioner intended to depart from or otherwise modify its reliance on Figure 33 for teaching the limitations of the base claim." Appx42-43. Notably, and as the Board found, BOE never carried back its analysis or attempted to explain how the independent claims would be met by the different circuit of Kimura's Figure 36. *Id.*

Third, BOE's discussion of other dependent claims confirms that its analysis was based on the Figure 33 circuit, and not the circuit of Figure 36. For example, dependent claim 8 requires the addition of an "initialization transistor." The petition proposes adding such a transistor to Kimura's Figure 33 circuit, noting that Kimura explains that the Figure 33 circuit has a problem with "undesired light emission." Appx131. The petition asserts that adding this transistor would address this light emission problem. *Id.* However, the Figure 36 circuit is provided by Kimura specifically to address the light emission problem of the Figure 33 circuit. Appx1011, ¶¶[0665]-[0666]. There would thus be no purpose in BOE's proposed modification for claim 8 if already starting from the Figure 36 circuit. As the Board

found, "Kimura's Figure 36 embodiment already provides a solution to the undesirable light emission problem," and Patent Owner's explanation was "supported by the cited evidence and not rebutted by Petitioner." Appx45-46.

Indeed, BOE acknowledges that it relied upon the Figure 33 embodiment for its analysis of claim 16. OB 23-24 ("BOE explained that incorporating the initialization transistor from Kimura Figures 16-17 **into Figure 33** would result in adding a dedicated initialization transistor.") (emphasis added). But claim 16 depends from claim 15, which includes the "shared control" requirement. BOE argues that its analysis for the "shared control" requirement is based on the Figure 36 embodiment. *Id*. Thus, BOE argues that the petition should be understood to rely on the Figure 33 embodiment for the analysis of dependent claim 16, but to rely on the Figure 36 embodiment for the analysis of independent claim 15 on which claim 16 depends. This cannot be. BOE's positions cannot be reconciled, and its attempt to recast its petition as relying on the circuit of Kimura's Figure 36 as a starting point results in inevitable internal inconsistencies. The Board provided extensive discussion of flaws in BOE's arguments in the Final Written Decision, concluding that:

> Had Petitioner actually based its analysis of the shared control limitations of the independent claims solely on Kimura's Figure 36 embodiment, then Kimura's ready-made solution to the light emission problem would nullify Petitioner's stated motivation in the context of dependent

> claims 2, 16, and 18, to look to Kimura's Figures 16/17 embodiment to add an initialization transistor.

Appx50.

### B. The Petition's Proposed Modification to the Figure 33 Circuit Would Render the Circuit Inoperable.

As the Board found, a POSITA would have had no motivation to make the petition's proposed modification, nor a reasonable expectation of success in doing so. Indeed, as Dr. Wolfe explained, and Dr. Foty admitted in deposition, BOE's proposed modification would result in an inoperable circuit. Appx3163, ¶97; Appx3816-3818, 71:21-72:15, 72:21-73:7; *see also, e.g.*, Appx884. The Board credited this evidence in finding that "when modifying Kimura's Figure 33 embodiment to have transistors 4 and 5 driven by a shared input signal the resulting circuit does not work or is inoperative for the pixel circuit." Appx40.

In particular, the operation of the circuit in Figure 33 would be frustrated if, as the petition proposes, the alleged fourth and fifth transistors shared a light emitting signal. Appx3163, ¶97. For example, Figure 33B of Kimura depicts an operation stage in which transistor 3307 is OFF, while transistor 3310 is ON:




Appx530, Kimura Fig. 33B (annotated).

In this stage, transistor 3308 is turned ON in preparation for a subsequent stage shown in Fig. 33C. *See, e.g.*, Appx3817, 72:12-18; Appx1011, ¶¶[0655]-[0656]. As BOE's expert admitted, the operation stage shown in Fig. 33B is necessary to the circuit's operation, including to place the circuit in a state required for the subsequent stage. Appx3817-3818, 72:21-73:7 ("And you can't do the programming step unless 3308 is on and can function as is shown in 33B."); *see* Appx3163-3165, ¶¶98-100.

However, under BOE's proposed modification of the Figure 33 circuit, in which transistors 3307 and 3310 are both pMOS and have their gates controlled by the same signal, those transistors would always both be ON or OFF together. Appx3165-3166, ¶¶101-102. Accordingly, the operation stage shown in Figure 33B would be impossible, because it requires transistor 3307 to be OFF while transistor 3310 is ON. *Id.*

The result of BOE's proposed modification would be that either (a) both transistors 3307 and 3310 would be OFF during the stage shown in Fig. 33B, or (b) both transistors 3307 and 3310 would be ON during that stage. Appx3165-3166, ¶¶101-102. Either possibility would result in an inoperable pixel circuit. *Id.*

If both transistors 3307 and 3310 were controlled to be OFF, the operation shown in Fig. 33B could not take place. Appx3166, ¶103. As shown in Fig. 33B, transistor 3310 must be ON in order for transistor 3308 to turn ON. Appx3165-3166, ¶102; *see also* Appx1091, ¶133. Thus, as Dr. Wolfe explains, if both transistors 3307 and 3310 were controlled to be OFF, the stage shown in Fig. 33B could not occur; it would instead collapse into the stage shown in Fig. 33C (in which both transistors 3307 and 3310 are OFF). Appx3165-3166, ¶¶102-103.

Similarly, if both transistors 3307 and 3310 were controlled to be ON, the operation of the circuit would be disrupted. This would allow VDD to be input through transistor 3307 while VData is input to the circuit through transistor 3306. Providing both signals during this stage would disrupt the pixel circuit's operation and cause numerous potential issues. Appx3166-3167, ¶¶104-105. As discussed, Kimura recognizes its Figure 33 design is prone to unwanted light emission outside of the light-emission stage. The additional current flowing to the OLED in Petitioner's proposed modification would cause further unwanted light emission during a non-emission stage, exacerbating the problem. *Id.*, ¶105. Providing VDD

in addition to VData would also lead to potential problems with compensation. *Id.* BOE's Dr. Foty admitted in deposition that providing both VDD and VData to the circuit during this operation stage "would make no sense," "would be a bad idea," and might lead to "too much current through the electroluminescent element and damage it." Appx3816-3817, 71:2-72:15.

Simply put, as Dr. Wolfe explained, the Figure 33 circuit would not operate correctly under BOE's proposed modifications. Appx3163-3167, ¶¶97-105. As he explained, and as the Board credited, a POSITA would have had no motivation to make those modifications, and would not have had any reasonable expectation of success in making them. *Id.*; *see, e.g.*, Appx40

### C. The Board Correctly Rejected BOE's Attempts to Shift to an Entirely New Theory Based on the Figure 36 Embodiment.

Recognizing the clear flaw in the Petition's theory, BOE subsequently sought to switch to a different theory that argued for modifying a different circuit in Kimura, Kimura's Figure 36 embodiment. BOE first attempted to inject this new theory in its motion to submit supplemental information, and again later in its reply. As the Board recognized and found, these arguments constituted improper attempts to change to new and different obviousness arguments that were not set forth in the Petition. In its reply, BOE introduced over ten pages of new testimony, Appx2202-2213, ¶¶55-71, and attempted to satisfy the shared light-emitting signal claims by citing to the

*Figure 36 embodiment in its entirety*, including "the 'extra' transistor (circled in red) in Fig. 36B," Appx618:




*Petitioner's Annotations to Figs. 33B/36B (Reply at 17)*

This attempt to rely on the "extra" transistor circled in red—i.e., TFT 3612—was effectively the same new theory that BOE attempted to introduce in its Motion to Submit Supplemental Information. In denying that motion, the Board agreed that the "supplemental declaration relies on an *additional transistor from Figure 36, transistor 3612*, which was neither referenced nor discussed in the Petition or Dr. Foty's original declaration with respect to claim 13." Appx406. As the Board explained, the "additional modifications **including adding another transistor,** are new and not in any way addressed or referred to in the Petition or Dr. Foty's first

declaration." Appx406-407 (emphasis added). BOE did not move for rehearing, nor have any basis to do so. Yet BOE attempted in reply to change its obviousness theory to one based on the same modifications the Board had already explained were "new and not in any way addressed or referred to in the Petition or Dr. Foty's first declaration." *Id.*

In doing so, BOE tried to claim that the Board "invited" it to assert a new theory based on the Figure 36 circuit and its "extra" transistor 3612:

> At institution, the Board agreed but observed that Fig. 36 "[uses] six transistors, not five as in the case of the Figure 33 embodiment," and invited the parties to develop the record on whether the "<u>Figure 36 embodiment, would still meet all the requirements of the first, second, third, fourth, and fifth transistor</u>" in base claim 7. ID, 51-52. The unequivocal answer is "yes."

Appx615 (emphasis added). The Board never invited such a change, as its opinions amply demonstrate. BOE relied on a selective quotation of only a portion of the Board's statement, purposefully omitting the portion shown below in bold, with the selective quotation underlined:

> **It is questionable whether the Figure 33 embodiment, after being modified to make the fourth and fifth transistor always turn on and off together, as Petitioner proposes based on the** <u>Figure 36 embodiment, would still meet all the requirements of the first, second, third, fourth, and fifth transistor</u>, as recited in claim 7. Based on the present record, we find that Petitioner has not provided an adequate explanation as to this potential discrepancy.

Appx318-319 (emphasis added). Considering the entirety of the Board's instruction, it is clear that the Board properly rejected BOE's attempt to shift to an entirely new argument. *See also Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330 (Fed. Cir. 2019) ("Because of the expedited nature of IPR proceedings, it is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify with particularity the evidence that supports the grounds for the challenge to each claim.") (cleaned up).

While BOE suggests that switching from an argument about modifying Kimura's Figure 33 embodiment to a different theory about modifying Kimura's distinct circuit of Figure 36 was not a "new direction," the Board carefully and thoroughly explained that BOE was attempting to raise a new theory. Appx40-50. Moreover, BOE's analysis in the petition itself demonstrates the flaws in BOE's argument on appeal. For example, BOE acknowledges that it relies upon Kimura's Figure 33 embodiment for its analysis of dependent claim 16. OB 23-24 ("BOE explained that incorporating the initialization transistor from Kimura Figures 16-17 **into Figure 33** would result in adding a dedicated initialization transistor.") (emphasis added). But claim 16 depends from independent claim 15, which includes the "shared control" requirement. BOE argues that its analysis for the "shared control" requirement is based on the Figure 36 embodiment. Thus, as the Board found, BOE is in the position of arguing that the petition should somehow be

understood to rely on modifying the Figure 33 embodiment for the analysis of dependent claim 16, but to rely on modifying the different circuit of the Figure 36 embodiment for the analysis of independent claim 15 on which claim 16 depends. Appx49-50. An APJ highlighted this very inconsistency in BOE's position at oral argument, explaining that BOE's position cannot be reconciled with its actual petition:

> So because we're focusing on 33, then that's inconsistent with what you're telling us now, that, well, actually you were relying on Figure 36 for the common control. So these two things can't happen at the same time. Either you relied on Figure 36 or you relied on a modification of Figure 33 based on Figure 36. You can't be at the same time telling us, oh, for the common control, I'm using all of Figure 36, no modification, Figure 33. And then when you get to this dependent claim, which adds another limitation, you go, oh, here, you know, I'm back to Figure 33 again. It doesn't compute in my mind. You can't take me to 36 and say, that's all of it. And now take me back and say, well, now I'm modifying Figure 33. You're clearly modifying Figure 33 now for this initialization feature.

Appx890.

### D. The Board Did Not Err in Rejecting BOE's New Arguments Based on Figure 36.

BOE argues on appeal that the Board erred in not crediting its new argument based on the Figure 36 circuit. OB 69. BOE attempts to argue that the petition's theory was always based on the Figure 36 circuit, despite the clear record to the contrary discussed above. The Board correctly rejected BOE's "supplemental

information" seeking to pivot to a new theory based on Figure 36 for the same reasons. Appx403-407. BOE suggests that "[i]t is difficult to see what more BOE could have done to convey its substantive analysis," OB 66-67, but this rhetoric cannot be squared with the Board's thorough discussion of this issue. If it was truly BOE's intention to rely on modification of the Figure 36 embodiment, BOE could have provided in its petition an analysis based on the Figure 36 circuit for each element of the challenged claims for which it intended to rely on the Figure 36 embodiment—something it did not do, as the Board explained. Appx40-50. Instead, BOE chose in its petition to rely on the "baseline" circuit of Figure 33 to challenge all claims, and provided analysis of the independent claims of the 599 Patent exclusively with respect to that circuit, not the circuit of Figure 36.

Contrary to BOE's assertion, the Board did not require any particular "magic words"; rather, it properly held BOE to the grounds it presented in its petition. *See Netflix, Inc. v. DivX, LLC*, 80 F.4th 1352, 1359-60 (Fed. Cir. 2023). Indeed, the Board provided more than 8 pages of analysis explaining in detail that the petition's theory was based on the Figure 33 circuit, after this issue had been extensively discussed in the oral argument. Appx42-50; Appx879-893. BOE's reliance on *Apple Inc. v. Andrea Elec's Corp.* is misplaced for the same reasons.

## III. THE BOARD DID NOT ABUSE ITS DISCRETION IN DENYING BOE'S ATTEMPT TO PROVIDE NEW ARGUMETN UNDER THE GUISE OF SUPPLEMENTAL INFORMATION.

Faced with the significant flaws in the petition identified by SDC and the Board, BOE sought to shift to new arguments through its motion to provide "supplemental information." The Board correctly found that BOE's submission sought to provide new arguments rather than to provide additional detail regarding the petition's actual theories. Appx397-413. The Board did not abuse its discretion in rejecting BOE's improper new arguments.

### A. The Board Properly Rejected BOE's Attempt to Provide New Argument as Supposed Supplemental Information.

"[W]hether the Board grants a motion to submit supplemental information … 'depend[s] upon the Boards [sic] determination that, in its discretion, the action sought by the movant is consistent with the Boards [sic] statutory mandate.'" *Redline Detection*, 811 F.3d at 444 (quoting *Redline Detection, LLC v. Star Envirotech, Inc.*, IPR2013-00106, Paper 35, at 4 (PTAB Sept. 11, 2013)). As this Court has noted, "[t]he guiding principle for the PTAB in making any determination is to 'ensure efficient administration of the Office and the ability of the Office to complete IPR proceedings in a timely manner.'" *Id.* at 446. "Additionally, the PTAB has discretion to grant or deny motions as it sees fit." *Id*. at 446-47.

Consistent with *Redline Detection*, the Board has routinely denied motions to submit supplemental information "where," as here, "the petitioner sought to use the

supplemental information to refine or bolster challenges originally presented in the petition, based on information in the preliminary response or institution decision." *Am. Well Corp. v. Teladoc Health, Inc.*, IPR2021-00748, Paper 23, at 6-7 (PTAB Feb. 28, 2022) (collecting cases).

As the Board has explained, "[s]upplemental information is not intended to provide a petitioner an advantageous 'wait and see' opportunity to use a patent owner's preliminary response and [the] decision on institution in order to refine or bolster petitioner's position." *Ooma, Inc. v. Deep Green Wireless LLC*, IPR2017-01541, Paper 14, at 3-4 (PTAB Jan. 23, 2018). Yet BOE sought to file what amounted to a 36-page supplemental petition advancing new theories and new evidence of supposed unpatentability—and circumventing the Board's word count limits—after SDC and the Board identified deficiencies in the petition's theories. The Board properly rejected the proposed supplemental information, and did not abuse its discretion in so doing.

BOE argues that the Board abused its discretion in not allowing it to present new argument regarding the "initialization transistor" limitation of certain challenged claims. OB 76. BOE's argument, which is twofold, is meritless. First, BOE argues that the "supplemental information" is necessary to correct a supposed error in the Board's finding that the theory set forth in BOE's petition was premised on conflating the concepts of initialization with erasure. OB 77-78. But the Board

did not make any error, as discussed further below. Second, BOE argues that the "supplemental information" was needed to make clear that Kimura's initialization and erasure periods overlap. *Id*. Neither argument has merit. But BOE fails to mention that it also made this argument in its reply and thus already presented its evidence to the Board that the two periods overlap. *See, e.g.*, Appx626-627. There is accordingly no need for any additional "supplemental information" to be considered on this issue.

As to BOE's first argument, there was no error in the Board's finding, let alone an abuse of discretion by the Board in declining to allow BOE to change its theory. Appx410. Kimura describes "initialization" and "erasure" as distinct functions. Appx407-408; Appx3152-3156, ¶¶81-85. Kimura describes "initialization" as applying a default voltage ("VReset") to a capacitor or gate electrode. Appx995, ¶¶[0425]-[0426], whereas "erasure" is described as "forcibly plac[ing] [the EL device] in a non-light-emitting state." Appx994, ¶[0410]. The petition, however, conflated these two concepts. *See, e.g.*, Appx98, n.4 ("Initialization" . . . "Kimura also calls this . . . 'erasure' (see [0658])."). Indeed, BOE's obviousness theory was based on this conflation. As the Board found, BOE's petition "reli[ed] on the use of the fifth transistor in Figure 33 as an **erasure** transistor to account, at least in part, for the **initialization** transistor of claim 8." Appx410 (emphasis added). The Board did not abuse its discretion in not allowing BOE to

"switch to sole reliance on Kimura's disclosure of initialization/reset transistor 1607 in Kimura's Figures 16 and 17." *Id.*

While the petition's theory required taking an "initialization" transistor from the Figure 16-17 circuit and adding it to the Figure 33 circuit, Appx131-133, the petition's sole basis for why an initialization transistor "is readily applicable to the baseline circuit of Fig. 33" and could be placed where BOE proposed was based on equating erasure and initialization. Appx132-133 (arguing that Kimura teaches "the **erasure [transistor]** can be placed in any location, provided that it is a location at which electric current supplied to the EL device can be cut off at an arbitrary timing" and "[t]hus a POSITA would have been motivated to place the **initialization transistor**" as BOE proposed) (emphasis added).

Thus, as the Board found, the petition's theory assumed the "erasure" and "initialization" transistors operate in the same way. Appx315-316 (finding that "Petitioner grounds its reasoning for claim 8 on [the] theory" that "initialization and erasure are the same"). Specifically, the petition's theory was that the "initialization" transistor 1607 and the "erasure TFT" 3310 were supposedly analogous, including because they both allegedly served to initialize or reset the capacitor to a specific default initialization voltage. *See* Appx131; Appx133; Appx159. There is no merit to BOE's attempt to argue that the petition's theory was not based on the sentence from Kimura that BOE cited in the petition, but instead was proposing more

abstractly to adopt "the approach disclosed in Kimura's Figure 16-17" with Kimura's Figure 33 circuit. OB 77. The Board correctly assessed the argument that BOE made in the petition, and was well within its discretion in rejecting BOE's attempt to change its theory.

Underlying BOE's dogged efforts to change positions is its recognition that the petition's theory was based on an inaccurate premise. Kimura does not describe Figure 33 or its erasure TFT 3310 as involving such resetting of the capacitor to a default voltage. Appx3152-3153, ¶82. Although "initialization" and "erasure" in Kimura are separate concepts, BOE continues to base its proposed modifications to the Figure 33 circuit on a mistaken premise that "initialization" and "erasure" are the same. Indeed, BOE continues to mischaracterize the reference in arguing that "Kimura Figure 33 already disclose[s] . . . reset[ting] the capacitor voltage to a default initialization value." OB 77. BOE cites to Paragraph 658 of Kimura as its basis for this assertion, *id.* at 9, but this paragraph makes no mention of the capacitor or of initialization, *see, e.g.*, Appx203; Appx3152-3153, ¶82.

Moreover, even if some voltage from the capacitor may "discharge" through TFT 3310, Kimura does not teach or suggest that the transistor is being used to initialize the capacitor to a default voltage. Rather, as Dr. Wolfe explained, Figure 33B shows "the first phase of the capacitor programming" in which "there appears to be some discharging of that node [the capacitor]" but "there's also this VData

coming in" (i.e., the programming data voltage). Appx2096-2097, 203:4-5, 203:20, 205:6. Hence, the current flow (and the voltage on the capacitor) "depend[s] on . . . the value of Vdata and the relative resistivity of the four transistors." Appx2097, 205:15-206:2. The result of the step shown in Figure 33B is not initialization, but rather brining the capacitor to an indeterminate voltage.

Confronted with the fact that initialization and erasure are actually different in Kimura, BOE sought to present a new interpretation of Kimura. Appx397. In BOE's proposed supplemental declaration, its expert Dr. Foty stated that "my opinion is based on the initialization period … rather than the optional additional erasure period." Appx1915-1916, ¶36. BOE's apparent acknowledgement that initialization and erasure are <u>not</u> the same starkly contrasted with the petition and Dr. Foty's original declaration, which definitively equated these operations. *See, e.g.*, Appx98, n.4 ("Kimura also calls [initialization]…'erasure' (*see* [0658])); Appx1145-1150, ¶¶224-230 (repeatedly referring to an "initialization/erasure operation" and "initialization/erasure transistor").

As the Board recognized in denying BOE's motion to submit supplemental information, this was a new theory. The Board explained:

> It is only based on Petitioner's identification of an undesirable consequence of using the fifth transistor **as an erasure transistor** that Petitioner proposes a modification to incorporate an additional transistor from Kimura's embodiment of Figure 16 and 17, into Kimura's Figure 33 embodiment to reset the capacitor voltage. **Petitioner may**

> **not now divorce itself from its original reliance on the use of the fifth transistor in Figure 33 as an erasure transistor to account, at least in part, for the initialization transistor** of claim 8, **and switch to sole reliance on Kimura's disclosure of initialization/reset transistor 1607 in Kimura's Figures 16 and 17. This change is significant,** and substantially alters, if not completely eliminates, Petitioner's initial reasoning to use transistor 1607 in Kimura's Figures 16 and 17.

Appx409-410 (citing Appx131-136) (emphasis added).

The Board's finding that the "supplemental information" constituted new argument was solidly rooted in and supported by the record. The Board did not abuse its discretion in (i) not allowing BOE to "switch to sole reliance on Kimura's disclosure of initialization/reset transistor 1607 in Kimura's Figures 16 and 17," which "substantially alters, if not completely eliminates, Petitioner's initial reasoning," Appx410, and (ii) denying BOE's motion.

Even if the substance of BOE's initialization argument were to be considered, it is fundamentally undermined by Kimura's teachings and without merit. The very portion of Kimura that BOE relies on as to why an initialization transistor "is readily applicable to the baseline circuit of Fig. 33" and could be placed where BOE proposed, Appx131-133, explains that "the erasure [transistor] can be placed in any location" only "provided that it is a location **at which electric current supplied to the EL device can be cut off** at an arbitrary timing." Appx1011, ¶[0658] (emphasis added). However, BOE's expert Dr. Foty admitted during deposition that the

"initialization" transistor he seeks to add would *not* "cut off" current flow to the EL element. *See* Appx3865, 120:5-15; *see also* Appx3156-3157, ¶¶86-87.

Dr. Foty then attempted to shift to a new strained assertion that a transistor *that plays no role in cutting off current* can still be an "erasure TFT" as long as it does not "*prevent* the cutting-off of the flow of current . . . via the actions of the other parts of the circuitry." Appx2221-2222, ¶85 (emphasis in original). However, this finds no support in Kimura, or in the record, and is belied by Kimura's teaching as to the meaning of "erasure" and the location of an "erasure" transistor. Appx1011, ¶[0658].

## CONCLUSION

For the foregoing reasons, the Court should affirm the Board's thorough and well-reasoned Final Written Decision finding that BOE has not shown any claim of the '599 Patent to be unpatentable.

Dated: July 30, 2025

Respectfully submitted,

/s/ *Jeffrey H. Lerner*

Jeffrey H. Lerner
Scott C. Weidenfeller
Richard L. Rainey
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St NW
Washington, DC 20001
(202) 662-6000

*Counsel for Appellee*
*Samsung Display Co., Ltd.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1426

**Short Case Caption:** Mianyang BOE Optoelectronics Technology Co., Ltd. v. Samsung Display Co., Ltd.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,890 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 07/30/2025

Signature: /s/ Jeffrey H. Lerner

Name: Jeffrey H. Lerner